BRITISH STEEL PLC, Plaintiff,

v.

UNITED STATES, Defendant.

USINAS SIDERURGICAS de MINAS GERAIS, S.A., et al., Plaintiffs,

v.

UNITED STATES, Defendant.

INLAND STEEL INDUSTRIES, INC., et al., Plaintiffs,

v.

UNITED STATES, Defendant.

LTV STEEL CO., INC., et al., Plaintiffs,

v.

UNITED STATES, Defendant.

LACLEDE STEEL CO., et al., Plaintiffs,

v.

UNITED STATES, Defendant.

LUKENS STEEL CO., INC., et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Slip Op. 95–17.
Court Nos. 93–09–00550–CVD, 93–09–00558–CVD, 93–09–00567–CVD through 93–09–00570–CVD.

United States Court of International Trade.

Feb. 9, 1995.

Regarding British Steel plc v. United States, Consol. Court No. 93–09–00550–CVD: Steptoe & Johnson (Richard O. Cunningham, Peter Lichtenbaum), (Sheldon E. Hochberg, William L. Martin, II), on brief, (Richard O. Cunningham, Sheldon E. Hochberg), on oral argument, for British Steel plc; Morgan, Lewis & Bockius (Mark R. Joelson), (Marcela B. Stras, Roger C. Wilson), on brief, for the Government of the United Kingdom, et al.; Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, John R. Magnus, Jeffrey D. Nuechterlein, Guy C. Smith, Philip Karter), on brief, (John A. Ragosta, Martha J. Talley, Philip Karter), on oral argument, for Geneva Steel, et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance, Barry J. Gilman), on brief, (D. Scott Nance, Barry J. Gilman), on oral argument, for Geneva Steel, et al.

Regarding Usinas Siderurgicas de Minas Gerais, S.A., et al. v. United States, Consol. Court No. 93–09–00558–CVD: Willkie Farr & Gallagher (Christopher S. Stokes), (William H. Barringer, Nancy A. Fischer), on brief, (Christopher S. Stokes), on oral argument, for USIMINAS; Dickstein Shapiro & Morin (Arthur J. Lafave, III, Douglas N. Jacobson), for Companhia Siderurgica Nacional; Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan), (Barry J. Gilman, D. Scott Nance), on brief, (Barry J. Gilman, D. Scott Nance), on oral argument, for Gulf States Steel, Inc., et al.; Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, John R. Magnus, Guy C. Smith, Jeffrey D. Nuechterlein), on brief, (John A. Ragosta), on oral argument, for Gulf States Steel, Inc., et al.

Regarding Inland Steel Industries, Inc. et al. v. United States, Consol. Court No. 93–09–00567–CVD: Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, John R. Magnus, Jeffrey D. Nuechterlein), on brief, (John A. Ragosta, Martha J. Talley, John R. Magnus), on oral argument, for Inland Steel Indus., Inc., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (Barry J. Gilman, D. Scott Nance), on oral argument, for Inland Steel Indus., Inc., et al.; Weil, Gotshal & Manges (Stuart M. Rosen), (M. Jean Anderson, Jeffrey P. Bialos, Diane M. McDevitt, Scott Maberry; and Stuart M. Rosen, Mark F. Friedman, Jonathan Bloom), on brief, (M. Jean Anderson, Stuart M. Rosen), on oral argument, for Usinor Sacilor, Sollac and GTS.

Regarding LTV Steel Co., Inc., et al. v. United States, Consol. Court No. 93–09–00568–CVD: Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Jeffrey D. Nuechterlein, Guy C. Smith, O. Julia Weller), on brief, (John A. Ragosta, Martha J. Talley, O. Julia Weller), on oral argument, for LTV Steel Co., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument, for LTV Steel Co., et al.; Sharretts, Paley, Carter & Blauvelt, P.C. (Gail T. Cumins), for Thyssen Stahl AG, et al.; LeBoeuf, Lamb, Greene & MacRae, L.L.P. (Pierre F. de Ravel d'Esclapon, Mary Patricia Michel), for AG der Dillinger Hüttenwerke; Hogan & Hartson (Lewis E. Leibowitz), for Fried, Krupp AG Hoesch–Krupp, et al.

Regarding Laclede Steel Co., et al. v. United States, Consol. Court No. 93–09–00569–CVD: Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, John R. Magnus, Jeffrey D. Nuechterlein), on brief, (John A. Ragosta, Martha J. Talley), on oral argument, for Laclede Steel Co., et al. Armco Steel Co., et al. and Bethlehem Steel Corp., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument,

for Laclede Steel Co., et al., Armco Steel Co., et al., and Bethlehem Steel Corp., et al.; Morrison & Foerster (Donald B. Cameron), (Julie C. Mendoza, Craig A. Lewis, M. Diana Helweg, Sue–Lynn Koo, Carl R. Sanchez), on brief, (Donald B. Cameron, Julie C. Mendoza), on oral argument, for Dongbu Steel Co., et al.

Regarding Lukens Steel Co., et al. v. United States, Consol. Court No. 93–09–00570–CVD: Dewey Ballantine (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Jeffrey D. Nuechterlein, Guy C. Smith, Scott L. Forseth), on brief, (John A. Ragosta, Martha J. Talley, Scott L. Forseth), on oral argument, for Lukens Steel Co., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument, for Lukens Steel Co., et al.; Shearman & Sterling (Jeffrey M. Winton), (Robert E. Herzstein, Joseph A. Jiampietro), on brief, for Altos Hornos de Mexico, S.A. de C.V.

Regarding Geneva Steel, et al. v. United States, Consol. Court No. 93–09–00566–CVD: Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Michael R. Geroe), on brief, (John A. Ragosta, Martha J. Talley, Michael R. Ge-

roe), on oral argument, for Geneva Steel, et al.; Barnes, Richardson & Colburn (Gunter von Conrad), for Fabrique de Fer de Charleroi, S.A.; LeBoeuf, Lamb, Greene & MacRae (Melvin S. Schwechter), for S.A. Forgess de Clabecq; O'Melveny & Myers (Peggy A. Clarke), for Sidmar N.V. and TradeARBED, Inc.

Regarding Empresa Nacional Siderurgica, S.A. v. United States, Consol. Court No. 93–09–00625–CVD: George V. Egge, Jr., P.C. (George V. Egge, Jr.), for Empresa Nacional Siderurgica, S.A., et al.; Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Scott L. Forseth), on brief, (John A. Ragosta, Martha J. Talley, Scott L. Forseth), on oral argument, for Bethlehem Steel Corp., et al.

Frank W. Hunger, Asst. Atty. Gen. of the U.S.; David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, (A. David Lafer), (Marc E. Montalbine, Jeffrey M. Telep), on brief; Stephen J. Powell, (Terrence J. McCartin, Robert E. Nielsen, David W. Richardson, Elizabeth C. Seastrum, Marguerite Trossevin), on brief, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel, for defendant.

## Table of Contents

Introduction ......................................................... 1261

Standard of Review ................................................. 1263

Section One: Privatization ......................................... 1263
 I. Certain Steel Products From Mexico ........................ 1264
 Background ............................................... 1264
 Contentions of the Parties ............................... 1266
 A. *The Foreign Producers* ........................ 1266
 B. *The Domestic Producers* ....................... 1267
 C. *The Department of Commerce* ................... 1268
 Discussion ............................................... 1270
 II. Certain Steel Products from Brazil ....................... 1277
 Background ............................................... 1277
 Contentions of the Parties ............................... 1278
 A. *The Foreign Producers* ........................ 1278
 B. *The Domestic Producers* ....................... 1278
 C. *The Department of Commerce* ................... 1279
 Discussion ............................................... 1279
 III. Certain Steel Products from the United Kingdom ........... 1280
 Background ............................................... 1280
 Contentions of the Parties ............................... 1280
 A. *The Foreign Producers* ........................ 1280
 B. *The Domestic Producers* ....................... 1281
 C. *The Department of Commerce* ................... 1281
 Discussion ............................................... 1282
 IV. Certain Steel Products from Germany ...................... 1283
 Background ............................................... 1283

CONTENTIONS OF THE PARTIES .......................................... 1284
 A. *The Domestic Producers* ........................................ 1284
 B. *The Foreign Producers* ........................................ 1284
 C. *The Department of Commerce* .................................... 1285
DISCUSSION ......................................................... 1285
V. MOTION FOR SUMMARY JUDGMENT BASED ON ISSUE PRECLUSION ...................... 1288
CONCLUSION ........................................................ 1288

SECTION TWO: ALLOCATION METHODOLOGY ..................................... 1289
 BACKGROUND ...................................................... 1289
 ISSUE PRESENTED .................................................. 1290
 CONTENTIONS OF THE PARTIES ........................................ 1290
 A. *Plaintiffs* ........................................... 1290
 B. *Defendant* ........................................... 1292
 C. *Defendant–Intervenors* ................................... 1292
 DISCUSSION ...................................................... 1293
 CONCLUSION ...................................................... 1298

SECTION THREE: THE GRANT METHODOLOGY .................................... 1299
 BACKGROUND ...................................................... 1300
 A. *The Rate of Return Shortfall Method* ............................ 1300
 B. *The Grant Methodology* ...................................... 1300
 C. *Equity Infusions in Brazil, France, and Korea* .................... 1301
 ISSUES PRESENTED .................................................. 1302
 CONTENTIONS OF THE PARTIES ........................................ 1302
 A. *Plaintiffs* ........................................... 1302
 B. *Defendant* ........................................... 1304
 C. *Defendant–Intervenors* ................................... 1305
 DISCUSSION ...................................................... 1306
 A. *Commerce's Abandonment of the RORS Methodology* ................. 1306
 B. *Commerce's Adoption of the Grant Methodology* .................... 1307
 CONCLUSION ...................................................... 1309

SECTION FOUR: SALES DENOMINATOR ....................................... 1310
 BACKGROUND ...................................................... 1310
 ISSUE PRESENTED .................................................. 1311
 CONTENTIONS OF THE PARTIES ........................................ 1311
 A. *Plaintiffs* ........................................... 1311
 B. *Defendant* ........................................... 1312
 C. *Defendant–Intervenors* ................................... 1314
 DISCUSSION ...................................................... 1315
 A. *Agency Explanation of the Tying Presumption* .................... 1315
 B. *Adoption of the Tying Presumption* ............................ 1316
 C. *Motion to Strike Portions of Plaintiffs' Reply Brief* ................ 1317
 D. *Motion to Strike Plaintiffs' Supplemental Memorandum* .............. 1318
 CONCLUSION ...................................................... 1319

SECTION FIVE: DISPROPORTIONALITY ....................................... 1320
 BACKGROUND ...................................................... 1320
 CONTENTIONS OF THE PARTIES ........................................ 1322
 A. *The Korean Respondents* ...................................... 1322
 B. *The Department of Commerce* .................................... 1323
 C. *The Domestic Producers* ...................................... 1324
 DISCUSSION ...................................................... 1324
 CONCLUSION ...................................................... 1328

---

**OPINION**

CARMAN, Judge:

The following actions were consolidated by order of the Court of International Trade (CIT) dated February 4, 1994: *British Steel plc v. United States,* Court No. 93–09–00550–CVD and *Geneva Steel, et al. v. United States,* Court No. 93–09–00572–CVD consoli- dated as *British Steel plc v. United States,* Consol. Court No. 93–09–00550–CVD; *Usinas Siderurgicas de Minas Gerais, S.A. v. United States,* Court No. 93–09–00558–CVD, *Gulf States Steel, Inc. of Alabama, et al. v. United States,* Court No. 93–09–00574–CVD, and *Usinas Siderurgicas de Minas Gerais, S.A. v. United States,* Court No. 93–09–

00578–CVD consolidated as *Usinas Siderurgicas de Minas Gerais, S.A. v. United States,* Consol. Court No. 93–09–00558–CVD; *Inland Steel Industries, Inc., et al. v. United States,* Court No. 93–09–00567–CVD, *Usinor Sacilor, et al. v. United States,* Court No. 93–09–00588–CVD, *Usinor Sacilor, et al. v. United States,* Court No. 93–09–00589–CVD, *Usinor Sacilor, et al. v. United States,* Court No. 93–09–00590–CVD, and *Usinor Sacilor, et al. v. United States,* Court No. 93–09–00591–CVD consolidated as *Inland Steel Industries, Inc., et al. v. United States,* Consol.Court No. 93–09–00567–CVD; *LTV Steel Co., Inc., et al. v. United States,* Court No. 93–09–00568–CVD, *Thyssen Stahl AG, et al. v. United States,* Court No. 93–09–00585–CVD, *AG der Dillinger Hüttenwerke v. United States,* Court No. 93–09–00596–CVD, and *Fried, Krupp AG Hoesch–Krupp and Krupp Hoesch Stahl AG v. United States,* Court No. 93–09–00603–CVD consolidated as *LTV Steel Co., Inc., et al. v. United States,* Consol.Court No. 93–09–00568–CVD; *Laclede Steel Co., et al. v. United States,* Court No. 93–09–00569–CVD, *Pohang Iron & Steel Co., Ltd. v. United States,* Court No. 93–09–00579–CVD, *Dongbu Steel Co. Ltd., et al. v. United States,* Court No. 93–09–00580–CVD, *Dongbu Steel Co. Ltd., et al. v. United States,* Court No. 93–09–00581–CVD, and *Pohang Iron & Steel Co., Ltd. v. United States,* Court No. 93–09–00582–CVD consolidated as *Laclede Steel Co., et al. v. United States,* Consol.Court No. 93–09–00569–CVD; *Lukens Steel Co., et al. v. United States,* Court No. 93–09–00570–CVD, *Altos Hornos de Mexico, S.A. de C.V. v. United States,* Court No. 93–09–00618–CVD, and *Industrias Monterrey S.A. de C.V. v. United States,* Court No. 93–09–00632–CVD consolidated as *Lukens Steel Co., et al. v. United States,* Consol.Court No. 93–09–00570–CVD; [1] and *Geneva Steel, et al. v. United States,* Court No. 93–09–00566–CVD and *Fabrique de Fer de Charleroi v.*

*United States,* Court No. 93–09–00599–CVD, consolidated as *Geneva Steel, et al. v. United States,* Consol.Court No. 93–09–00566–CVD.[2]

After several scheduling conferences and upon review and consideration of the minutes of the December 15, 1993, scheduling conference and upon agreement of all parties and pursuant to U.S. CIT R. 42(a), the Court entered the scheduling order governing the joint proceeding in the above-captioned cases. As a convenience to the parties, the Court used *British Steel plc v. United States,* Consol.Court No. 93–09–00550–CVD to identify this joint proceeding and to establish the guidelines set forth in the February 18, 1994 scheduling order. In accordance with that order, the parties were jointly ordered to brief five general issues which were divided into two groups. General Issues—Group One pertains to: (a) the Department of Commerce's use of a fifteen-year allocation period to determine the benefit from several nonrecurring countervailable grants; (b) the Department of Commerce's use of a grant methodology to countervail equity infusions into an unequityworthy company whose shares are not publicly traded; and (c) the Department of Commerce's treatment of privatization and restructuring regarding previously received subsidies, including the Department's use of a repayment methodology. General Issues—Group Two pertains to: (a) the Department of Commerce's determination of the appropriate sales denominator to be used in subsidy calculations when a respondent's total sales include not only sales of domestically produced merchandise, but also sales of merchandise produced in one or more foreign countries; and (b) the Department of Commerce's treatment of disproportionality for the purpose of evaluating the specificity of a potentially countervailable program. The Scheduling Order directed all questions of law and issues of fact regarding the five general issues to be briefed solely in

---

**1.** *Industrias Monterrey S.A. de C.V. v. United States,* Court No. 93–09–00632–CVD, was consolidated under *Lukens Steel Co., et al. v. United States,* Consol. Court No. 93–09–00570–CVD, by order of this Court on December 9, 1994.

**2.** The Court notes that *Empresa Nacional Siderurgica, S.A. v. United States,* Court No. 93–09–00625–CVD, was also a part of this joint pro

ceeding. *See British Steel plc v. United States,* Consol.Court No. 93–09–00550–CVD at 11 (CIT Feb. 18, 1994) (scheduling order). The Court further notes that the parties represented in *Empresa Nacional Siderurgica, S.A. v. United States,* Court No. 93–09–00625–CVD, filed a voluntarily stipulated dismissal pursuant to which that action was dismissed on January 25, 1995.

the context of the briefs on these issues. All parties were prohibited from re-briefing or re-arguing any of these questions or issues in the context of the briefs on the country-specific issues. The Court has jurisdiction over all of these matters pursuant to 28 U.S.C. § 1581(c) (1988).

### STANDARD OF REVIEW

The appropriate standard for the Court's review of a final determination by Commerce is whether the agency's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted).

█ The Court must accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). While Commerce has discretion in choosing one interpretation over another, "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986), *cited in Ceramica Regiomontana, S.A.,* 10 CIT at 405, 636 F.Supp. at 966 ("[T]his Court will not allow an agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute.") (further citation omitted).

3. Commerce amended the *Brazilian Final Determination* on August 17, 1993. *See Certain Steel Products from Brazil,* 58 Fed.Reg. 43,751 (Dep't Comm.1993) (order and am. final determ.).

4. Commerce amended the *Mexican Final Determination* on August 17, 1993. *See Certain Steel Products from Mexico,* 58 Fed.Reg. 43,755 (Dep't Comm.1993) (order and am. final determ.).

### SECTION ONE: PRIVATIZATION

On the general issue of privatization, British Steel plc, Usinas Siderurgicas de Minas Gerais, S.A., and Altos Hornos de Mexico, S.A. de C.V. (collectively "Foreign Producers") have filed a joint motion for partial judgment on the agency record and supporting memoranda contesting the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed.Reg. 37,225, 37,259–73 (Dep't Comm.1993) (final determ.) (*General Issues Appendix*), as well as the application of the *General Issues Appendix* in *Certain Steel Products from Brazil,* 58 Fed.Reg. 37,295 (Dep't Comm.1993) (final determ.) (*Brazilian Final Determination*),[3] *Certain Steel Products from Mexico,* 58 Fed. Reg. 37,352 (Dep't Comm.1993) (final determ.) (*Mexican Final Determination*),[4] and *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm. 1993) (final determ.) (*British Final Determination*).[5] The Government of the United Kingdom of Great Britain and Northern Ireland, as plaintiff-intervenor, has filed a brief challenging the administrative determination on the issue of privatization in the *British Final Determination,* in support of the Foreign Producers' motion.

AK Steel Corporation,[6] Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a Unit of USX Corporation, and WCI Steel, Incorporated (collectively "Domestic Producers") have filed a joint motion for partial judgment on the agency record and supporting memoranda contesting the *General Issues Appendix* as well as the application of the *General Issues Appendix* in the *Bra-*

5. Commerce amended the *British Final Determination* on August 17, 1993. *See Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 43,748 (Dep't Comm.1993) (order and am. final determ.).

6. At the time of the filing of this motion, AK Steel Corporation was named Armco Steel Company, L.P. The Court will refer to the company as AK Steel Corporation throughout this opinion.

*zilian Final Determination,* the *Mexican Final Determination,* the *British Final Determination,* and *Certain Steel Products from Germany,* 58 Fed.Reg. 37,315 (Dep't Comm. 1993) (final determ.) (*German Final Determination* ).[7]

AG der Dillinger Hüttenwerke has moved for summary judgment in *LTV Steel Co., Inc. et al. v. United States,* Consol.Court No. 93–09–00568–CVD, one of the consolidated cases under the Court's scheduling order governing this joint proceeding.

## I. CERTAIN STEEL PRODUCTS FROM MEXICO
### BACKGROUND

The Department of Commerce's (Commerce) period of investigation (POI) of Altos Hornos de Mexico, S.A. de C.V. (AHMSA)[8] is calendar year 1991. *Mexican Final Determination,* 58 Fed.Reg. at 37,354. The product covered by Commerce's investigation is certain cut-to-length carbon steel plate. *Id.* at 37,353.[9]

In the *Mexican Final Determination,* Commerce confirmed its preliminary determination and found AHMSA equityworthy in 1977 and unequityworthy from 1979 through 1987. *Id.* at 37,355. Commerce also found AHMSA unequityworthy for 1990 and 1991 and uncreditworthy from 1983 to 1986. *Id.* Commerce then concluded that the Government of Mexico was providing subsidies to AHMSA in certain years through various programs including equity infusions, assumption of debt, debt restructuring, short-term pre-export financing, short-term import financing, long-term loans, joint ·venture research and development, and pre-privatization lay-off financing. *Id.* at 37,356–61.

Commerce also determined that AHMSA, a government-owned company, was priva-

tized: "In November 1991, the [Government of Mexico (GOM)] sold all of its ownership interest in AHMSA. Prior to privatization, AHMSA was almost entirely owned by the GOM. Since November 1991, the GOM holds no stock in AHMSA." *Id.* at 37,355. Accordingly, Commerce applied the privatization and repayment methodologies set forth in *General Issues Appendix* to the privatization of AHMSA. Commerce explained,

> In these final determinations, we have decided that a portion of the price paid for a formerly government-owned company represents partial repayment of prior subsidies. We calculated the portion of the purchase price attributable to repayment of prior subsidies. We then reduced the benefit streams for each of the prior subsidies by the ratio of the repayment amount to the net present value of all remaining benefits from those prior subsidies at the time of privatization.... The subsidies allocated to the POI for AHMSA reflect, where appropriate, the application of the privatization methodology.

*Id.* at 37,355.

The nature of the *General Issues Appendix* is as follows. In the July 9, 1993, issue of the *Federal Register* Commerce published a series of countervailing duty (CVD) final determinations for twelve countries. Several broad methodological issues that were "not case-specific but rather general in nature" were common to many of the investigations involved in the twelve determinations. *Certain Steel Products from Austria,* 58 Fed. Reg. 37,217, 37,219 (Dep't Comm.1993) (final determ.). Commerce addressed this situation by creating a *General Issues Appendix,* appended to the first determination in the series, in which Commerce set forth its posi-

---

**7.** Commerce amended the *German Final Determination* on August 17, 1993. *See Certain Steel Products from Germany,* 58 Fed.Reg. 43,756 (Dep't Comm.1993) (orders and am. final determ.)

**8.** Three companies were involved in the *Mexican Final Determination:* Industrias Monterrey, S.A. de C.V.; Hojalata ỳ Lamina, S.A. de C.V.; and AHMSA. *Mexican Final Determination,* 58 Fed. Reg. at 37,353. Because only the investigation of AHMSA involves issues of privatization and Commerce's privatization and repayment meth-

odologies, the Court will address the final determination only as it pertains to AHMSA.

**9.** Certain corrosion-resistant carbon steel flat products were also covered by Commerce's investigation as the investigation related to Industrias Monterrey, S.A. de C.V. and Hojalata y Lamina, S.A. de C.V. *Mexican Final Determination,* 58 Fed.Reg. at 37,353. As discussed, *supra* note 8, the Court will not address these aspects of Commerce's investigation.

tions and analyses and addressed interested party comments on the several general issues consisting of allocation, denominator, equity, prepension program issues, privatization, and restructuring. *See generally General Issues Appendix,* 58 Fed.Reg. at 37,225–73. Commerce then invoked by reference and applied its methodologies as set forth in the *General Issues Appendix* in each of the CVD determinations where those issues arose.[10]

In the *General Issues Appendix* discussion of privatization, Commerce set forth its methodology for analyzing the privatization of some or all of a government-owned company. *General Issues Appendix,* 58 Fed.Reg. at 37,259–73. Commerce began by analyzing the nature of countervailable benefits and concluded that the relevant statutory authority, legislative history, judicial opinions, and Commerce's regulations "do not permit" Commerce to take into account the use to which subsidies are put or their effect on the recipient's subsequent performance. *Id.* at 37,260–61. Instead, CVD law requires Commerce "to countervail an allocated share of the subsidies received by producers, regardless of their effect.... [T]he statute embodies the irrebuttable presumption that subsidies confer a countervailable benefit upon goods produced by their recipients." *Id.* at 37,260.

"Accepting that the CVD law does not require a subsidy bestowed on a steel producer to confer a demonstrable competitive benefit on that producer in order to be countervailable," Commerce turned to the specific issue of privatization. *Id.* at 37,261 (internal quotations omitted). Commerce rejected arguments that privatization automatically extinguishes prior subsidies and concluded that such arguments are contrary to CVD law. Instead, under Commerce's methodology, "some portion of the prior subsidies received by the seller 'travel[s] (with the productive unit) to its new home.'"[11] *Id.* at 37,268. Commerce explained,

> [T]he countervailable subsidy (and the amount of the subsidy to be allocated over time) is fixed at the time the government provides the subsidy. The privatization of a government-owned company, *per se,* does not and cannot eliminate this countervailability.... [T]he statute does not permit the amount of the subsidy, including the allocated subsidy stream, to be reevaluated based upon subsequent events in the marketplace."

*Id.* at 37,263.

Commerce, however, rejected arguments that after privatization, only a full repayment by the new company can extinguish past subsidies.[12] Instead, Commerce announced a repayment methodology: "[A] private party purchasing all or part of a government-owned company (e.g., a productive unit) can repay prior subsidies on behalf of the company as part or all of the sales price.... [T]o the extent that a portion of the price paid for a privatized company can reasonably be attributed to prior subsidies, that portion of those subsidies will be extinguished." *Id.* at 37,262–63.

**10.** *See, e.g., Certain Steel Products from Austria,* 58 Fed.Reg. 37,217, 37,219 (Dep't Comm.1993) (final determ.); *Certain Steel Products from Belgium,* 58 Fed.Reg. 37,273, 37,274 (Dep't Comm. 1993) (final determ.); *Brazilian Final Determination,* 58 Fed.Reg. at 37,296; *Certain Steel Products from France,* 58 Fed.Reg. 37,304, 37,305 (Dep't Comm.1993) (final determ.); *German Final Determination,* 58 Fed.Reg. at 37,315; *Certain Steel Products from Italy,* 58 Fed.Reg. 37,327, 37,328 (Dep't Comm.1993) (final determ.); *Certain Steel Products from Korea,* 58 Fed.Reg. 37,338, 37,339 (Dep't Comm.1993) (final determ.); *Mexican Final Determination,* 58 Fed. Reg. at 37,354; *Certain Steel Products from New Zealand,* 58 Fed.Reg. 37,366, 37,366–67 (Dep't Comm.1993) (final determ.); *Certain Steel Products from Spain,* 58 Fed.Reg. 37,374, 37,375 (Dep't Comm.1993) (final determ.); *Certain Steel Products from Sweden,* 58 Fed.Reg. 37,385, 37,-386 (Dep't Comm.1993) (final determ.); *British Final Determination,* 58 Fed.Reg. at 37,394.

**11.** Commerce established a minimum threshold for allocating subsidies because the agency determined it would be administratively infeasible to allocate subsidies to each individual asset. "In order to be considered a productive unit, the spun-off operation must be capable of (1) generating sales and (2) operating independently." *General Issues Appendix,* 58 Fed.Reg. at 37,268.

**12.** Commerce explained: "To adopt [that] rationale ... would create a test that would elevate form over substance and produce incentives for foreign governments merely to alter the form of the privatization to satisfy this artificial distinction." *General Issues Appendix,* 58 Fed.Reg. at 37,262.

Under Commerce's repayment methodology, Commerce examines the proportion of the privatized company's subsidies to the company's net worth from 1977 [13] to the date of privatization. *Id.* at 37,263. To calculate this proportion, Commerce takes the simple average of the ratios of subsidies to net worth for each year. Commerce averages those ratios to reach the "historical surrogate for the percent that subsidies constitute of the overall value, i.e., net worth of the company." *Id.* Commerce then multiplies the average ratio by the privatization purchase price "to derive the portion of the purchase price attributable to repayment of prior subsidies." *Id.* Finally, Commerce reduces "the benefit streams of the prior subsidies by the ratio of the repayment amount to the net present value of all remaining benefits at the time of privatization." *Id.*

### Contentions of the Parties

#### A. *The Foreign Producers*

The Foreign Producers contend that Commerce erred by not finding, as compelled by the evidence, "that the production of a company that has been privatized in an arm's-length transaction or otherwise at market value is not subsidized by reason of pre-privatization grants or other untied capital subsidies that may have been provided to the state-owned enterprise." (Resp'ts' J.Br. in Supp. of Mot. for Partial J. on R., Vol. I at 2). The Foreign Producers contend that the true inquiry here is a statutory one. To impose a countervailing duty under 19 U.S.C. § 1671(a)(1), Commerce must find a benefit to the company under investigation. According to the Foreign Producers, the benefit from a subsidy is a financial one, that is, the benefit of operating with funds for which the recipient does not have to pay market price. Because the companies at issue were privatized at arm's length, the fair market value paid included the payment, at market price,

of the value of the subsidies. Thus, the Foreign Producers contend,

A privatized company operating with full, market-oriented capital costs does not have an artificial, subsidized cost of capital as did the state-owned enterprise. Its production does not realize any such subsidy benefits and, accordingly, there is no basis under the statute for [Commerce] to determine that such production "is subsidized" because of those past subsidy funds.

(*Id.* at 40).

The Foreign Producers further contend that Commerce, contrary to law, erected an "irrebuttable presumption that no subsequent event—including a privatization—can affect a subsidy allocation stream created by the Department under its methodology for allocating subsidies over time." (*Id.* at 50). The Foreign Producers argue that no basis to erect such a presumption exists in the statute. Furthermore, they contend, the presumption contradicts the non-punitive nature of countervailing duties intended by Congress and is inconsistent with judicial precedent and Commerce's own practice. Moreover, the Foreign Producers argue, under the irrebuttable presumption the value of countervailable benefits attributed to the privatized company exceeds the market value of the entire company in some cases.

Alternatively, the Foreign Producers contend that if the Court ultimately affirms Commerce's determination concerning the countervailability of privatized companies for pre-privatization subsidies, the Court should hold Commerce's repayment methodology arbitrary and capricious. The Foreign Producers claim Commerce adopted this methodology without notice and comment, the preclusion of which is sufficient to justify a remand. Furthermore, they claim, the repayment methodology contains fundamental flaws rendering the methodology arbitrary and capricious.

With regard to the privatization of AHMSA, the Foreign Producers [14] admit that

---

13. Commerce explained that it used 1977 as a measuring point because it was "the earliest point at which subsidies with benefits remaining countervailable in this investigation could have been bestowed." *General Issues Appendix,* 58 Fed.Reg. at 37,263.

14. The Foreign Producers' Memorandum in Support of Their Motion for Partial Judgment on the Agency Record includes individual submissions by AHMSA, Usinas Siderurgicas de Minas Gerais, S.A. (USIMINAS), and British Steel plc. *See* Resp'ts J.Br. in Supp. of Mot. for Partial J. on R.,

Commerce made no specific finding regarding whether AHMSA was privatized at arm's length. (AHMSA's Resp. to Ct.'s Questions at 1). The Foreign Producers contend, however, "the evidence on the record demonstrates that the privatization of AHMSA was accomplished through a fair, open and transparent, competitive auction.... The privatization was ... a non-preferential arm's-length transaction." (*Id.*). Therefore, because the purchaser "paid fair market value for the items it purchased in a fair and competitive auction, it fully paid for the entire value it received.... [T]here is no basis for finding that [the purchaser] or its steelmaking operations were in any way subsidized." (Resp'ts J.Br. in Supp. of Mot. for Partial J. on R., Vol. II Tab B at 13).

Furthermore, in their response to this Court's post-oral argument questions, the Foreign Producers contend Commerce "found that the post-privatization entity was fundamentally different" from pre-privatization AHMSA. (AHMSA's Resp. to Ct.'s Questions at 4). The Foreign Producers claim "[a]s [Commerce] recognized, the privatization created a new consolidated ... entity, which had to be treated as a 'single business enterprise.' This new consolidated entity was clearly different from the pre-privatization state-owned entity—of which [the purchaser] had not been a part." (*Id.* (quoting *General Issues Appendix*, 58 Fed. Reg. at 37,262)). To support these assertions, the Foreign Producers maintain that "facts demonstrate that the new entity created by the privatization process was physically different from the entity that existed before." (*Id.*). Furthermore, even if no physical changes occurred, "privatization would still have made a fundamental change in the company.... [T]he payment of the purchase price by [the purchaser] in the privatization imposed new costs and obligations *on AHMSA*" thus eliminating any continuing benefit from pre-privatization subsidies. (*Id.* at 5 (footnote omitted)).

### B. The Domestic Producers

The Domestic Producers contend Commerce properly determined in its final deter-minations that privatization itself does not render non-countervailable subsidies bestowed upon government-owned companies prior to privatization. (Pls.' J.Br. in Supp. of Mot. for J. on R. at 20). Instead, the Domestic Producers challenge as unsupported by substantial evidence and not in accordance with law Commerce's determination that privatization could result in a partial repayment of pre-privatization subsidies. (*Id.* at 20).

The Domestic Producers contend that CVD statutes do address repayment of subsidies and issues raised by privatization. According to the Domestic Producers, the CVD statutes require Commerce to countervail subsidies provided and specifically limit the instances in which Commerce may decrease subsidies otherwise countervailable. The specific instances allowing for offsets do not include repayment as a result of privatization.

In addition to contending that Commerce did not act in accordance with law, the Domestic Producers argue Commerce's "interpretation of the statute as requiring the conclusion that subsidies are partially repaid as a result of privatization at fair market value is not reasonable." (*Id.* at 31). According to the Domestic Producers, Commerce's interpretation is inconsistent with both Commerce's conceptual models of subsidies and its practice of not considering "subsequent events" in calculating the amount of duties imposed. (*Id.* at 36). Furthermore, Commerce's repayment methodology ignores the fact that, in a privatization by sale of stock, "[a]ll that change[s] hands [are] literally 'pieces of paper,'" the certificates evidencing ownership of the company. The company itself [is] not affected by the privatization in and of itself." (*Id.* at 42). Because "[e]ach of the transactions at issue here involved the sale by a government of stock in a state-owned company to private investors," none of the subsidies were repaid. (*Id.* at 42). The Domestic Producers also contend that the repayment methodology itself is fundamen-

Vol. II. Additionally, AHMSA submitted an individual response to this Court's post-oral argument questions concerning privatization. This opinion, however, will refer textually to all submissions made by Foreign Producers, collectively or individually, as made by Foreign Producers.

tally flawed on both legal and economic grounds.

Finally, while the Domestic Producers agree with Commerce's determination that in a corporate restructuring a portion of those subsidies allocable to the various productive units "travels" with the units, the Domestic Producers dispute the manner in which those subsidies are allocated across the various corporate entities benefitted. Specifically, the Domestic Producers dispute Commerce's use of relative asset values as the basis for allocating the subsidies. Citing the inherent subjectivity of asset valuations and their susceptibility to manipulation, the Domestic Producers argue that Commerce must use sales values in its calculations.

With regard to the privatization of AHMSA, the Domestic Producers contend Commerce's determination that AHMSA's privatization could result in a partial repayment of pre-privatization subsidies is not supported by substantial evidence and is not otherwise in accordance with law. *See id.* at 2, 13–14.[15] As to the privatization transaction itself, the Domestic Producers "make no representations as to whether [any of] the privatization transactions occurred at fair market value, because it is not relevant to the law, which does not concern itself with whether the new *shareholders* benefit as a result of the change in the subsidized company's ownership." (AK Steel Corp., *et al.*, Answers to Ct.'s Questions at 3).[16]

The Domestic Producers do contend, however, that AHMSA is "in all material and commercial respects the same" company that received pre-privatization subsidies. (*Id.* at 4 (stating that all of "the companies under investigation are in all material and commercial respects the same companies that received the subsidies")). In the case of AHMSA, "the privatization[ ] ... involved a straightforward sale of shares." (*Id.* at 17). In fact, "all of the privatizations under review here involved the sale of shares in the company that had received subsidies, so that the company continued in existence and operations were completely uninterrupted or changed under the new ownership." (*Id.* at 16–17).

C. *The Department of Commerce*

Commerce contends that although neither the statutes nor the legislative history provides specific guidance on the issue of privatization, Congress "has directed Commerce to countervail subsidized imports when it is determined that a domestic industry has been injured by reason of such imports." (Def.'s Br. in Opp'n to Mots. for J. on R. at 10–11). Accordingly, Commerce reasonably continued to countervail subsidies of public corporations subsequent to the privatizations of those corporations.

Commerce maintains it has broad authority both to interpret CVD statutes and to pursue subsidies. Commerce defends its "irrebuttable presumption" as reflective of the basic concept that subsidies confer countervailable benefits. (*Id.* at 77–100). Furthermore, Commerce contends, Congress intended the agency to countervail subsidies aggressively. Using its broad statutory au-

---

**15.** The Domestic Producers have not made this statement directly. The Domestic Producers inform this Court, however, that they challenge both the *Mexican Final Determination* and whether Commerce's "determination that the privatization of a state-owned company could result in the partial repayment of subsidies bestowed upon the company before its privatization was without support of substantial evidence, and was otherwise contrary to law." (Pls.' J. Br. in Supp. of Mot. for J. on R. at 2; *see also id.* at 13–14 (setting forth the facts of the *Mexican Final Determination*)).

**16.** The Court notes that the Domestic Producers did argue in the underlying investigation that AHMSA was not sold at fair market value. *See General Issues Appendix*, 58 Fed.Reg. at 37,264; AK Steel Corp., *et al.*, Answers to Ct.'s Questions

at 3 n. 4. The Domestic Producers argued that AHMSA's auction sale price "was not the fair market value of AHMSA because the highest bid did not win the auction.... [B]y considering promises of post-privatization investment, the GOM considered factors other than the fair market value of AHMSA.... [T]he highest bid selected was not the highest cash bid." *General Issues Appendix*, 58 Fed.Reg. at 37,264. The Domestic Producers explain to this Court, however, that their argument below "was made solely in response to the Mexican Producers' claim; the issue is not germane under [Commerce's] privatization/repayment methodology or Domestic Producer's [sic] position on the legal consequences of a change in ownership." (AK Steel Corp., *et al.*, Answers to Ct.'s Questions at 3 n. 4).

thority and in accordance with congressional intent, Commerce determined it must measure subsidies on the date those subsidies are bestowed. The statutory scheme does not require Commerce to remeasure the competitive benefits of subsidies due to subsequent events such as privatization. Commerce argues that contrary to this Court's opinions in *Saarstahl, AG v. United States,* 18 CIT ——, 858 F.Supp. 187 (1994), and *Inland Steel Bar Co. v. United States,* 18 CIT ——, 858 F.Supp. 179 (1994), legislative history clearly shows Congress did not want Commerce to engage in an "effects" analysis. Instead, Commerce reasons:

> When untied subsidies are bestowed upon a company, they are presumed to benefit the entire company and are allocated across the total sales of the company. This means, in effect, that each of the various productive parts of the subsidized company derive benefits from those subsidies. Therefore when a company is sold, those previously bestowed subsidies continue to be allocable to it.

(Def.'s Br. in Opp'n to Mots. for J. on R. at 14).

Commerce further argues it reasonably concluded that "because a portion of the value of the company is due to prior subsidies, it was reasonable to consider that some or all of the sale price could constitute repayment for those prior subsidies." (*Id.* at 15). Commerce contends its repayment concept does not contradict Commerce's position that it is not required to take into account subsequent effects. Rather, Commerce argues, the repayment methodology "merely represents an allocation of the remaining unamortized subsidies between the seller . . . and the private purchaser." (*Id.*).

Finally, Commerce defends its use of asset values as the basis for allocating subsidies to a productive unit of a government-owned company when that unit is sold to a private party. (*Id.* at 71–77). Commerce explains that because its definition of a productive unit does not require a unit to be a profit center, "the value of a productive unit's sales

may not be identifiable." (*Id.* at 76 (citing *General Issues Appendix,* 58 Fed.Reg. at 37,268)). In order to eliminate the necessity of artificially constructing a productive unit's sales value, Commerce reasonably chose to use book value for assets. (*Id.*).

With regard to AHMSA, Commerce maintains that AHMSA was privatized by a bidding process through which "the Government of Mexico sold all of its ownership interest in AHMSA in November 1991." (*Id.* at 8 (citing the *Mexican Final Determination,* 58 Fed.Reg. at 37,355)). Grupo Acerero del Norte (GAN), the purchaser of AHMSA, "is a holding company formed by a group of private investors for the purpose of purchasing AHMSA." (Def.'s Resp. to Ct.'s Questions at 13). Commerce maintains "[t]he record reflects that the privatization represented a complete transfer of assets from the GOM to [GAN], the ultimate purchaser." (*Id.* at 6–7).

Commerce, however, makes no specific assertions concerning whether AHMSA's privatization was effected through an arm's-length transaction. (*Id.* at 2, 3).[17] Instead, Commerce maintains that in all of the determinations under review, its "principal concern was whether a legitimate sale had taken place." (*Id.* at 2). Commerce explains,

> Commerce applied its privatization methodology only in instances where there were legitimate sales. Commerce stated that a legitimate sale 'must involve unrelated parties, one of which must be privately owned.' Given this focus, Commerce made no specific findings that the privatizations in the Brazil, Germany, Mexico, and United Kingdom certain steel CVD investigations were necessarily of arm's-length transactions.

(*Id.* at 2 (citations to the *General Issues Appendix* omitted)).

While making no specific assertion concerning whether AHMSA's privatization was at arm's length, Commerce does, however, contend that "the record reflects that the GOM sold AHMSA to the lower bidder in

---

**17.** In fact, in the *General Issues Appendix,* Commerce states that "[g]iven the Department's methodology, petitioners' and respondents' con- cerns regarding whether or not the sale of AHM- SA was at a fair market price are irrelevant." *General Issues Appendix,* 58 Fed.Reg. at 37,264.

terms of cash received." (*Id.* at 3). Commerce explains that because the Mexican Government was concerned with production of quality steel for domestic use, the GOM's bid valuation methodology valued post-privatization committed investment at 50% of the investment. (*Id.* at 3–4). As a result, "[t]he cash portion of the winning bid was lower than the cash amount offered by the losing bid." (*Id.* at 4).

## Discussion

◼ The threshold issue this Court must determine is whether, if AHMSA was privatized, Commerce properly determined subsidies previously bestowed upon AHMSA continued to be countervailable after AHMSA's privatization. For the reasons that follow, the Court remands to Commerce to reconsider its determination in light of the Court's analysis in this opinion.

In *Saarstahl, AG v. United States*, 18 CIT ——, 858 F.Supp. 187 (1994), this Court examined the issue of whether pre-privatization subsidies bestowed upon a government-owned corporation could be attributed to a purchaser after privatization through an arm's-length transaction. This Court pointed to the non-punitive nature of the CVD laws' legislative intent requiring Commerce to use reasonable methods of allocating the value of subsidies and to relate "the benefit of the commercial advantage to the recipient." *Saarstahl*, 18 CIT at ——, 858 F.Supp. at 193 (quoting H.R.Rep. No. 317,

96th Cong., 1st Sess. 75 (1979) and citing S.Rep. No. 249, 96th Cong., 1st Sess. 85–86 (1979) U.S. Code Cong. & Admin.News 1979, pp. 381, 471–472 (Methods for allocating the value of non-recurring subsidy grants or loans must be "based on the *commercial and competitive benefit to the recipient as a result of the subsidy.*") (emphasis added)).

Accordingly, this Court concluded that a new owner who pays fair market value for a productive unit cannot be the "recipient" of a subsidy because the buyer has paid for all that it is to receive. *Id.* at ——, 858 F.Supp. at 193. In other words, by paying fair market value for all it has received the new owner has not gained any recognizable[18] commercial or competitive benefit as a result of the transaction. Therefore, if Commerce were permitted to countervail a purchaser who has paid fair market value, Commerce's actions would directly violate the overriding purpose of the CVD laws "to assess countervailing duties against those goods entering the U.S. *on an uneven playing field.*" *Id.* at ——, 858 F.Supp. at 194 (emphasis added) (citing *British Steel Corp. v. United States*, 9 CIT 85, 95, 605 F.Supp. 286, 294 (1985) (further citations omitted)).

◼ Further analysis of the CVD statutes supports this Court's analysis in *Saarstahl* and gives the Court the opportunity to further articulate its reasoning and holding in *Saarstahl*. Precedent informs this Court that "if the statute is silent or ambiguous with respect to the specific issue, the ques-

---

18. While one may argue that the new owner has received a commercial and/or competitive benefit because the opportunity to purchase the assets would not have existed but for the foreign government's organization and subsidization of the government-owned corporation, the Court notes Commerce has rejected this line of argument. In the *General Issues Appendix*, Commerce addressed party comments as follows:

Petitioners have argued that subsidies cannot be expunged through privatization because the distortion created by past subsidization still continues (lives on) in the productive capacity of the company.... In their view such assets would not have existed except for the bestowal of subsidies. Therefore, privatization, because it cannot now re-allocate to their most efficient use the resources used in the past which created the capacity at issue, can have no effect on prior subsidies. The distortion continues even though a purchaser pays a market price, pre-

cisely because the excess capacity continues to exist in the company the day after privatization exactly as it did the day before.

.... We disagree with petitioners' position. While the CVD law contains an irrebuttable presumption that subsidies bestow a competitive benefit upon the production of a company, it does not follow that the statute requires us to somehow "correct" market distortions which may have occurred due to the provision of subsidies, beyond countervailing the benefits received. The CVD law is designed to provide remedial relief as a result of subsidies; it is not intended to recreate the *ex ante* conditions that existed prior to the bestowal of such subsidies.... The fact that the productive capacity may have been created or continues to exist is an irrelevant inquiry and beyond the scope of the law.

*General Issues Appendix*, 58 Fed.Reg. at 37,264.

tion for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). In its review of the agency's answer, "a court may reject an agency interpretation that contravenes clearly discernible legislative intent," but "its role when that intent is not contravened is to determine whether the agency's interpretation is 'sufficiently reasonable.' " *Grupo Industrial Camesa v. United States,* 18 CIT ——, ——, 853 F.Supp. 440, 442 (1994) (quoting *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted)).

The statutory authority governing countervailing duties does not speak directly to privatization and the imposition of countervailing duties upon privatized corporations. In fact, congressional input is sorely lacking. Commerce has virtually no statutory framework under which to administer the CVD laws with respect to the complex and universally important issue of privatization.[19] However, as this Court discussed in *Saarstahl* and reiterates above, congressional intent concerning the overriding purpose of the CVD laws as a whole is clearly discernible. Commerce's interpretation of the CVD statutes to allow the countervailing of pre-privatization subsidies bestowed upon government-owned corporations after any and all types of privatization transactions can result in punitive duties directly violative of that congressional purpose. Additionally, even if Commerce's interpretation did not contravene clearly discernible legislative intent, for the reasons that follow, Commerce's interpretation of what little statutory framework is relevant to privatization is unreasonable.

In 19 U.S.C. § 1677, Congress defines "subsidy" in part as follows:

**(A) In general**

The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

. . . .

(ii) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(I) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(II) The provision of goods or services at preferential rates.

(III) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

(IV) The assumption of any costs or expenses of manufacture, production, or distribution.

19 U.S.C. § 1677(5)(A) (1988).

In 19 U.S.C. § 1677, Congress sets forth the following rule concerning subsidies:

**(B) Special rule**

In applying subparagraph (A), the administering authority, in each investigation, shall determine whether the bounty, grant, or subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or industries. . . .

19 U.S.C. § 1677(5)(B) (1988); *see also* 19 U.S.C. § 1671(a)(1)(B) (1988) (discussing the administering authority's determination of whether a relevant entity "is providing, directly or indirectly, a subsidy").

 While these statutory provisions do not speak directly to the privatization issue, Congress has worded § 1677(5)(B) such that the administering authority must determine if a subsidy is provided *"to a specific enterprise or industry, or group of enterprises or industries."* This implies that the recipient of a subsidy must be a person or artificial person, such as a corporation carrying on a specific enterprise or industry, capable of holding a property interest such as a subsidy. Indeed, this was conceded by parties including the government at oral argument. *See, e.g.,* Tr. at 496–97, 530. Contrary to the government's argument, a subsidy cannot be

---

**19.** *See infra* note 34.

provided to a "productive unit" or "travel" with it unless the "productive unit" is itself an artificial person capable of receiving a subsidy. To reason otherwise leads to absolute absurdity. Who would suggest, for example, that a subsidy could be provided to an inanimate object such as a chair.

If a subsidy recipient, then, must be capable of receiving a subsidy, when a foreign government bestows a subsidy upon a corporation, it follows logically that the corporation, and not the corporation's individual assets, receives the subsidy. In other words, it is with the corporation and not its several parts that the subsidy resides. Accordingly, as discussed in *Saarstahl,* when a purchaser pays fair market value in an arm's-length transaction based upon commercial considerations for an asset or several assets of a subsidized corporation, the purchaser receives no gift or subsidy at all because the purchaser paid full monies worth.[20] Furthermore, the subsidy cannot travel with the asset or several assets because the asset or several assets did not receive the subsidy; the corporation received the subsidy.[21] Therefore, the subsidy continues to reside in the subsidized asset-selling corporate entity as holder of the subsidy benefits received.[22]

■ As discussed implicitly in *Saarstahl,* a different result may arise depending upon

20. The purchaser cannot be the recipient of a subsidy because by paying fair market value for an asset or assets of a subsidized corporation the private purchaser does not receive "[t]he provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations," "[t]he provision of goods or services at preferential rates," "[t]he grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry," "[t]he assumption of any costs or expenses of manufacture, production, or distribution," or any other commercial or competitive benefit constituting a subsidy. 19 U.S.C. § 1677(5)(A)(ii)(I)–(IV) (1988).

It could be argued that in an arm's-length transaction a purchaser of one or several assets of a subsidized corporation could discount its purchase price for "subsidies liability under the CVD laws" and therefore the subsidies could be accounted for in this manner. Congress could have but did not authorize such a result. In fact, Congress does not appear to ever have considered it. Furthermore, it would seem such an approach would cause ponderous burdens upon the free flow of commerce. One can only contemplate the frustrations of subsequent bona fide purchasers for value as they negotiate to buy one or several assets, absent recording statutes, in trying to evaluate actual and/or inchoate CVD liabilities. What if the last owner did not trade with the United States but the new owner plans to do so? One can imagine valuation problems especially where there is no statutory guidance. Absent express congressional authorization this Court observes Commerce would be wise to avoid such an approach.

21. One could argue, however, that a subsidy, once bestowed upon a corporation, attaches to the assets of the corporation much like a lien or a mortgage. This way, when a purchaser buys a corporation's asset or assets, the countervailing duty liability could "travel" with that asset or assets. Thus, through its purchase, the purchaser has, in a sense, taken subject to or assumed the countervailing duty liability.

Of course, mortgage liens, mechanic liens, vendor liens, and other such liens are authorized by statute. There is no statutory authorization for such treatment of CVD actual or inchoate liability. It would seem that such a mechanism would be extremely cumbersome and would impede the free flow of commercial activity. In any event, unless Congress chooses to enact such a statutory scheme, this Court will not allow Commerce, absent authority from Congress, to administratively create one. Therefore, this Court completely rejects such an analysis.

22. The Court notes that in a recent General Agreement on Tariffs and Trade (GATT) Panel ruling, the European Community argued a position consistent with the Court's analysis here. *See United States—Imposition of Countervailing Duties on Certain Hot–Rolled Lead and Bismuth Carbon Steel Products Originating in France, Germany and the United Kingdom: Report of the Panel* ¶¶ 137–44 (Oct. 14, 1994) (*GATT Panel Ruling*). In that ruling, a GATT Panel examined Commerce's countervailing of United Engineering Steels Limited (UES), a joint venture company formed by British Steel Corporation (British Steel), a government-owned company, and Guest, Keen & Nettlefolds (GKN), a private company. *Id.* at ¶ 16. Both British Steel and GKN contributed "productive units," accounts receivables, cash, and inventories in return for shares in UES. *Id.* Commerce had determined a portion of subsidies received by British Steel prior to the formation of UES were attributable to UES because UES had acquired one of British Steel's "productive units." *Id.* ¶ 407 (quoting *Certain Hot–Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom,* 58 Fed.Reg. 6237, 6238–40 (Dep't Comm.) (final determ.)).

The European Community (EC) argued in part that under the Preamble and Article 11 of GATT a benefit must be shown to exist to an entity before that entity could be considered to be subsidized.... The EC was of the view that ... the fact that UES had paid a market price for the assets in an arm's length transaction

what is purchased and the nature of the purchase transaction. For example, where a purchaser buys all or part of a subsidized corporation through a simple stock purchase, the purchaser is buying an interest in the very entity in which the subsidy resides under § 1677(5)(B). The stock purchase merely evidences a change in the identity of the shareholders who hold ownership interests in the subsidized corporation.[23] The stock purchase does not affect the life or nature of the corporate entity purchased.[24] In other words, the entity that received the subsidy continues to survive as does Commerce's authority to countervail that entity. Contrary to Commerce's position, Commerce does not have the ability to countervail in such a situation because subsidies "travel." Rather, Commerce has the ability to countervail because the subsidy continues to reside in the entity in which the subsidy was bestowed and

because the subsidy and the entity continue to exist.

▬ Commerce has consistently maintained that it does not measure the effects of subsidies once they have been determined by Commerce.[25] In other words, subsequent events are irrelevant. This Court, for the purposes of this proceeding, has no quarrel with that practice.[26] The question confronting the Court is not the measurement of the subsidies, but the question of the location of the subsidies after privatization has taken place. Commerce, after having analyzed the nature of countervailable benefits, relevant statutory authority, legislative history, judicial opinions, and the regulations of Commerce, concluded those authorities do not permit Commerce to take into account the use to which subsidies are put or their effect upon the recipient. *General Issues Appen-*

meant that UES did not benefit from the subsidies provided to the previous owner of the assets and thus precluded any possibility of a pass through of those subsidies to UES. A private company which paid market value to purchase an asset from a subsidized state-owned company had no competitive advantage over other companies. *Id.* at ¶ 413. The EC's general arguments concerning the purchase of a government-owned company's assets in an arm's-length transaction, as long as the sale is for fair market value based upon commercial considerations, are consistent with the Court's analysis in this opinion. The GATT Panel, however, made no pronouncements on whether the sale of a "productive unit" at market price precludes a "pass-through" of previously-bestowed subsidies. *Id.* at ¶ 427. Instead, the GATT Panel ultimately determined that because Commerce had not taken into account the purchase price paid by UES for the productive unit, Commerce's finding "of a 'pass through' of subsidies from [British Steel] to UES was not a sufficient basis to support a finding, required under Article 1 of [GATT], that a subsidy was bestowed on the production of merchandise by UES." *Id.* at ¶ 429.

**23.** The Court notes the Foreign Producers' admission to this Court: "In a privatization, when the shares of a company are sold, the new shareholders then own all of the assets and liabilities of that company." (Resp'ts' Answers to Ct.'s Questions at 16).

**24.** The Court finds unpersuasive the Foreign Producers' argument that because a newly privatized corporation now has an obligation to provide shareholders with a return on their investments, the corporation is fundamentally differ-

ent. The Court assumes neither private nor public shareholders desire corporations in which they hold stock to perform poorly or provide a low rate of return on corporate equity. Furthermore, the fact that one person or a group of persons owns common stock in a corporation does not by itself change the essence of the corporate entity.

**25.** For example, Commerce maintains that,

Nothing in the statute requires Commerce to consider the actual use to which subsidies are put or their effect, *i.e.,* the competitive benefit, on the recipient company's subsequent performance in order to find them countervailable. Rather, the statute requires Commerce to countervail an allocated share of the subsidies *received* by producers, regardless of their *effect.* (Def.'s Br. in Opp'n to Mots. for J. on R. at 27–28; *see also id.* at 14 ("[O]nce subsidies are identified and measured as of the date of bestowal, Commerce makes no attempt to … try to determine what effect the subsidies have on the company. Nor does Commerce engage in an analysis of any alleged effects on a subsidy from a subsequent even, such as privatization.")).

**26.** The Court does note, however, the disingenuousness of Commerce's argument that it is not required to engage in an effects analysis such that "when a company is sold … previously bestowed subsidies continue to be allocable to it." (Def.'s Br. in Opp'n to Mots. for J. on R. at 14). It is hard to imagine how any purchaser of assets only of a corporation could have anticipated "traveling subsidies" and the treatment by Commerce of privatization in general absent any prior notice by Commerce or any direction from Congress.

*dix,* 58 Fed.Reg. at 37,260–61. It is not the effect upon the recipient that is presented by the general issue of privatization, but the identity of the recipient. The CVD laws are remedial in purpose and are designed to correct as much as possible artificial distortions in the marketplace occasioned by the inputs of subsidies, grants, or other types of gifts by governments or others to foreign companies exporting goods to the United States. Under these general principles, where a private investor pays fair market value in an arm's-length transaction based upon commercial considerations for an asset or assets of a corporation, "there is no benefit conferred to the purchaser and therefore, no countervailable subsidy within the meaning of 19 U.S.C. § 1677(5)." *Saarstahl,* 18 CIT at ——, 858 F.Supp. at 193.[27] Commerce cannot do that which is in direct opposition to congressional intent, that is, countervail where no subsidy has been given in commercial terms. *See American Lamb Co.*

*v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) ("[A] court may reject an agency interpretation that contravenes clearly discernible legislative intent. . . .") (citation omitted); *Ceramica Regiomontana S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) ("[T]his Court will not allow an agency . . . to contravene or ignore the intent of the legislature or the guiding purpose of the statute.") (citations omitted). If, however, a purchaser buys into the subsidized corporate entity itself so that the subsidized entity continues in its corporate existence in whole or in part, Commerce may properly continue to countervail that entity in accordance with legislative intent. This analysis is consistent with both the common law of corporations[28] and public policy favoring facilitation of the alienability of property.[29]

Turning to the privatization of AHMSA, Commerce reported its conclusion in the

---

27. The Court notes that Commerce itself has advanced arguments before this Court on the general issue of grant methodology consistent with the Court's analysis here. Under that general issue, Commerce defended its abandonment of the rate of return shortfall (RORS) methodology used to calculate the benefits to an unequityworthy company that receives an equity infusion. In the *General Issues Appendix,* Commerce explained it abandoned RORS because "[f]inally, and perhaps most importantly, RORS implies a 'cost to government' standard rather than a 'benefit to recipient' standard." *General Issues Appendix,* 58 Fed.Reg. at 37,241.

28. Generally, a corporation which purchases the assets of another corporation does not thereby become liable for the selling corporation's obligations. Most courts have recognized four exceptions: (1) Where the successor expressly or impliedly assumes the liabilities of the predecessor; (2) Where the transaction is a de facto merger or consolidation; (3) Where the successor is a mere continuation of the predecessor (same shareholders, directors, and officers); and (4) Where the transaction is a fraudulent effort to avoid liabilities of the predecessor.
 Harry G. Henn & John R. Alexander, *Laws of Corporations and Other Business Enterprises* 967 (3d ed. 1983) (footnote omitted); *see, e.g., Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388 (1973) (citations omitted); *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1424 (7th Cir.1993) ("The general rule in Illinois as elsewhere is that the purchaser of assets does not acquire the

seller's liabilities unless he agrees to do so.") (citations omitted); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2nd Cir.1993) ("[T]he law in this country is clear that where one company transfers all its assets to another company, the latter is responsible for the debts and liabilities of the transferor if . . . the transferee expressly or impliedly agrees to assume such debts or the purchasing corporation is merely a continuation of the transferor.") (citations omitted); *Russell v. SunAmerica Securities, Inc.,* 962 F.2d 1169, 1175–76 (5th Cir.1992) (citation omitted).

29. If the liabilities always went with the assets, it would be difficult to sell assets because the purchaser would not know what he was getting. He might be "buying" a lawsuit the expected cost of which exceeded the value of the asset purchased, yet it would be too late for him to back out of the sale or renegotiate the price. . . .
 The rule permitting assets to be sold separately from liabilities is part of a large family of rules aimed at facilitating transactions by clearing clouds on titles.
*Chaveriat,* 11 F.3d at 1424 (Posner, C.J.) (citation omitted); *see Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323, 1325–26 (7th Cir.1990) ("The general common law rule, *designed to maximize fluidity of corporate assets,* is that 'a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities.'") (emphasis added) (citation omitted).

*Mexican Final Determination* that AHMSA was privatized in 1991. *See Mexican Final Determination,* 58 Fed.Reg. at 37,355 ("In November 1991, the GOM sold all of its ownership interest in AHMSA. Prior to privatization, AHMSA was almost entirely owned by the GOM. Since November 1991, the GOM holds no stock in AHMSA."). Commerce specifically declined, however, to determine whether the privatization of AHMSA was an arm's-length transaction. *See General Issues Appendix,* 58 Fed.Reg. at 37,264 ("Given the Department's methodology ... concerns regarding whether or not the sale of AHMSA was at a fair market price are irrelevant."); Def.'s Resp. to Ct.'s Questions at 2 ("Commerce made no specific findings that the privatizations in the Brazil, Germany, Mexico, and United Kingdom certain steel CVD investigations were necessarily of arm's-length transactions."). Instead, Commerce simply "passed through" the government-owned corporation's pre-privatization subsidies to the privatized corporate entity.

Commerce also seems to have stated no finding in the *Mexican Final Determination* concerning the nature of the privatization transaction involved in that determination.

In the *General Issues Appendix,* Commerce did address party comments involving the manner in which AHMSA was privatized. *See General Issues Appendix,* 58 Fed.Reg. at 37,264–65. Commerce, however, did not address these comments by making any findings concerning the privatization transaction.[30]

█ As discussed above and in *Saarstahl,* privatization as such does not cause subsidies to travel. If privatization is effected through an arm's-length transaction for fair market value based upon commercial considerations in which the subsidized corporate entity does not continue to survive, Commerce's ability to countervail that entity also ceases to exist.[31] Similarly, if privatization takes place by a sale in an arm's-length transaction for fair market value based upon commercial considerations of the corporation's several assets, nothing "travels," and Commerce has no recourse against the purchaser of those assets because it received no subsidy.[32] If, however, privatization is effected through, for example, a simple stock transfer, Commerce may continue to countervail because the entity subsidized continues to exist.[33] However, the mere conclusion that a corporation was privatized is not determinative of

---

**30.** For example, the Domestic Producers argued that, because the highest bid did not prevail in an auction of AHMSA, fair market value was not paid for AHMSA. *General Issues Appendix,* 58 Fed.Reg. at 37,264. The Foreign Producers contended that fair market value was paid. *Id.* In answering these comments, Commerce made no findings concerning the auction or other aspects of the privatization transaction. Instead, Commerce only answered as follows:

As outlined above, we determine that some portion of the remaining subsidies received prior to privatization will be repaid through privatization (as long as the company is not given away). The methodology described above has been applied to all total and partial privatizations at issue in these investigations. Given the Department's methodology, petitioners' and respondents' concerns regarding whether or not the sale of AHMSA was at a fair market price are irrelevant. To the extent that the purchase price may have been lower than the offer made by a different bidder, correspondingly less of any pre-existing subsidies were repaid.

*Id.*

**31.** Presumably the subsidy would stay with the shareholders on dissolution. *See Saarstahl,* 18

CIT at ——, 858 F.Supp. at 193. It would seem direction from Congress in this area would be helpful. Some obvious questions immediately present themselves. If the shareholders continue to do business in the United States in the steel or another industry, how should they be treated? How should the subsidy be measured? What provision is necessary to enable Commerce to effectively discover sham-type transactions?

**32.** Again, legislative guidance in this scenario is crucial. What if the government-owned corporation continues to exist, but no longer exports to the United States? Suppose the government-owned corporation indirectly supports other types of exports to the United States. Would special attribution rules be needed?

**33.** Another example of a situation in which Commerce may properly continue to countervail would be in the presumably unusual event of a subsidized public or private corporation donating the subsidized benefit to another commercial entity. Because the subsequent corporate entity did not pay monies worth for the benefit, the subsidy is not extinguished. Precisely how Commerce would implement its requirement to countervail is left to the expertise of that agency.

whether Commerce's ability to countervail continues to exist. Therefore, insofar as Commerce's privatization methodology holds that subsequent to any privatization transaction, Commerce may countervail a privatized company for pre-privatization subsidies regardless of how privatization takes place, that methodology is unlawful.[34]

■ Commerce appears to have made no findings in the *Mexican Final Determination* as to the nature of the transaction involving AHMSA, other than the finding that AHMSA was privatized in 1991. Accordingly, this Court remands the *Mexican Final Determination* to Commerce so that Commerce, in its expertise, may make findings in accordance with the above analysis concerning the nature of the transaction which resulted in the privatization of AHMSA. These findings should include: ·(1) whether the privatization transaction at issue was effected at arm's-length, for fair market value, and based upon commercial considerations; (2) whether the transaction at issue involved a privatization or partial privatization; (3)

the terms and substance of the transaction at issue, and whether the transaction involved a sale of an asset or several assets, or consisted entirely of a sale of shares; (4) whether, under the Court's analysis set forth above, if a privatization or partial privatization took place, the privatized entity continues to be, for all intents and purposes, the same entity that received subsidies prior to the transaction; and (5) whether, under the Court's analysis, Commerce may properly continue to countervail AHMSA. Commerce is further directed to perform and report to the Court the following calculations: (1) Commerce will calculate any countervailing duties due, if any, by any transferor and transferee subsequent to a privatization; (2) if, under the Court's analysis set forth above, Commerce determines that post-transaction AHMSA continues to be, for all intents and purposes, the same entity that received subsidies prior to the transaction at issue, Commerce will calculate any and all countervailing duties due on that surviving entity; and (3) Commerce will calculate any and all coun-

---

**34.** The Court notes that Congress has recently enacted legislation touching upon privatization issues discussed in this opinion. The relevant provision of the statutory implementation of the Uruguay Round states as follows:

> (F) CHANGE IN OWNERSHIP.—A change in ownership of all or part of a foreign enterprise or the productive assets of a foreign enterprise does not by itself require a determination by the administering authority that a past countervailable subsidy received by the enterprise no longer continues to be countervailable, even if the change in ownership is accomplished through an arm's length transaction.

Uruguay Round Agreements Act, Pub.L. No. 103–465, § 251(a), 108 Stat. 4809, 4903 (1994) (to be codified at 19 U.S.C. § 1677(5)(F)). The Court notes that this provision is consistent with the Court's analysis in this opinion. As discussed above, the mere change in ownership of a government-owned corporation, by itself, does not render subsidies non-countervailable that have been received antecedent to privatization. Similarly, it is correct that a sale at arm's length of an asset or assets of a subsidized corporation does not, by itself, render subsidies previously received non-countervailable. As discussed above, if a purchaser pays fair market value at arm's length and based upon commercial considerations for an asset or several assets of a subsidized corporation, none of the subsidies "travel" with the assets or several assets and the subsidy stays with the selling corporation. Commerce

may continue to countervail the selling corporation that originally received the subsidy.

The Court further notes that the intent of Congress as expressed in the legislative history of § 251(a) of the Uruguay Round Agreements Act is very consistent with the purport of this opinion. The legislative history explains that § 251(a)

> is being added to the Act to clarify that the sale of a firm at arm's-length does not automatically, and in all cases, extinguish any prior subsidies conferred. Absent this clarification, some might argue that all that would be required to eliminate any countervailing duty liability would be to sell subsidized productive assets to an unrelated party. Consequently, it is imperative that the implementing bill correct and prevent such an extreme interpretation.

> The issue of the privatization of a state-owned firm can be extremely complex and multifaceted. While it is the Committee's intent that Commerce retain the discretion to determine whether, and to what extent, the privatization of a government-owned firm eliminates any previously conferred countervailable subsidies, Commerce must exercise this discretion carefully through its consideration of the facts of each case and its determination of the appropriate methodology to be applied.

H.R.Rep. No. 826, 103d Cong., 2d Sess., pt. 1, at 110 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3882.

tervailing duties due on account of any other type of privatization transaction. In its calculations Commerce shall, where applicable, make any corrections necessary on account of allocation and/or sales denominator adjustments occasioned by the respective remands on those issues.

■ The Court does not reach the issue of the repayment methodology adopted by Commerce because of the several remands to Commerce on issues pertaining to privatization. Such discussion would be premature. The Court observes, nevertheless, even where a bona fide purchaser in an arm's-length transaction pays full value to a corporate transferor on an asset by asset basis that the purchase payment would not seem in any way to extinguish the gift .or subsidy previously given to the corporate transferor by its government. It would seem at best the only way to extinguish such a previously given gift or subsidy would be to repay the gift or subsidy to the original donor government. Furthermore, when a bona fide purchaser in an arm's-length transaction buys only all or some of the stock of a government-owned corporation, none of the subsidy is repaid by that purchase. The corporation still has the subsidy. All that has changed is who owns a beneficial interest in the corporation, evidenced by ownership in the corporation's common stock. There appears to be nothing in the record that demonstrates any corporate transferor returned anything to its original donor government.

It is conceivable that foreign governments, transferors, and transferees could try to structure their privatization transactions to evade potential tariff liability under United States' CVD laws. Perhaps Congress will provide guidance pertaining to such potential problems. In any event, Commerce, using its considerable expertise and insisting that such transactions be based upon good faith commercial considerations, should be able to ferret out sham transactions.[35] The Court

observes, however, it is beyond the scope of this opinion to speculate upon how parties may endeavor to structure future privatization transactions or whether such structuring would be consonant with present CVD statutes.

## II. CERTAIN STEEL PRODUCTS FROM BRAZIL

### BACKGROUND

The period for which Commerce measured subsidies for purposes of the final determination concerning Usinas Siderurgicas de Minas Gerais, S.A. (USIMINAS) is calendar year 1991.[36] *Brazilian Final Determination,* 58 Fed.Reg. at 37,296. The products covered by Commerce's investigation of USIMINAS are certain hot-rolled carbon steel flat products, certain cold-rolled carbon steel flat products, and certain cut-to-length carbon steel plate. *Id.*

In the *Brazilian Final Determination,* Commerce set forth its determination that USIMINAS was unequityworthy from 1980 to 1988 and that equity infusions provided by the government of Brazil in those years were inconsistent with commercial considerations. *Id.* at 37,297. Commerce further determined that USIMINAS was uncreditworthy during the period 1980–1988. *Id.* Commerce then determined the amount of net subsidies provided under various government programs. *Id.* at 37,298–300.

Without elaboration, Commerce also determined that in 1991, USIMINAS was partially privatized. *Id.* at 37,297. Accordingly, Commerce applied its privatization and repayment methodology set forth in the *General Issues Appendix:*

In these final determinations, we have decided that a portion of the price paid for a formerly government-owned company represents partial repayment of prior subsidies. We calculated the portion of the purchase price attributable to repayment of prior subsidies. We then reduced the benefit streams for each of the prior subsi-

---

**35.** Presumably, if the only reason governments are structuring privatization transactions is to evade countervailing duties, and do so without commercial considerations, Commerce will look upon such transactions with disfavor.

**36.** In the *Brazilian Final Determination,* Commerce set forth the results of its investigation of three companies. Only the USIMINAS investigation, however, involved privatization issues. Therefore, only USIMINAS will be considered in the Court's discussion of privatization.

dies by the ratio of the repayment amount to the net present value of all remaining benefits from those prior subsidies at the time of privatization. A further explanation of the Department's determination on privatization and these calculations can be found in the Privatization section of the General Issues Appendix. The subsidies allocated to the POI for USIMINAS reflect, where appropriate, the application of the privatization methodology.

*Id.*

## CONTENTIONS OF THE PARTIES

### A. *The Foreign Producers*

The Foreign Producers' contentions concerning the general issue of privatization as set forth in the *General Issues Appendix* and applied in the relevant determinations in the CVD series published in the *Federal Register* on July 9, 1993, are described above in the Court's discussion of the *Mexican Final Determination.*

Specifically with regard to Commerce's application of its privatization methodology to USIMINAS, the Foreign Producers contend that USIMINAS was privatized by public auction in October 1991 at an arm's-length market price for fair market value. (Resp'ts' J.Br. in Supp. of Mot. for Partial J. on R. (Resp'ts' J.Br.), Vol. I at 6, Vol. II Tab C at 1–3, 6; Resp'ts' Answers to Ct.'s Questions (Resp'ts' Answers) at 15). The Foreign Producers acknowledge that Companhia Vale do Rio Doce (CVRD), a company majority-owned by the government, purchased 15% of USIMINAS' common shares at auction. (Resp'ts' J.Br., Vol. II Tab C at 4). The Foreign Producers maintain, however, that CVRD bought those shares on terms consistent with other auction purchases. (*Id.*). The Foreign Producers also acknowledge that the Brazilian government retained an ongoing residual ownership interest in USIMINAS. (*Id.* at 5; Resp'ts' Answers at 16 n. 15). They argue, however, that this equity interest is *"nominal"* and confers no leverage over USIMINAS. (Resp'ts' Answers at 16 n. 15; Resp'ts' J.Br., Vol. II Tab C at 5). In sum, the Foreign Producers contend any alleged subsidy benefits received by USIMINAS prior to privatization were extinguished

by the sale of the controlling interest in USIMINAS at a bona fide market price. (Resp'ts J.Br., Vol. II Tab C at 1–8).

### B. *The Domestic Producers*

The Domestic Producers' contentions concerning the general issue of privatization as set forth in the *General Issues Appendix* and applied in the applicable determinations in the CVD series published in the *Federal Register* on July 9, 1993, are described above in the Court's discussion of the *Mexican Final Determination.*

Specifically in regard to USIMINAS, while the Domestic Producers dispute Commerce's determination that privatization results in a partial repayment of pre-privatization subsidies, the Domestic Producers support Commerce's determination that USIMINAS was only partially privatized. (Def.–Intervenors' Resp. at 90–92). According to Domestic Producers, the partial privatization of USIMINAS "involved a straightforward sale of shares." (AK Steel Corp. *et al.*, Answers to Ct.'s Questions at 17). Prior to privatization, the Brazilian Government owned 94.6% and 87.7% of the common and preferred shares of USIMINAS. (*Id.*). Through an auction of USIMINAS' shares, various parties purchased "almost all" of the Brazilian Government's common shares and 32% of its preferred shares. (*Id.*). These purchasers, however, included CVRD, a government-owned mining company that bought 15% of USIMINAS' common shares at auction. (*Id.* at 5). Additionally, "[s]tate-owned entities . . . held 44% of the non-voting preferred shares. SIDERBRAS [Siderurgia Brasileira, S.A.], the state-owned steel holding company, retained ownership of 17% of the preferred shares, while BNDES [Banco Nacional de Desenvolvimento Economico e Social], the state-owned development bank, held another 15%." (*Id.* (footnotes omitted)). The Domestic Producers argue "USIMINAS has admitted that government-owned entities continued to own a substantial portion of USIMINAS' shares after privatization" and thus the Foreign Producers have not shown Commerce's determination that USIMINAS was only partially privatized to be unsupport-

ed by substantial evidence. (Def.–Intervenors' Resp. at 91–92).

### C. *The Department of Commerce*

The Department of Commerce's contentions concerning the general issue of privatization as set forth in the *General Issues Appendix* and applied in the applicable determinations in the CVD series published in the *Federal Register* on July 9, 1993, are described above in the Court's discussion of the *Mexican Final Determination.*

With regard to USIMINAS, Commerce maintains that after benefitting from equity infusions and other subsidies, USIMINAS was partially privatized in 1991. (Def.'s Br. in Opp'n to Mots. for J. on R. at 3–4). This partial privatization was effected through an auction of USIMINAS' voting stock and a second auction of USIMINAS' non-voting stock. (*Id.*). Subsequent to both auctions, SIDERBRAS and BNDES retained a 17% and 15% interest respectively of USIMINAS' nonvoting preferred shares. (*Id.* at 4). Also, CVRD, a state-owned mining company, purchased 15% of USIMINAS' common shares at auction. (*Id.*).

Commerce has made no findings and makes no assertions, however, as to whether the sales of USIMINAS' shares at auction were carried out at fair market value. (Def.'s Resp. to Ct.'s Questions at 3 (citing Commerce's statement in the *General Issues Appendix* that "whether or not the sale of USIMINAS was made at a fair market price was not relevant under the Department's methodology," *General Issues Appendix,* 58 Fed.Reg. at 37,265). Additionally, Commerce made no finding and makes no assertions as to whether the partial privatization of USIMINAS was necessarily an arm's-length transaction. (Def.'s Resp. to Ct.'s Questions at 2).

### DISCUSSION

In the *Brazilian Final Determination,* Commerce appears to have concluded that USIMINAS was partially privatized. *Brazilian Final Determination,* 58 Fed.Reg. at 37,297 ("USIMINAS was partially privatized in 1991."); *see also General Issues Appendix,* 58 Fed.Reg. at 37,265 (responding to party comments regarding USIMINAS by stating that Commerce's privatization methodology "has been applied to all total and partial privatizations at issue in these investigations"). Because Commerce determined that a partial privatization took place, Commerce applied its privatization methodology. *See Brazilian Final Determination,* 58 Fed.Reg. at 37,297 ("The subsidies allocated to the POI for USIMINAS reflect, where appropriate, the application of the privatization methodology.").

Commerce, however, failed to explicate in the *Brazilian Final Determination* what it means to be "partially privatized" and how USIMINAS was "partially privatized." From the parties' papers, the Court surmises that an auction of USIMINAS' shares took place. The circumstances of this transaction, however, are not articulated in the *Brazilian Final Determination.*

Accordingly, this case is remanded to Commerce with instructions to examine and report to the Court if and how a partial privatization took place. Specifically, Commerce should report to the Court the following: (1) whether the privatization or partial privatization transaction at issue was at arm's length, for fair market value, and based upon commercial considerations; (2) whether the transaction at issue involved a privatization or partial privatization; (3) the terms and substance of the transaction at issue, and whether the transaction involved a sale of an asset or several assets, or consisted entirely of a sale of shares; (4) whether, under the Court's analysis set forth above, if a privatization or partial privatization took place, the privatized entity continues to be, for all intents and purposes, the same entity that received subsidies prior to the transaction; and (5) whether, under the Court's analysis, Commerce may properly continue to countervail USIMINAS. Commerce is further directed to perform and report to the Court the following calculations: (1) Commerce will calculate any countervailing duties due, if any, by any transferor and transferee subsequent to a privatization; (2) if, under the Court's analysis, Commerce determines that post-transaction USIMINAS continues to be, for all intents and purposes, the same

entity that received subsidies prior to the transaction at issue, Commerce will calculate any and all countervailing duties due on that surviving entity; and (3) Commerce will calculate any and all countervailing duties due on account of any other type of privatization transaction. In its calculations Commerce shall, where applicable, make any corrections necessary on account of allocation and/or sales denominator adjustments occasioned by the respective remands on those issues.

### III. CERTAIN STEEL PRODUCTS FROM THE UNITED KINGDOM

#### BACKGROUND

The period for which Commerce measured subsidies for purposes of the final determination in the *British Final Determination* is April 1, 1991, through March 31, 1992. *British Final Determination*, 58 Fed.Reg. at 37,-394. The product covered by Commerce's investigation is certain cut-to-length carbon steel plate. *Id.*

The only respondent company for the class or kind of merchandise subject to investigation in the *British Final Determination* is British Steel plc (BS plc). *Id.* According to Commerce, BS plc is the "corporate successor" to British Steel Corporation (British Steel), a company that was wholly-owned by the British Government. *Id.* Commerce explains,

> In 1988, the UK government sold [British Steel] through a public offering of shares. With the exception of a Special Share which represents approximately 0.000017 percent of the total number of shares issued and which is intended to prevent persons, or persons acting in concert, from having an interest of 15 percent or more in the company, the UK government currently holds no ownership interest in BS plc.

*Id.*

In the *British Final Determination*, Commerce found that British Steel was both uncreditworthy and unequityworthy from 1977–1978 through 1985–1986. *Id.* at 37,395. Commerce further determined that British Steel had received subsidies from a variety of programs such as government equity infusions, cancelled debt, and regional development programs. *Id.* at 37,395–97. At the conclusion of each discussion of the various countervailable government programs providing benefits to British Steel, Commerce explained that it had calculated the benefit and net subsidy under that program for BS plc for the period of investigation. *See id.* In other words, Commerce had applied its privatization and repayment methodology by countervailing BS plc for subsidies bestowed upon British Steel because BS plc was British Steel's "corporate successor." In its brief discussion of privatization, Commerce explained once again:

> In this final determination, we have determined that a portion of the price paid for a formerly government-owned company represents partial repayment of prior subsidies. We calculated the portion of the purchase price attributable to repayment of prior subsidies. We then reduced the benefit streams for each program by the ratio of the repayment amount to the net present value of the remaining benefits at the time of privatization. A further explanation of the Department's determination on privatization and these calculations can be found in the Privatization section of the General Issues Appendix. The subsidies allocated to the [period of investigation] for BS plc reflect, where appropriate, the application of the privatization methodology.

*Id.* at 37,394.

#### CONTENTIONS OF THE PARTIES

##### A. *The Foreign Producers*

The Foreign Producers' contentions concerning the general issue of privatization as set forth in the *General Issues Appendix* and applied in the applicable determinations in the CVD series published in the *Federal Register* on July 9, 1993, are described above in the Court's discussion of the *Mexican Final Determination.*

With regard to the privatization of British Steel, the Foreign Producers contend that British Steel, a Crown corporation, was privatized in 1988. (Resp'ts' J.Br. in Supp. of Mot. for Partial J. on R. (Resp'ts' J.Br.), Vol. I at 6). To effect privatization, "the U.K. Government created a new company limited by shares called British Steel plc ... to

which all of the Crown corporation's property, rights and liabilities were transferred" pursuant to the British Steel Act of 1988. (*Id.* at 5–6; *see* Resp'ts Answers at 4). The British Steel Act also authorized the sale of ordinary shares in BS plc to the public. (Resp'ts' Answers to Ct.'s Questions (Resp'ts' Answers) at 4). On November 23, 1988, two billion shares in BS plc were offered for sale. (Resp'ts' J.Br., Vol. II Tab A at 6).

The Foreign Producers further maintain that since 1988, the U.K. government has held two types of ownership interests in BS plc. (*Id.* at 7–8). First, the United Kingdom's "Secretary of State for Trade and Industry retained a single Special Share in BS plc on behalf of the government.... intended to prevent any alteration of specified Articles of Association." (*Id.* at 7). The Special Share was redeemed at par in 1993. Second, the U.K. government retained 34,088 shares of BS plc "to deal with the logistical problems." (*Id.*). The Foreign Producers contend, however, "[t]he U.K. Government intends to dispose of these remaining shares in due course." (*Id.* at 8).

The Foreign Producers contend that BS plc's shares were transferred "at a price reflecting the fair market value of the entire company." (Resp'ts' J.Br., Vol. I at 6; *see* Resp'ts' Answers at 2–3). Specifically, the Foreign Producers argue that "arm's-length transaction" and "fair market value" are closely linked concepts. (Resp'ts' Answers at 1). In the determinations under review, they argue, Commerce "implicitly recognized that all the privatization transactions in these cases reflected the companies' actual value." (*Id.* at 2 (quoting Commerce's statement that a "privatized company now has an obligation to provide to its private owners a market return on the company's full value," *General Issues Appendix,* 58 Fed.Reg. 37,262)). The Foreign Producers thus contend that "[i]f the owners have paid the 'full value' of the company, [Commerce] necessarily must have found that the transactions occurred at arm's length and involved payment for the market value of the company." (*Id.*). The Foreign Producers argue, furthermore, that in the investigation Commerce verified facts supporting the finding that the privatization at issue was effected at fair market value. (*Id.*).

## B. *The Domestic Producers*

The Domestic Producers' contentions concerning the general issue of privatization as set forth in the *General Issues Appendix* and applied in the applicable determinations in the CVD series published in the *Federal Register* on July 9, 1993, are described above in the Court's discussion of the *Mexican Final Determination.*

With regard to the privatization of British Steel, the Domestic Producers contend that BS plc is in all material and commercial respects the same company that received subsidies. (AK Steel Corp., *et al.,* Answers to Ct.'s Questions at 4; *see also id.* at 13 (quoting Commerce's statement in the *British Final Determination* that BS plc "is the corporate successor to British Steel Corporation") (footnote omitted)). The Domestic Producers maintain that when all of British Steel's property, rights, and liabilities were transferred to BS plc under the British Steel Act, BS plc "became the legal owner of [British Steel's] assets, both tangible and intangible." (*Id.* at 15). British Steel and BS plc "from the perspective of the British Government and in all significant commercial respects ... *were the same company.*" (*Id.*). To privatize the company now named BS plc, the company simply issued and sold shares. (*Id.* at 14, 16). Thus, "[t]he privatization reflected a change in the owners of the shares of British Steel plc only." (*Id.* at 16 (emphasis omitted)).

The Domestic Producers take no position, however, on whether the transaction occurred at fair market value. The Domestic Producers claim that whether a privatization is effected at fair market value "is not relevant to the law, which does not concern itself with whether the new *shareholders* benefit as a result of the change in the subsidized company's ownership." (*Id.* at 3).

## C. *The Department of Commerce*

The Department of Commerce's contentions concerning the general issue of privatization as set forth in the *General Issues Appendix* and applied in the applicable de-

terminations in the CVD series published in the *Federal Register* on July 9, 1993, are described above in the Court's discussion of the *Mexican Final Determination*.

With regard to the privatization of British Steel, Commerce maintains British Steel was privatized in 1988 through a public offering of shares. (Def.'s Br. in Opp'n to Mots. for J. on R. at 8 (stating that "British Steel plc ... became the corporate successor to British Steel Corporation ... when the British Government sold [British Steel] through a public offering of shares"); *see also* Def.'s Resp. to Ct.'s Questions at 4). Commerce contends that prior to the offering, British Steel became BS plc under the terms of the British Steel Act of 1988. (Def.'s Resp. to Ct.'s Questions at 10). According to evidence on the record, Commerce maintains, the British Steel Act of 1988 acted as a statutory instrument whereby British Steel's assets vested into BS plc. (*Id.* at 11 (citations omitted)).[37] Record evidence further shows that the British Steel Act "'was to change the legal status of British Steel from a public corporation to a public limited company but *it was intended that the successor company should be regarded for all practical commercial purposes as the same company.'*" (*Id.* (citation omitted) (emphasis added by Commerce)).

Commerce makes no representation and claims to have made no findings as to whether the privatization transaction occurred at arm's length or for fair market value. (*Id.* at 2, 4). Commerce explains that it only applied its privatization methodology where "legitimate sales" took place. (*Id.* at 2). A legitimate sale, according to Commerce, "'must involve unrelated parties, one of which must be privately-owned.'" (*Id.* (quoting *General Issues Appendix,* 58 Fed. Reg. at 37,266)). Because Commerce focused only on the "legitimate sale" question, the agency claims it did not need to determine whether the transaction occurred at

arm's-length or for fair market value. (*Id.* at 2–4).

## DISCUSSION

In the *British Final Determination,* Commerce appears to have concluded that "BS plc is the corporate successor to the British Steel Corporation[,] ... a company that was wholly-owned by the UK government." *British Final Determination,* 58 Fed.Reg. at 37,394. Commerce also appears to have determined that a privatization took place. *See id.* Because Commerce determined a privatization occurred, it applied its privatization methodology. *See id.* ("The subsidies allocated to the [period of investigation] for BS plc reflect, where appropriate, the application of the privatization methodology.").

Commerce failed, however, to explicate in the *British Final Determination* how British Steel was privatized other than to state that,

In 1988, the UK government sold [British Steel] through a public offering of shares. With the exception of a Special Share which represents approximately 0.000017 percent of the total number of shares issued and which is intended to prevent persons, or persons acting in concert, from having an interest of 15 percent or more in the company, the UK government currently holds no ownership interest in BS plc.

*Id.* Other than in this passage, Commerce did not articulate the circumstances of the transaction at issue in the *British Final Determination.* Commerce made no determination as to whether the transaction took place at arm's length for fair market value based upon commercial considerations. *See* Def.'s Resp. to Ct.'s Questions at 2, 4. Furthermore, Commerce did not explain in the *British Final Determination* if, by stating that "BS plc is the corporate successor" to British Steel, Commerce found that BS plc is for all intents and purposes the same corporation as British Steel.[38]

---

**37.** Commerce informs this Court that "[a]n exception to what was transferred from [British Steel] to BS plc were [sic] tax losses." (Def.'s Resp. to Ct.'s Questions at 11). Commerce indicates the record shows that British Steel's accumulated tax losses were reduced from £1.9 billion to a carried forward balance of approxi-

mately £171 million. (*Id.* at 11–12 (citations omitted)).

**38.** Under Commerce's discussion of government equity infusions into British Steel, Commerce did state that:

Accordingly, the *British Final Determination* is remanded to Commerce with instructions to examine and report to the Court if and how privatization took place. If privatization occurred, the Court instructs Commerce in its remand determination to advise the Court as to the nature of the privatization transaction. Commerce argues to this Court that British Steel became BS plc, and subsequently shares of BS plc were sold. *See* Def.'s Resp. to Ct.'s Questions at 10. If this is so, Commerce should inform this Court: (1) whether British Steel and BS plc, prior to any sale of BS plc's shares, were for all intents and purposes the same entity; and (2) whether, after any sale of BS plc's shares, BS plc continued to be for all intents and purposes the same corporate entity that existed prior to the sale, that is, if privatization took place, whether privatized BS plc was for all intents and purposes the same corporate entity as pre-privatization BS plc. Commerce is also to inform this Court: (1) whether each aspect of the transaction was at arm's length, for fair market value, and based upon commercial considerations; (2) whether each aspect of the transaction involved a privatization or partial privatization; (3) the terms and substance of each aspect of the transaction and whether each transaction involved a sale of an asset or several assets or consisted entirely of a sale of shares; and (4) whether, under the Court's analysis, Commerce may properly countervail BS plc. Commerce is further directed to perform and report to this Court the following calculations: (1) Commerce will calculate and report any countervailing duties due, if any, by any transferor and transferee subsequent to privatization; (2) if, under the Court's analysis, Commerce determines it may properly countervail BS plc as a surviving corporate entity, Commerce will calculate any and all countervailing duties due; and (3) Commerce will calculate any and all countervailing duties due on account of any other type of privatization transaction arising. In its calculations

Commerce shall, where applicable, make any corrections necessary on account of allocation and/or sales denominator adjustments occasioned by the respective remands on those issues.

## IV. CERTAIN STEEL PRODUCTS FROM GERMANY

### BACKGROUND

In April 1989, the Government of Saarland and a French company, Usinor Sacilor, reached an agreement whereby Saarstahl Volklingen GmbH (Saarstahl), a government-owned company, and AG der Dillinger Hüttenwerke (Dillinger) were transferred to a newly created holding company, Dillinger Hütte Saarstahl AG (DHS). *German Final Determination*, 58 Fed.Reg. at 37,320. In the *German Final Determination*, Commerce characterized the transaction as follows:

> Under the terms of this agreement, Saarstahl and Dillinger became wholly-owned subsidiaries of DHS.
>
> The Government of Saarland contributed the assets of Saarstahl and DM 145.1 million in cash in return for 27.5 percent ownership of the holding company, DHS. Usinor Sacilor contributed its shares of Dillinger to DHS in return for 70 percent ownership of the holding company.... Pursuant to the purchase agreement, the Governments of Germany and Saarland forgave all of the outstanding debts owed to them by Saarstahl.... In addition, private creditors forgave debt amounting to DM 217.1 million as part of the restructuring of the two companies.

*Id.*

Commerce found the forgiveness of debt by the Governments of Germany and Saarland to constitute a countervailable benefit. *Id.* Commerce also found the private debt forgiveness countervailable "because it was required by the governments as part of a

---

A second capital reconstruction of [British Steel] tool place in 1988 in accordance with the British Steel Act of 1988. The purpose of this second reconstruction ... was to prepare [British Steel] for privatization by bringing it into a form appropriate for a Public Limited Company (i.e., "plc").

*British Final Determination*, 58 Fed.Reg. at 37,-395. Without a clearer and more explicative statement concerning the entire privatization transaction, however, the Court cannot discern whether Commerce properly determined it could countervail BS plc for subsidies received by British Steel.

government-led debt reduction package, and because the two governments guaranteed the future liquidity of Saarstahl, thereby implicitly assuring the private banks that the remaining portion of Saarstahl's outstanding loans would be repaid." *Id.*

Commerce further determined that Saarstahl benefitted from the debt forgiveness and attributed those benefits to DHS as the purchaser of Saarstahl: "[T]he debt forgiveness provided by the Governments of Germany and Saarland and the private creditors, provided benefits to Saarstahl which were then passed through to DHS with the 100 percent spin-off of Saarstahl to DHS." *Id.* Accordingly, Commerce apparently applied the methodologies set forth in the *General Issues Appendix* and reduced the amount of subsidies attributable to DHS based on the notion that a portion of the sales price paid for Saarstahl repaid part of the subsidies. *Id.; see id.* at 37,316; *see also General Issues Appendix,* 58 Fed.Reg. at 37,269 ("[C]onsistent with the Department's position regarding privatization, the Department will analyze the spin-off and acquisition of productive units to assess what portion of the sale price of the productive unit repays prior subsidies given to the seller of the productive unit.").[39]

CONTENTIONS OF THE PARTIES .

A. *The Domestic Producers*

The Domestic Producers' contentions concerning the general issue of privatization as set forth in the *General Issues Appendix* and applied in the applicable determinations in the CVD series published in the *Federal Register* on July 9, 1993, are described above in the Court's discussion of the *Mexican Final Determination.*

The Domestic Producers contend that Commerce's application of the privatization and repayment methodology to the creation of DHS, thus reducing the amount of subsidies attributable to DHS, is not supported by substantial evidence and is not otherwise in accordance with law. (Pls.'s J.Br. in Supp. of Mot. for J. on R. at 61). The Domestic Producers argue that the subsidy at issue, the forgiveness of certain debts incurred by Saarstahl, was provided to DHS, not to Saarstahl, in the course of the creation of DHS. (Reply Br. of Def.–Intervenors at 54). By its own terms, the Domestic Producers maintain, for Commerce's repayment methodology to apply subsidies must have been bestowed prior to the transaction at issue. (*Id.* at 55). Here, however, "the subsidy was the debt forgiveness that occurred *at the time of the transaction* and was a condition to the transaction itself. In this context, by definition, DHS was the original beneficiary." (*Id.* at 56 (footnote omitted)). Furthermore, even if the Court should disagree with the Domestic Producers' contention that Commerce's repayment methodology does not apply because the subsidy was provided to DHS during the course of its creation, the Domestic Producers argue Commerce's determination that the creation of DHS was a privatization is not supported by factual evidence on the record. (*Id.*).

B. *The Foreign Producers*

The Foreign Producers maintain that Commerce "does not dispute that fair market value was paid in the 1989 Transaction by which Dillinger and Saarstahl became subsidiaries of the holding company, DHS." (Resp'ts' Answers to Ct.'s Questions at 10; *see also id.* at 12 ("Dillinger submits that the Government perhaps misspoke when it included the German transaction among those about which it stated that no specific arm's-length finding was made.")).[40] Pursuant to

---

39. It appears from the papers submitted to this Court in regard to the motion for summary judgment in *LTV Steel, Co., Inc.* et al. *v. United States,* Consol.Court No. 93–09–00568–CVD, that once Commerce determined the subsidy benefits had passed through to DHS, Commerce allocated the benefits deemed received by DHS over the sales of its new subsidiaries, Saarstahl and Dillinger. *See* Def–Intervenors' Mot. for Summ. J. at 4, 6. In the case of Dillinger, the allocation was pursu-

ant to the *German Final Determination* at issue here. *See id.*

40. In their response brief, the Foreign Producers did not answer the Domestic Producers' contentions concerning Commerce's application of its repayment methodology to the DHS–Dillinger–Saarstahl transaction. However, AG der Dillinger Hüttenwerke and Dillinger Hütte Saarstahl did submit answers to the Court's post-oral argu-

the transaction, Saarstahl was fully privatized and its new owner was DHS. (*Id.* at 12). While the Government of Saarland owned a 27.5% "non-controlling interest" in DHS, Commerce "found that the Government's interest in the new entity had been acquired on commercially consistent terms, which were established by the independent accountants." (*Id.*). Furthermore, the Foreign Producers argue, Commerce "has never suggested that, after the privatization, DHS, or Saarstahl, was the same entity as the privatized company while under Government ownership." (*Id.* at 14).

### C. The Department of Commerce

The Department of Commerce's contentions concerning the general issue of privatization as set forth in the *General Issues Appendix* and applied in the applicable determinations in the CVD series published in the *Federal Register* on July 9, 1993, are described above in the Court's discussion of the *Mexican Final Determination.*

With regard to the corporate transaction relevant to the *German Final Determination,* Commerce maintains it properly applied its privatization methodology. Commerce contends that the transaction resulting in the formation of DHS was not an internal corporate restructuring, but instead resulted in an independent, joint-venture company. (Def.'s Br. in Opp'n to Mots. for J. on R. at 101, 103). Commerce maintains that under the April 1989 agreement, DHS became the holding company for both Saarstahl·and Dillinger. (*Id.* at 103). Saarstahl was thus privatized when the Government of Saarland sold Saarstahl to DHS. (*Id.* at 104). Citing this Court's decision in *Saarstahl,* Commerce contends the argument that privatization could not have occurred because the Government of Saarland still owned 27.5% of the purchaser, DHS, does not change the analysis. (*Id.*). Finally, Commerce contends it properly determined that countervailable benefits in the form of debt forgiveness were provided originally to Saarstahl, not DHS. (*Id.* at 106–07).

ment questions on the issue of privatization relevant to the dispute at issue. *See generally*

Commerce maintains, however, it made no specific finding regarding whether fair market value was paid in the transaction, or whether the transaction took place at arm's length. (Def.'s Resp. to Ct.'s Questions at 2, 3). Commerce does reiterate its statement in the *German Final Determination* that " '[t]he Government of Saarland contributed the assets of Saarstahl and DM 145.1 million in cash in return for 27.5 percent ownership of the holding company, DHS.' " (*Id.* at 6 (citation omitted)). Commerce claims, however, to have "made no ... specific finding regarding the nature of Saarstahl either before or after privatization." (*Id.* at 16).

### DISCUSSION

In *Saarstahl, AG v. United States,* 18 CIT ——, 858 F.Supp. 187 (1994), this Court held that the attribution of subsidies, consisting of the forgiveness of debt by the government and private banks, previously bestowed upon Saarstahl to DHS after DHS acquired Saarstahl in an arm's-length transaction was unlawful. *Id.* at ——, 858 F.Supp. at 191. As discussed above, this Court reasoned in *Saarstahl* that Saarstahl was privatized in an arm's-length transaction in which DHS paid for all that it received. *Id.* at ——, 858 F.Supp. at 192. DHS, therefore, did not realize any countervailable benefit and any countervailable duty assigned to it amounts to a penalty. *Id.* at ——, 858 F.Supp. at 192–93.

This Court's decision and analysis in *Saarstahl* is consistent with the analysis set forth in the Court's present opinion. As discussed above, Commerce may only countervail a privatized company for pre-privatization subsidies if the privatized company is the same or partially the same entity that received those subsidies. Whether the privatized company is the entity that received the subsidy depends upon the nature of the privatization transaction undergone. If, for example, a company is privatized through a simple stock transfer carried out at arm's-length for fair market value based upon com-

Resp'ts' Answers to Ct.'s Questions.

mercial considerations, only the ownership interests in that corporation have changed; the corporation itself still exists and may continue to be countervailed. If, however, a government-owned company is privatized through a sale of that company's several assets, Commerce cannot countervail the purchaser of those assets as long as the purchaser pays fair market value at arm's length based upon commercial considerations. In that case, Commerce cannot countervail for pre-privatization subsidies not only because the purchaser has paid for all which it is to receive, but also because the purchaser/transferee is not the same entity that received the subsidies. Commerce could, however, continue to countervail the transferor.[41]

It appears from the *German Final Determination* Commerce found that Saarstahl was privatized in a transaction involving a sale of Saarstahl's several assets: "The Government of Saarland *contributed the assets of Saarstahl* and DM 145.1 million in cash in return for 27.5 percent ownership of the holding company, DHS." *German Final Determination,* 58 Fed.Reg. at 37,320 (emphasis added). Commerce also appears to have determined that Saarstahl was the original recipient of the subsidies. *Id.* The Domestic Producers, however, characterize the transaction as a "reorganization" of Saarstahl followed by a sale of its shares. (Answers of AK Steel Corp., *et al.,* to Ct.'s Questions at 7–8 ("Saarstahl was reorganized as DHS Dillinger Hütte Saarstahl.... The Government of Saarland acquired a 27.5 percent ownership interest in the enlarged DHS in exchange for a cash contribution of DM 145.1 million.") (footnote omitted)). Domestic Producers also claim that, because the loan forgiveness occurred during the transaction and as a requirement of DHS's creation, the benefit vested in DHS, not in Saarstahl. *See*

Pls.'s J.Br. in Supp. of Mot. for J. on R. at 9, 11.

If in fact Commerce has interpreted the evidence to conclude that the loan forgiveness constituted a subsidy to Saarstahl and not to DHS, and that Saarstahl was privatized through a sale of its several assets, as long as those interpretations are supported by substantial evidence they will stand. *See, e.g., Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (citations omitted). However, other than setting forth the conclusory statements that "the debt forgiveness ... provided benefits to Saarstahl which were then passed through to DHS," and "the Government of Saarland contributed the assets of Saarstahl," Commerce does not appear to have explicated how it reached its determinations in the *German Final Determination. German Final Determination,* 58 Fed.Reg. at 37,320.

In oral argument before this Court, Commerce informed the Court that the privatization of Saarstahl was at fair market value. *See* Tr. at 483 ("Other than Brazil and Mexico, for all the remaining countries the Commerce Department determined that the transactions were made at ... fair market value."). Commerce also informed this Court during the course of the *Saarstahl* proceeding that the privatization of Saarstahl was an arm's-length transaction. *Saarstahl,* 18 CIT at ——, 858 F.Supp. at 192 (("In response to the Court's question "was this an arm's length transaction," the government responded, "Yes, it was.") (citing *Saarstahl* Tr. at 19)). Indeed, the very holding of

**41.** If the "old" public corporation goes out of business and the "new" privatized corporation is going into business, should not Commerce seek to countervail all prior subsidies that were given? Are not those tariffs somehow lost? In light of the purposes of the CVD statutes, the answer to both questions would seem to be no. The intent of Congress has been given implementation. The "new" privatized entity has received no bounty or grant because it has paid full value for the assets it has received. The "old" entity will

follow one of several routes. For example, if the "old" corporation is out of business it is not competing with the advantages of subsidies. If the "old" corporation continues to do business with the United States it will be countervailed for the subsidies it has received. It certainly can be argued that governments may endeavor to structure privatization transactions to avoid countervailing tariffs. Commerce, with its considerable expertise should have the ability to ferret out sham transactions.

*Saarstahl* was premised in substantial part upon the proposition that "Saarstahl was privatized in an arm's length transaction." *Id.* at ——, 858 F.Supp. at 192. Commerce now informs this Court, however, that it did not in fact make such findings. *See, e.g.,* Def.'s Resp. to Ct.'s Questions at 2, 3, 13. Commerce also claims to have made no specific finding as to whether the privatized entity is the same entity as the company that received subsidies. (*Id.* at 16).

The Foreign Producers inform this Court in their response to this Court's post-oral argument questions on privatization that Commerce has made a specific finding that the 1989 Transaction was at arm's length. (Resp'ts' Answers to Ct.'s Questions at 10). The Foreign Producers take the position that Commerce first made these findings in *Certain Hot Rolled Lead and Bismuth Carbon Steel Products from Germany,* 58 Fed.Reg. 6233, 6234, 6235–37 (1993) (*Leaded Bar* ), in which Commerce stated:

> We believe that the equity infusion made by the Government of Saarland into DHS was on terms consistent with commercial considerations.... [W]e determine that the equity infusion made by the Government of Saarland into DHS was made on terms consistent with commercial considerations.

(*Id.* at 10 (quoting *Leaded Bar,* 58 Fed.Reg. at 6236)). The Foreign Producers maintain that this Court upheld Commerce's "findings of an arm's-length and fair market value transaction on appeal of the *Leaded Bar* determination." (*Id.* (citing *Saarstahl,* 18 CIT at ——, 858 F.Supp. at 192–93)). Furthermore, they argue, Commerce has carried forward its determination into the instant case and is defending its determination in this litigation. (*Id.* at 11).

It is the position of this Court that because Commerce has specifically informed this Court that:

> Commerce made no specific findings that the privatizations in the Brazil, Germany, Mexico, and United Kingdom certain steel CVD investigations were necessarily of arm's-length transactions[;]
>
> ....

> ... Commerce made no specific finding regarding whether fair market value was paid[;]

> ... On further review of the record, Commerce respectfully must correct the suggestion it initially made to the Court regarding whether Commerce had made a specific finding that a fair market value was paid in the privatization of Saarstahl. Commerce made no such specific finding[;]
>
> ....

> ... Commerce made no ... specific finding regarding the nature of Saarstahl either before or after privatization[;]

(Def.'s Resp. to Ct.'s Questions at 2, 3, 13, 16), the *German Final Determination* must be remanded so that Commerce may properly make these findings and report them to this Court with articulated reason and consistency.

Accordingly, the *German Final Determination* is remanded to Commerce. Specifically, Commerce is to report to this Court the following: (1) whether the privatization transaction at issue was effected at arm's length, for fair market value, and based upon commercial considerations; (2) whether the transaction at issue involved a privatization or partial privatization; (3) the terms and substance of the transaction at issue, and whether the transaction involved a sale of an asset or several assets, or consisted entirely of a sale of shares; (4) whether, under the Court's analysis, if a privatization or partial privatization took place, the privatized entity continues to be, for all intents and purposes, the same entity that received subsidies prior to the transaction; and (5) whether, under the Court's analysis, Commerce may properly countervail DHS or any other party. Commerce is further directed to perform and report to this Court the following calculations: (1) Commerce will calculate any countervailing duties due, if any, by any transferor and transferee subsequent to a privatization; (2) if, under the Court's analysis, Commerce determines that any privatized or partially privatized entity continues to be, for all intents and purposes, the same entity that received subsidies prior to the privatization transaction, Commerce will calculate any and all countervailing duties due on such surviv-

ing entity; and (3) Commerce will calculate any and all countervailing duties due on account of any other type of privatization transaction involved. In its calculations Commerce shall, where applicable, make any corrections necessary on account of allocation and/or sales denominator adjustments occasioned by the respective remands on those issues.

## V. MOTION FOR SUMMARY JUDGMENT BASED ON ISSUE PRECLUSION

■ Under *LTV Steel Co., Inc.* et al. *v. United States,* Consol. Court No. 93–09–00568–CVD, one of the consolidated cases under the Court's scheduling order governing this joint proceeding, AG der Dillinger Hüttenwerke (Dillinger) has moved for summary judgment based on a claim of issue preclusion. *LTV Steel* involves an appeal from the administrative determination in *Certain Steel Products From Germany,* 58 Fed.Reg. 37,315 (Dep't Comm.1993) (final determ.).

Dillinger contends that this Court's decision in *Saarstahl, AG v. United States,* 18 CIT ——, 858 F.Supp. 187 (1994), warrants the granting of summary judgment in the present case. In *Saarstahl* this Court adjudicated on the merits the appeal of an administrative determination involving Dillinger's former sister company, Saarstahl AG. Dillinger maintains that the administrative determination appealed in *Saarstahl* involved "virtually identical facts" as the administrative determination in the present case. (Def.–Intervenor's Mot. for Summ.J. at 3). Dillinger claims the source of the subsidy and the countervailable event are the same in both final determinations, as well as the parties, and the time period. Dillinger also argues that the central issues in both appeals are identical. (*Id.* at 5). Accordingly, Dillinger argues this Court's decision in *Saarstahl* should be applied in favor of Dillinger and its parent company DHS. (*Id.* at 8).

Commerce does state in its response that "there is no dispute that the privatization transaction involved in *Saarstahl* is the same involved here." (Def.'s Opp'n to Mot. for Summ.J. at 4). From the parties' briefs in the joint proceeding addressed in this opinion

as well as the *Federal Register* determination itself, however, the Court discerns that the issues sought to be precluded may be somewhat obfuscated. The transaction that resulted in DHS holding Dillinger and Saarstahl as subsidiaries was a complicated one not fully explained by Commerce. *See, e.g., German Final Determination,* 58 Fed.Reg. at 37,320 ("The Government of Saarland contributed the assets of Saarstahl.... Usinor–Sacilor contributed its shares of Dillinger to DHS...."). This Court cannot discern from the *German Final Determination* or the parties' briefs whether the issues to be determined are identical. The Court has issued general remand instructions on the issue of privatization. The remand will presumably yield clarifying results. Accordingly, Dillinger's motion for summary judgment based on issue preclusion is denied.

## CONCLUSION

After considering the arguments of all parties, the Court makes the following holdings on the issue of privatization: (1) Commerce's privatization methodology as set forth in the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed. Reg. 37,225, 37,259–74 (Dep't Comm.1993) (final determ.) and applied in *Certain Steel Products from Brazil,* 58 Fed.Reg. 37,295 (Dep't Comm.1993) (final determ.), *Certain Steel Products from Mexico,* 58 Fed.Reg. 37,352 (Dep't Comm.1993) (final determ.), *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm. 1993) (final determ.), and *Certain Steel Products from Germany,* 58 Fed.Reg. 37,315 (Dep't Comm.1993) (final determ.), to the extent it states pre-privatization subsidies bestowed upon government corporations continue to be countervailable after all types of privatization transactions and that purchasers of discrete assets of subsidized corporations at arm's length for fair market value based upon commercial considerations may be attributed with subsidies previously received by the subsidized seller corporations, is unlawful; (2) Commerce's determination in the *Mexican Final Determination,* insofar as it pertains to the application of Commerce's privatization methodology, is remanded pur-

suant to the instructions in this opinion and its accompanying order; (3) Commerce's determination in the *Brazilian Final Determination,* insofar as it pertains to the application of Commerce's privatization methodology, is remanded according to the instructions in this opinion and its accompanying order; (4) Commerce's determination in the *British Final Determination,* insofar as it pertains to the application of Commerce's privatization methodology, is remanded according to the instructions contained in this opinion and its accompanying order; (5) Commerce's determination in the *German Final Determination,* insofar as it pertains to Commerce's application of its privatization methodology, is remanded according to the Court's instructions in this opinion and its accompanying order; and (6) the motion of AG der Dillinger Hüttenwerke for summary judgment in *LTV Steel Co., Inc. et al. v. United States,* Consol. Court No. 93–09–00568–CVD, is denied in all respects.

### SECTION TWO: ALLOCATION METHODOLOGY

Usinor Sacilor and Sollac (Usinor Sacilor) and British Steel plc (collectively "plaintiffs") jointly move for partial judgment on the agency record pursuant to U.S. CIT R. 56.2 and for an order declaring that aspect of the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed. Reg. 37,225, 37,225–31 (Dep't Comm.1993) (final determ.) (*General Issues Appendix*)[42] pertaining to the allocation methodology[43] employed by Commerce to amortize countervailable benefits as set forth in the *General Issues Appendix* and applied in the final countervailing duty determinations in *Certain Steel Products from France,* 58 Fed. Reg. 37,304 (Dep't Comm.1993) (final determ.) (*French Final Determination*)[44] and *Certain Steel Products from the United*

*Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm. 1993) (final determ.) (*British Final Determination*)[45] to be unsupported by substantial evidence on the record and not otherwise in accordance with law. Defendant, the Department of Commerce (Commerce), opposes plaintiffs' motion and asserts Commerce's determinations are based on substantial evidence on the administrative record and are otherwise in accordance with law. AK Steel Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a unit of USX Corporation, and WCI Steel, Incorporated (collectively "defendant-intervenors") oppose plaintiffs' motion and argue Commerce's determinations are fully supported by substantial evidence and are not contrary to law.

### BACKGROUND

In allocating the economic benefits of nonrecurring subsidies, Commerce apportions the value of the subsidies over a number of years beginning with the year of receipt. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 85–86 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 471 ("[I]n the case of nonrecurring subsidy grants or loans ... [r]easonable methods of allocating the value of such subsidies over the production or exportation of the products benefiting from the subsidy must be used."). The countervailing duty statute is silent, however, as to the methodology to be employed in allocating subsidy benefits.

Commerce erected an allocation methodology using the Internal Revenue Service's 1977 Class Life Asset Depreciation Range

---

**42.** See *supra* note 10 and accompanying text describing the nature of the *General Issues Appendix.*

**43.** In their papers, the parties also refer to the allocation methodology as an amortization methodology. In this opinion, the Court refers to the allocation methodology as a method employed by Commerce to allocate over time the benefits flowing from nonrecurring subsidies.

**44.** Commerce amended the *French Final Determination* on August 17, 1993. *See Certain Steel Products from France,* 58 Fed.Reg. 43,759 (Dep't Comm.1993) (order and am. final determ.).

**45.** Commerce amended the *British Final Determination* on August 17, 1993. *See Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 43,748 (Dep't Comm.1993) (order and am. final determ.).

System[46] (IRS tax tables) as a proxy. *General Issues Appendix,* 58 Fed.Reg. at 37,227. As explained by Commerce,

> Since 1982, it has been the Department's practice to allocate benefits from nonrecurring subsidies, such as grants and equity, over the average useful life of renewable physical assets, as set out in the U.S. Internal Revenue Service's Class Life Asset Depreciation Range System.... After careful consideration of the comments made by the interested parties, and our own internal examination of this policy, we have concluded that the allocation period traditionally used by the Department is the most reasonable. Furthermore, our use of the IRS tax tables ... is consistent with the Guidelines Adopted By The GATT Committee On Subsidies And Countervailing Measures: Guidelines on Amortization and Depreciation (GATT Doc. No SCM/64 of July 11, 1985).

*Id.*

In each of the investigations under review, Commerce "determined that the average useful life of renewable assets in the steel industry is 15 years, as set out in the IRS [tax] tables." *Id.* at 37,230. Thus, the agency found "the allocation period in these investigations is 15 years, which the Department considers to be reflective of the average useful life of assets in the steel industry." *Id.* (citing 54 Fed.Reg. 23,366, 23,384 (Dep't Comm.1989) (to be codified at 19 C.F.R. § 355.49(b)(3)) (proposed May 31, 1989) (*Proposed Regulations* )).

The nonrecurring grants at issue in the *French Final Determination* are the conversion of "loans with special characteristics" to common stock received by Usinor and Sacilor in the amount of French francs (FF) 13.8 billion in 1981 and FF12.6 billion in 1986. *French Final Determination,* 58 Fed.Reg. at 37,307. Commerce determined Usinor Sacilor to be unequityworthy from 1978 through 1988 and therefore "consider[ed] the conversion of PACS to common stock in 1981 and 1986 to constitute equity infusions on terms inconsistent with commercial considerations."

*Id.* Usinor Sacilor's conversion of "Fonds d'Intervention Sidérurgique" bonds to common stock in 1986 and 1988 were also construed as nonrecurring grants by Commerce. *Id.* Commerce's treatment of Usinor Sacilor's conversions of the FIS instruments paralleled the agency's treatment of the company's PACS conversions. Thus, because Commerce found Usinor Sacilor unequityworthy in 1986 and 1988, Commerce "consider[ed] the conversion of FIS bonds to common stock in 1986 and 1988 to constitute equity infusions on terms inconsistent with commercial considerations." *Id.*

In the *British Final Determination,* Commerce determined British Steel Corporation (British Steel) was unequityworthy from 1977–78 through 1985–86. *British Final Determination,* 58 Fed.Reg. at 37,395. Therefore, the equity infusions provided to British Steel by the U.K. Government between 1977–78 through 1985–86 were on terms inconsistent with commercial considerations. *Id.* In addition, the agency found British Steel wrote-off capital invested in the corporation by the U.K. Government under several Iron and Steel Acts in the amount of £3.0 billion in 1981, £1.0 billion in 1982, and £2.98 billion in 1988. *Id.* These equity infusions and debt write-offs constituted nonrecurring grants subject to the 15–year allocation period employed by Commerce. *Id.* at 37,396.

### ISSUE PRESENTED

Whether Commerce's use of a 15–year allocation period to amortize the benefits conferred by nonrecurring countervailable subsidies is supported by substantial evidence on the record and is otherwise in accordance with law.

### CONTENTIONS OF THE PARTIES

#### A. *Plaintiffs*

Plaintiffs first argue the 15–year allocation period is improper because it ignores that an infusion of fungible capital benefits a company's overall operations and not only the acquisition of depreciable physical assets.

---

**46.** Rev.Proc. 77–10, 1977–1 C.B. 548, *superseded by* Rev.Proc. 83–35, 1983–1 C.B. 745, *made obsolete by* Rev.Proc. 87–56, 1987–2 C.B. 674.

(Pls.' Br. at 15). Plaintiffs contend Commerce must "allocate the benefits from a nonrecurring subsidy over a 'reasonable period' that reflects the duration of the 'commercial and competitive benefit' of the subsidy to the recipient." (Pls.' Br. at 5 (quoting S.Rep. No. 249, 96th Cong., 1st Sess. 85–86 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 471–72)). Plaintiffs claim it is unreasonable to assume benefits extend through the life cycle of the steel industry's depreciable physical assets and therefore, Commerce's depreciable physical assets methodology is not a "reasonable proxy for the actual duration of the commercial and competitive benefits." (*Id.* at 8). As plaintiffs explain, a "company's operations necessarily require the allocation of capital to many other areas, the impact of which may be appropriately attributable to the year of expenditure or to a period of significantly shorter duration than the depreciation period for renewable physical assets." (*Id.* at 9 (footnote omitted)). Plaintiffs assert Commerce cites to *"no empirical evidence* supporting its 'industry life cycle' concept.... Indeed, there is no mention whatsoever of supporting evidence in the record" establishing the reasonableness of the depreciable physical assets methodology. (*Id.* at 10–11; *see* Pls.' Reply Br. at 8).

Second, plaintiffs argue Commerce itself has acknowledged the arbitrariness of the methodology because Commerce has "repeatedly and explicitly acknowledged in past cases that the average useful life of assets does not necessarily bear any relation to the economic benefit conferred by subsidy funds." (Pls.' Br. at 12; *see id.* at 13 (quoting *Certain Carbon Steel Products from Mexico,* 49 Fed.Reg. 5142, 5150 (Dep't Comm.1984) (prelim. determ.) (*Carbon Steel Products from Mexico* ); *Cold–Rolled Steel Flat Products from Argentina,* 49 Fed.Reg. 18,006, 18,018, 18,021 (Dep't Comm.1984) (final determ.) (*Flat Products from Argentina*))). Plaintiffs emphasize Commerce's earlier finding that " 'the average life of equipment is arguably no more accurate a measure than simply choosing a number.' " (*Id.* at 13 (quoting *Carbon Steel Products from Mexico,* 49 Fed.Reg. at 5150)). Plaintiffs quote from *Flat Products from Argentina,* where Commerce stated:

[W]e recognize first that the physical assets are often a fairly small part of the costs of doing business, and second that even in highly capital intensive industries the benefit of funds received ... has no particular relationship to the life of the machinery.... We originally chose the average useful life of assets because we believed the benefits of a grant somehow had a life approximating the life of assets.... We now consider this belief wrong....

(*Id.* at 12 (emphasis omitted) (quoting *Flat Products from Argentina,* 49 Fed.Reg. at 18,018, 18,021)). Because Commerce correctly recognized that physical assets are often a "small part of the costs of doing business," plaintiffs contend Commerce cannot justify its allocation methodology which purports to "treat[ ] all such capital as if it were used to acquire depreciable physical assets." (*Id.* at 15–16). This approach fails to recognize that capital "is used for a range of corporate purposes, *e.g.,* to cover cash losses, finance working capital needs (net receivables and inventory), finance research and development, and fund the closure of facilities." (*Id.* at 15). Plaintiffs assert Commerce "must adopt a reasonable allocation approach that reflects the fact that an infusion of fungible capital provides a company with a financial benefit that flows to the company's overall operations and funds all corporate purposes." (*Id.* at 16).

Finally, plaintiffs allege the physical assets methodology was "unequivocally rejected by this Court eight years ago." (*Id.* at 13 (citing *British Steel Corp. v. United States,* 10 CIT 224, 238, 632 F.Supp. 59, 69 (1986) (*British Steel II* ))). In *British Steel II,* the Court found Commerce's methodology to be unreasonable and not in accordance with the law and remanded for "further consideration of other 'viable options' that may more reasonably reflect the benefit of the subsidies in question." *British Steel II,* 10 CIT at 238, 632 F.Supp. at 69–71; *see also Ipsco, Inc. v. United States,* 12 CIT 359, 372, 687 F.Supp. 614, 625–26 (1988) (quoted in Pls.' Br. at 13–14).

## B. Defendant

Commerce advances several claims in support of its use of the 15–year allocation period. Commerce argues the allocation period conforms with the practice the agency has developed over the last ten years. Commerce recognizes the congressional mandate that "the allocation period must reasonably reflect 'the commercial and competitive benefit to the recipient.'" (Def.'s Br. at 5 (quoting S.Rep. No. 249 at 85–86, *reprinted in* 1979 U.S.C.C.A.N. at 381, 471–72)). Commerce contends, however, several reasonable options exist "that could form the basis for estimating the commercial and competitive benefits and none is clearly superior to the others." (*Id.*). Commerce explains that "[a]fter careful consideration of the comments . . . and our own internal examination of this policy, we have concluded that the allocation period . . . is the most reasonable." *General Issues Appendix,* 58 Fed.Reg. at 37,227.

Commerce asserts it "bases its amortization methodology upon the average useful life of assets because, given that benefits can continue indefinitely, it is reasonable to assume that benefits extend at least throughout a single 'life cycle' within the industry." (Def.'s Br. at 6 (footnote omitted)). Commerce analogizes "average life cycle" to "average life expectancy," arguing the "average useful life of renewable assets is, in a sense, an average industrial life expectancy because . . . 'if the assets are not renewed, operations would cease.'" (*Id.* at 7 (citing *General Issues Appendix,* 58 Fed.Reg. at 37,230)). The industry lifetime, Commerce continues, "is a finite period that enables Commerce reasonably to measure the impact of the subsidy." (*Id.*).

Commerce rejects plaintiffs' assertion that the allocation methodology treats all grants as if they were used to acquire depreciable physical assets, stating it "reveals a fundamental error in plaintiffs' perception of the methodology." (*Id.* at 7 (citing Pls.' Br. at 15)). Commerce's use of the average useful life of assets as the basis for its allocation period is

not premised upon treating all non-recurring grants as if they were used to pur-

chase physical assets. . . . [I]t is merely a means of reducing the indefinite to a finite period that can reasonably be used to measure the benefits of the grant over time—regardless of how the funds are used.

(*Id.* at 8). Furthermore, Commerce notes that "amortizing benefits over the average useful life of assets has the added advantage of promoting consistency and predictability in the administration of the countervailing duty law." (*Id.* at 11).

## C. Defendant–Intervenors

Defendant–Intervenors contend the *British Steel* and *Ipsco* decisions do not prohibit Commerce from using the 15–year allocation period, but instead require that Commerce's chosen allocation methodology satisfy two criteria: "(1) the allocation period must be reasonably related to the period of commercial and competitive benefit enjoyed by the recipient; and (2) the Department's determination must relate to the record evidence." (Def.–Intervenors' Br. at 11). Defendant–Intervenors argue Commerce's application of its allocation methodology satisfies these criteria and is therefore supported by substantial evidence and is otherwise in accordance with law. (*Id.*). Additionally, defendant-intervenors contend the Court's decision in *Ipsco, Inc. v. United States,* 13 CIT 335, 710 F.Supp. 1581 (1989) (*Ipsco III*), *rev'd in part on other grounds,* 8 Fed.Cir. (T) 80, 899 F.2d 1192 (1990), upheld Commerce's "use of an allocation methodology based on the average useful life of renewable physical assets" and therefore such a methodology is acceptable under the law. (*Id.* at 4–5; *see id.* at 11).

Defendant–Intervenors also assert Commerce's allocation methodology is "eminently reasonable, given the inherent limitations upon any methodology." (*Id.* at 14). As defendant-intervenors explain,

[B]ecause it is impossible to know how long the benefits from a subsidy truly exist, it is reasonable to assume that they extend at least as long as if they were used to purchase physical assets. This approach satisfies the requirement enunciated by the Court, that [Commerce] relate any allocation period to the period over

which a subsidy recipient enjoys the benefits of the subsidy.

(*Id.* (footnote omitted)). Because "[t]here is no economic theory that would allow an identification of the actual period of subsidy benefits," defendant-intervenors continue, Commerce's approach "has identified the average useful life of assets as being a reasonable *estimate* of that period." (*Id.* at 15). Therefore, defendant-intervenors argue Commerce's methodology produces a "reasonable period related to the commercial and competitive benefits of subsidies." (*Id.*).

Turning to the IRS tax tables upon which Commerce's methodology is based, defendant-intervenors defend the use of the tables as "a reasonable measure of the useful life of assets in the steel industry." (*Id.* at 17). Defendant–Intervenors point out that the IRS tax tables are the result of "extensive and repeated research of the actual depreciation periods used within the steel industry" and have been "vigilantly scrutinized, studied, and updated" over the last 30 years. (*Id.* at 16 (footnotes omitted)). Specifically, defendant-intervenors cite two United States Department of Treasury studies [47] providing "information of record" that, defendant-intervenors contend, supports Commerce's conclusion that " 'the IRS tax tables are an accurate representation of the experiences of U.S. steel producers.' " (*Id.* at 17 (quoting *General Issues Appendix,* 58 Fed.Reg. at 37,230)).

Finally, defendant-intervenors contend Commerce's allocation methodology is "reasonably related to the actual experience of the recipient of the subsidy," citing calculations made by domestic producers demonstrating "British Steel used a depreciation period of between 19 and 21 years for plant machinery, equipment, and vehicles." (*Id.* at 18–19 (citation omitted)). Drawing on information in Usinor–Sacilor's 1986 annual report, defendant-intervenors note that "Usinor–Sacilor adopted a 15 year amortization period." (*Id.* at 19 (footnote omitted)). This "evidence of record," defendant-intervenors

claim, "establishes that [Commerce's] methodology satisfies the criteria for an allocation methodology—that it be related to the actual benefit to the foreign recipient." (*Id.* (footnote omitted)).

## DISCUSSION

It is unnecessary for this Court to belabor the various arguments advanced by Commerce and defendant-intervenors in support of Commerce's methodology. The government has unsuccessfully advocated similar positions before the CIT on numerous occasions. Specifically, in *Ipsco, Inc. v. United States,* 12 CIT 1128, 701 F.Supp. 236 (1988) (*Ipsco II* ), the Court rejected the government's contentions regarding the reasonableness of Commerce's methodology. *Ipsco II,* 12 CIT at 1130–31, 701 F.Supp. at 238–39. There the Court reasoned, "[e]ven assuming *arguendo* that ITA may adopt *any* allocation period which it determines to be 'reasonable,' it is unclear from the record why ITA believes that the IRS depreciation schedule for replaceable physical assets is a reasonably accurate indicator of economic reality in the light of plaintiffs' verified financial records." *Id.* at 1130, 701 F.Supp. at 238 (footnotes omitted). Likewise, in *Ipsco, Inc. v. United States,* 12 CIT 359, 687 F.Supp. 614 (1988) (*Ipsco I* ), the Court rejected the government's rationale that Commerce's method produces consistency and predictability because such attributes do not "ensure the reasonableness of either the method, or the resulting period, in this or any other particular case." *Ipsco I,* 12 CIT at 372, 687 F.Supp. at 625. Moreover, in *British Steel Corp. v. United States,* 10 CIT 224, 632 F.Supp. 59 (1986) (*British Steel II* ), the Court reached the conclusion that,

[L]inking the commercial and competitive benefit of the subsidies at issue to the 15–year average useful life of capital assets in the U.S. steel industry, while administratively convenient, is unreasonable and not in accord with Congressional intent that the benefits be allocated over a period of time reflecting *the commercial and com-*

47. Thomas Koerner, U.S. Department of the Treasury, *The Steel Industry: A Study of Factors Affecting Prescribed Capital Cost Recovery Allowances of Steel Industry Equipment* (1977); Office of Industrial Economics, U.S. Department of the Treasury, *The Steel Industry: A Supplemental Addendum Report to the OIE Study of the Steel Industry of October 1977* (1979).

*petitive benefit of the subsidy to the recipient.*

*British Steel II,* 10 CIT at 236, 632 F.Supp. at 68.

Although the Court must accord substantial weight to Commerce's interpretation of the statute it administers, *American Lamb Co. v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986), the Court must not defer to an agency interpretation "to alter the clearly expressed intent of Congress," *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986). Simply put, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984).

The legislative history of the Trade Agreements Act of 1979 clearly sets forth Congress' intent with respect to allocating benefits of subsidies over time:

There is a special problem in determining the gross subsidy with respect to a product in the case of nonrecurring subsidy grants or loans, such as those which aid an enterprise in acquiring capital equipment or a plant. *Reasonable methods of allocating the value of such subsidies over the production or exportation of the products benefiting from the subsidy must be used. In particular, a reasonable period based on the commercial and competitive benefit to the recipient as a result of the subsidy must be used.* For example, allocating a subsidy in equal increments over the anticipated 20-year useful life of capital equipment purchased with the aid of the subsidy would not be reasonable if the capital equipment gave the recipient of the subsidy an immediate significant competitive benefit compared to what would be the situation without the capital equipment and compared to the competitive benefit the equipment would likely provide in the later stages of its useful life.

S.Rep. No. 249, 96th Cong., 1st Sess. 85–86 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 471–72 (emphasis added). As the foregoing legislative history makes clear, Congress intended Commerce to amortize the value of subsidies a firm receives in a manner reflecting the actual "commercial and competitive benefit" of the subsidies to the firm.

▉ Commerce's failure to allocate subsidy benefits in the manner Congress intended underlies the Court's previous holdings in the *Ipsco* and *British Steel* cases.[48] The CIT struck down Commerce's use of the IRS

---

**48.** The *Ipsco* cases also emphasize Commerce had not "promulgated a regulation regarding allocation of subsidy benefits used for the purchase of capital assets that incorporates the IRS tables." *Ipsco II,* 12 CIT at 1132, 701 F.Supp. at 240. In the absence of such a regulation, "ITA must explain the basis for its decision based on the facts of [the] case." *Ipsco I,* 12 CIT at 372, 687 F.Supp. at 626. In addition, because Commerce had not followed the rule-making procedures prescribed by the Administrative Procedures Act (APA) in 5 U.S.C. § 553 (1982), the *Ipsco II* Court concluded the agency could not properly rely on the "rate rule" reflecting the IRS tables. *Ipsco II,* 12 CIT at 1132, 701 F.Supp. at 240.

The Court considers the provisions set forth in the *Proposed Regulations,* except where Commerce has indicated otherwise, as statements of the agency's position with respect to the matters addressed in the provisions. *See Proposed Regulations,* 54 Fed.Reg. at 23,366 (indicating the ITA proposes to establish "regulations codifying the methodology used to determine the existence and value of countervailable subsidies"). Because the agency has not yet published the provisions contained in the *Proposed Regulations* in a final form pursuant to the APA, 5 U.S.C. § 553 (1988), the Court does not regard the provisions as a codification of the agency's practice, but rather as merely published notice of its intent to codify those provisions. *See Ipsco II,* 12 CIT at 1131, 701 F.Supp. at 239 ("ITA has the power to enact rules, but when doing so must meet the guidelines of the APA as set out in 5 U.S.C. 553 [sic] (1982)."). Consequently, this Court will consider whether the agency based its decision on the facts presented in these particular cases. *See Ipsco I,* 12 CIT at 372, 687 F.Supp. at 626 ("ITA must explain the basis for its decision based on the facts of [the] case" in the absence of a promulgated final regulation).

Because Commerce has not yet promulgated final regulations with regard to its allocation methodology, this Court does not regard the agency's use of the IRS tables in these cases as the application of a firm rule. *Ipsco II,* 12 CIT at 1132, 701 F.Supp. at 240. The Court, therefore, must consider the evidentiary basis supporting Commerce's decision to use the IRS tax tables.

tables in those cases because nothing on the record demonstrated the IRS tables reflected "the commercial and competitive benefit to the recipient" as Congress intended. In *Ipsco II*, the Court noted "ITA has made no attempt to explain the figure it obtained from the IRS tables in relation to the facts of this case, so that the result might be said to reflect the economic reality of these particular plaintiffs." *Ipsco II*, 12 CIT at 1131, 701 F.Supp. at 239. Similarly, the Court in *Ipsco I* concluded,

> ITA has failed to provide a non-arbitrary basis for its decision to use a 15 year period that was derived from standardized IRS data on the useful life of equipment in the U.S. Steel industry, rather than a period that could be derived from verified information pertaining to the country and company under investigation in this case.

*Ipsco I*, 12 CIT at 372, 687 F.Supp. at 626 (footnote omitted). Likewise, in *British Steel II*, the Court underscored that the "ITA failed to adequately explain why a 15–year allocation period is reasonable based on the commercial and competitive benefit of the subsidies in question to [the recipient firm]." *British Steel II*, 10 CIT at 236, 632 F.Supp. at 68; cf. *Ipsco, Inc. v. United States*, 13 CIT 335, 336, 710 F.Supp. 1581, 1583 (1989) (*Ipsco III*), rev'd in part on other grounds, 8 Fed.Cir. (T) 80, 899 F.2d 1192 (1990) (upholding an allocation methodology, different from the methodology at issue here, as supported by evidence on the record because it reflected "the economic useful life of all of Ipsco's replaceable physical assets").

The same deficiencies infect Commerce's determinations in these cases. Little on the record suggests Commerce considered whether and to what extent the 15–year useful life period prescribed by the IRS tax tables and incorporated into the agency's allocation methodology reflects the commercial and competitive benefits received by the firms under investigation as a result of non-recurring grants and equity infusions.[49]

Commerce correctly quotes *Ipsco II*'s holding that the "Department's use of the 15–year period set out in the IRS table must be supported by substantial evidence in record." *General Issues Appendix*, 58 Fed.Reg. at 37,230 (citing *Ipsco II*); *see also* Memorandum from ITA Staff to Joseph A. Spetrini, Acting Assistant Secretary for Import Administration and Barbara R. Stafford, Deputy Assistant Secretary for Investigations, *The Appropriate Period Over Which to Allocate the Benefits from Nonrecurring Subsidies* 9 (stamped May 17, 1993; dated May 21, 1993) (*ITA Allocation Memo*), reprinted in Pls.' Br.App. Tab 3) ("From *IPSCO II* we know that the Department can continue to use the figures from the U.S. tax tables only if there is evidence in the record establishing that those tables are a 'reasonable indicator of economic reality' for the respondents."). Commerce fails, however, to abide by this stricture and fails to point to substantial evidence on the record to justify its methodology notwithstanding its claim that "[s]uch evidence exists in the record of these determinations." *General Issues Appendix*, 58 Fed.Reg. at 37,230.

The evidence cited by Commerce includes an explanation that the IRS tax tables employed in the allocation methodology are

> based on a study of the U.S. steel industry.... [That] information can also be used as a reasonable estimate of the useful life of steel industry assets throughout the world.... [b]ecause we have no reason to

---

**49.** In light of Commerce's and defendant-intervenors' assertion that Commerce's methodology is consistent with the GATT Guidelines on Amortization and Depreciation GATT Doc. No. SCM/64 (July 11, 1985), *see* Def.'s Br. at 9 n. 11, Def.–Intervenors' Br. at 14 n. 40, it is instructive to note a recent GATT Panel Ruling declaring Commerce's 15–year allocation methodology in violation of the GATT Guidelines. *See United States— Imposition of Countervailing Duties on Certain Hot–Rolled Lead and Bismuth Carbon Steel Products Originating in France, Germany and the United Kingdom: Report of the Panel*, ¶ 632 (Oct.

14, 1994). The Panel found Commerce's "reasoning was insufficient for the Panel to conclude that a 15 year period for the average useful life of assets was reasonable for the firms being investigated." *Id.* The Panel also noted Commerce failed to respond to respondents' argument that the IRS tables were outdated despite Commerce's admission of the same in the preamble to the *Proposed Regulations*. *Id.* at ¶ 629 (citing *Proposed Regulations*, 54 Fed.Reg. at 23,377 ("Although the IRS tables provide consistency and predictability, the Department is concerned that those tables are dated.")).

believe, nor has any respondent claimed, that the general type of facilities and equipment used to produce steel in foreign countries is substantially different from that used in the United States, or that its useful life would be substantially different. *Id.* As additional evidence, Commerce notes this "conclusion is supported by information on the record in these investigations." *Id.* The information on the record cited by Commerce, however, is cursory and fails to provide this Court with record evidence upon which Commerce's allocation methodology may be upheld.

Ostensibly, the evidence to support the methodology is Commerce's finding that "[a]nalysis of data on the depreciation of assets from the annual reports of several foreign companies currently under investigation demonstrates that 15 years is a reasonable estimate of the average useful life of assets in the steel industry worldwide." *Id.* (citing Memorandum from Joseph A. Spetrini, Acting Assistant Secretary for Import Administration to ITA Staff, *The Appropriate Period Over Which to Allocate the Benefits from Nonrecurring Subsidies* (stamped May 20, 1993) (*Spetrini Allocation Memo*), *reprinted in* Pls.' Br.App. Tab 3).[50] Commerce fails to clarify, however, which annual reports it examined, how it analyzed the data contained therein, and how this examination

led Commerce to conclude its methodology is reasonably based on record evidence and is tied to the commercial and competitive benefits enjoyed by the foreign producers under investigation.[51]

During oral argument, the Court asked Commerce to identify "the attributes of the methodology ... showing the commercial and competitive advantage to the recipient." (Tr. at 316). Commerce referred to a Department of Treasury study[52] of the "factors affecting prescribed capital cost, recovery allowance of steel industry equipment." (*Id.* at 318). The Treasury study was one of several studies confirming the "accuracy of the IRS class life for steel industry assets." (Petitioners' General Issues Case Br. Before the Int'l Trade Admin. (Apr. 28, 1993), *reprinted in* Def.–Intervenors' Br.App. Tab 1 at 30). At oral argument, Commerce argued the study

> gives us a window on the industry. We can look in at the industry and say what is happening.
>
> . . . .
>
> [A]mong several of the factors ... that were considered [in the study], were the historical retention periods, technical obsolescence, economic conditions, all ... of those factors are indicative of commercial

**50.** There is no mention in the *General Issues Appendix*, the final determinations under review, or Commerce's papers of the "analysis of data" the agency purports to have undertaken. Although *defendant-intervenors* provide some evidence on the record discussing the average amortization periods for British Steel, *see* Def.–Intervenors' Br.App. Tab 3, Commerce provides only the bare statement that "analysis of data ... from the annual reports ... demonstrates that 15 years is a reasonable estimate." *General Issues Appendix,* 58 Fed.Reg. at 37,230. Evidence on the record as to how the agency performed its analysis is sorely lacking.

**51.** Defendant–Intervenors argue this Court upheld the central assumption of Commerce's methodology by holding in *Ipsco III* that "amortizing grants over the average useful life of renewable physical assets is an acceptable methodology *when based on record evidence.*" (Def.–Intervenors' Br. at 13 (citing *Ipsco III,* 13 CIT at 337, 710 F.Supp. at 1584) (emphasis added); *see id.* at 15). *Ipsco III's* holding is of little use here as the allocation methodology reviewed in that

case was based on "data taken from Ipsco's 1984 Annual Report" that allowed Commerce to calculate the average depreciation period by "subtracting from the total value of [Ipsco's] replaceable physical assets the value of construction in progress ... and then divid[ing] this result by the net depreciation charged during the year." *Ipsco III,* 13 CIT at 335–36, 710 F.Supp. at 1582. Commerce provides no evidence that it invoked a comparable analysis in these cases. In the methodology under review, Commerce simply used the IRS tax tables as a proxy to measure the benefit of the subsidies and does not appear to have examined record evidence to develop a methodology to " 'accurately reflect the commercial and competitive benefit' " received by the firms under investigation. *See id.* at 335, 710 F.Supp. at 1582 (citing *Ipsco II* ). As stated by the Court in *Ipsco III,* Commerce must "utilize[ ] information of record in applying its chosen methodology." *Id.* at 337, 710 F.Supp. at 1584.

**52.** Thomas Koerner, U.S. Department of the Treasury, *The Steel Industry: A Study of Factors Affecting Prescribed Capital Cost Recovery Allowances of Steel Industry Equipment* (1977).

and competitive benefits ... which led to the conclusion ... regarding the fifteen-year life cycle.

And, consequently, there is support—there is support in the record.

(*Id.* at 318–19).[53] Beyond this general statement, there appears to be little pertinent evidence on the record explaining how the IRS tax tables or the Department of Treasury Study provide substantial evidence demonstrating the allocation methodology comports with the "commercial and competitive benefit" of the subsidies to the foreign steel producers. Commerce appears to have recognized this weak link in the record evidence when it stated in an internal memorandum,

> The 15 years in the tax table is based on a study of the U.S. industry to determine the actual AUL [actual useful life].... If the steel industry uses essentially the same physical assets worldwide, then the 15-year AUL should be consistent worldwide. There is some evidence on the record to support that conclusion, and respondents have not challenged using the IRS's 15-year AUL for subsidies used to purchase physical assets. Petitioners have done an analysis of annual report information for British Steel Corp. and for two of the largest German steel producers, which

**53.** Mr. A. David Lafer, arguing for Commerce, stressed that the Treasury study supported the agency's use of the allocation methodology under review:

> COURT: So, what you're saying to me ... is that you're dealing with, I think you used the word "proxy" or "surrogate" vehicle, meaning the depreciable assets, and you're using that as your measure, and the competitive and commercial advantage is reflected in the depreciation schedules which were developed by the United States Internal Revenue Service,—
> MR. LAFER: Correct.
> COURT:—and the Internal Revenue Service developed those depreciation schedules after having made a study of the steel industry, certainly domestically, and possibly beyond that, as to the useful life of assets for depreciation purposes. Is that right?
> MR. LAFER: Could not have said it better, Your Honor.
> COURT: You did say it. I just wanted to understand what your position is.
> MR. LAFER: Precisely.
> ....
> MR. LAFER: And, specifically, it is this study, which buttresses the Agency's conclusion that

does appear to support the conclusion that 15 years is the AUL of assets in the industry.

*Whether that limited analysis constitutes "substantial evidence" that the 15 years in the tax tables is equally representative of the AUL worldwide is a close call* .... Additionally, an analysis of the data for the other countries may not support the 15 years, *which would probably render reliance on the tax tables indefensible.*

*ITA Allocation Memo* at 9–10, *reprinted in* Pls.' Br.App. Tab 3 (emphasis added).

The Court notes further Commerce does not explain how its allocation methodology, in particular the use of the depreciation tables therein, reflects the commercial and competitive benefits of nonrecurring subsidies to other types of legitimate corporate commercial activity such as advertising, personnel management concerns, logistics of supplies, etc.[54] It is clear to this Court that the allocation methodology adopted by Commerce does not meet the test as set out in *British Steel II* to allocate subsidy benefits "over a period of time reflecting the commercial and competitive benefit of the subsidy to the recipient." *British Steel II*, 10 CIT at 236, 632 F.Supp. at 68 (emphasis omitted).

> ... utilizing ... the useful life of depreciable assets is a reasonable method of allocating non-recurring grants.
> (Tr. at 319–20).

**54.** As explained by plaintiffs, Commerce

> has stated that its rationale flows from the fact that "if the assets are not renewed, operations would cease." The undeniable necessity of renewing assets, however, bears no logical relationship to the duration of benefits from fungible subsidy funds, which are available for *all corporate activities*, both long- and short-term. In other words, the fact that *renewable physical assets* may last for fifteen years does not provide a basis for presuming that *subsidy benefits* will last that long.
> (Pls.' Reply Br. at 9 (citing Pls.' Br. at 9–10 and *Certain Hot Rolled Lead and Bismuth Carbon Steel Products for the United Kingdom*, 58 Fed. Reg. 6237, 6240 (Dep't Comm.1993) (final determ.) ("The subsidies provided to a company presumably are utilized to finance operations and investments in the entire company....") (additional footnote omitted))); *see* Pls.' Br. at 15–16 (discussing the wide range of uses of subsidy funds)..

It is not the role nor function of this Court to prescribe to Commerce which allocation methodology it should employ so long as the methodology applied is reasonable and conforms to Congress' intent.[55] However, Commerce must provide a *clear statement of the evidence upon which the agency based its methodology as applied to each firm under investigation* and that statement must be supported by substantial evidence on the record and be otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B) (1988); *Alhambra Foundry v. United States*, 9 CIT 632, 636, 626 F.Supp. 402, 408 (1985) ("[A]ny methodology employed must reasonably accurately reflect factual information in the administrative record.") (quoted in *British Steel II*, 10 CIT at 235, 632 F.Supp. at 68). The Court recognizes the apparent difficulty in allocating subsidy benefits in a manner reflecting the commercial and competitive benefit to the recipient while simultaneously refraining from tracing the use or effect of subsidies. *See British Steel Corp. v. United States*, 9 CIT 85, 95–96, 605 F.Supp. 286, 294–95 (1985) ("[I]t is unnecessary to trace the use of such funds or to find such funds or to find that they are directly related to enhances product competitiveness.") (citing *Michelin Tire Corp. v. United States*, 4 CIT 252, 255, 1982 WL 2251 (1982), *vacated on agreed statement of facts*, 9 CIT 38, 1985 WL 17682 (1985)). The Court observes that Commerce may find that after engaging in a case by case examination of the relevant commercial and competitive factors of the firms under investigation and making a clear pronouncement of those findings, the IRS tax tables as employed in the agency's allocation methodology still may properly serve as a proxy in allocating subsidy benefits. The Court cautions, however, the agency must demonstrate that the tax tables, in conjunction with other factual evidence on the record, reflect the commercial and competitive advantage enjoyed by the firms receiving nonrecurring subsidies.[56]

The Court holds Commerce has failed to allocate the benefits of the subsidies received by the firms under investigation in a manner reflecting the actual "commercial and competitive benefit" of the subsidies to the companies, thus the Court concludes the determinations conflict with Congress' clearly expressed intent. *See* S.Rep. No. 249 at 85–86, *reprinted in* 1979 U.S.C.C.A.N. at 381, 471–72. As a result, this Court also concludes Commerce's use of a 15–year allocation period based solely on the IRS tax tables is "unsupported by substantial evidence on the record [and is] otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Accordingly, the Court holds the allocation methodology as set forth in the *General Issues Appendix to Certain Steel Products from Austria*, 58 Fed.Reg. 37,225, 37,225–31 (Dep't Comm.1993) (final determ.) to be unlawful.

CONCLUSION

The Court remands the general issue of the allocation methodology. Insofar as *Certain Steel Products from France*, 58 Fed. Reg. 37,304 (Dep't Comm.1993) (final determ.) is concerned, that determination is remanded to Commerce to reexamine the

---

55. Although plaintiffs have put forth several alternative allocation approaches it recommends Commerce employ in place of the current methodology, *see* Pls.' Br. at 16–17; Pls.' Reply Br. at 12–13, and both Commerce and defendant-intervenors challenge such alternatives, *see* Def.'s Br. at 10–11; Def.–Intervenors' Br. at 19–23, the Court declines to entertain a discussion of alternative methodologies. *See Wheatland Tube Corp. v. United States*, 17 CIT ——, ——, 841 F.Supp. 1222, 1234 (1993) ("Commerce has broad discretion to choose a methodology to satisfy the statutory mandate."); *Hercules, Inc. v. United States*, 11 CIT 710, 726, 673 F.Supp. 454, 469 (1987) ("[This C]ourt may not substitute its judgment for that of [Commerce] when the choice is between two fairly conflicting views, even though the court would justifiably have made a different

choice had the matter been before it *de novo*.") (quoting *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 22 (1st Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983)) (internal quotations omitted).

56. It seems evident that where Commerce investigates a noncapital intensive industry, the agency might choose to employ a proxy other than the IRS tax tables. Whatever form that proxy might take Commerce must examine the commercial and competitive factors, which when taken into account with the proxy adopted, reflect the commercial and competitive advantages enjoyed by the firms receiving the nonrecurring subsidies in question.

allocation methodology as employed therein for a case by case examination of the relevant commercial and competitive factors of the firms under investigation occasioned by receipt of the nonrecurring subsidies at issue. After having examined such factors, Commerce is directed to determine if those factors, when examined with or without a proxy such as the IRS tax tables, lead to a method of allocating the benefits of nonrecurring subsidies that reasonably reflects the commercial and competitive advantages enjoyed by the firms receiving such subsidies.

Insofar as *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm.1993) (final determ.) (*British Final Determination*) is concerned, if Commerce should find in its remand determination on the general issue of privatization that any party is liable for countervailing duties, Commerce is directed to reexamine the allocation methodology as applied to those parties against whom countervailing duties have been assessed for a case by case examination of the relevant commercial and competitive factors of the firms under investigation occasioned by receipt of the nonrecurring subsidies. After having examined such factors, Commerce is directed to determine if those factors, when examined with or without a proxy such as the IRS tax tables, lead to a method of allocating the benefits of nonrecurring subsidies that reasonably reflects the commercial and competitive advantages enjoyed by the firms receiving such subsidies. Should Commerce find in its remand determination of the *British Final Determination* on the general issue of privatization that no parties are liable for countervailing duties, then the agency need not revisit the general issue of the allocation methodology.

SECTION THREE: THE GRANT METHODOLOGY

Plaintiffs Pohang Iron & Steel Company, Ltd. (POSCO), Usinas Siderurgicas de Minas Gerais, S.A. (USIMINAS), Usinor Sacilor and Sollac (Usinor Sacilor) and plaintiff-intervenor Companhia Siderurgica Nacional (CSN) (collectively "plaintiffs") jointly move for partial judgment on the agency record pursuant to U.S.CIT R. 56.2 and for an order declaring that aspect of the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed.Reg. 37,225, 37,239–44 (Dep't Comm.1993) (final determ.) (*General Issues Appendix*)[57] pertaining to the grant methodology employed by Commerce to countervail equity infusions into unequityworthy companies set forth in the *General Issues Appendix* and applied in the final countervailing duty determinations in *Certain Steel Products from Korea,* 58 Fed. Reg. 37,338 (Dep't Comm.1993) (final determ.) (*Korean Final Determination*),[58] *Certain Steel Products from Brazil,* 58 Fed.Reg. 37,295 (Dep't Comm.1993) (final determ.) (*Brazilian Final Determination*),[59] and *Certain Steel Products from France,* 58 Fed. Reg. 37,304 (Dep't Comm.1993) (final determ.) (*French Final Determination*)[60] to be unsupported by substantial evidence on the record and not otherwise in accordance with law and to remand these determinations for new determinations in accordance with law. Defendant, the Department of Commerce (Commerce), opposes plaintiffs' motion and asserts that Commerce's determinations are based on substantial evidence on the record and are otherwise in accordance with law. AK Steel Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a unit of USX Corporation, and WCI Steel, Incorporated (collectively "defendant-

**57.** See *supra* note 10 and accompanying text describing the nature of the *General Issues Appendix.*

**58.** Commerce amended the *Korean Final Determination* on August 17, 1993. *See Certain Steel Products from Korea,* 58 Fed.Reg. 43,752 (Dep't Comm.1993) (orders and am. final determ.).

**59.** Commerce amended the *Brazilian Final Determination* on August 17, 1993. *See Certain Steel Products from Brazil,* 58 Fed.Reg. 43,751 (Dep't Comm.1993) (order and am. final determ.).

**60.** Commerce amended the *French Final Determination* on August 17, 1993. *See Certain Steel Products from France,* 58 Fed.Reg. 43,759 (Dep't Comm.1993) (order and am. final determ.).

intervenors") oppose plaintiffs' motion and argue Commerce's determinations are fully supported by substantial evidence and are not contrary to law.

## BACKGROUND

### A. *The Rate of Return Shortfall Method*

From 1982 to 1993 Commerce used the rate of return shortfall (RORS) methodology to· measure the countervailable benefit received by an unequityworthy company that received an equity infusion.[61] Commerce employed RORS in those instances where a company under investigation did not have a market benchmark; that is, a publicly-traded price by which to measure the value of the company's stock at the time of the government infusion. *General Issues Appendix*, 58 Fed.Reg. at 37,239. Under the RORS methodology, Commerce

> measures the benefit of equity investments in "unequityworthy" firms by comparing the national average rate of return on equity with the company's rate of return on equity during each year of the allocation period. The difference in these amounts, the so-called rate of return shortfall ... is then multiplied by the amount of the equity investment to determine the countervailable benefit in the given year.

*Certain Steel Products from France*, 57 Fed. Reg. 57,785, 57,787 (Dep't Comm.1992) (preliminary determ.) (*French Preliminary Determination*); *see also* 54 Fed.Reg. 23,366, 23,385 (Dep't Comm.1989) (to be codified at 19 C.F.R. § 355.49(e)(1)) (proposed May 31, 1989) (*Proposed Regulations*) (setting forth the RORS methodology).

### B. *The Grant Methodology*

In the preliminary determinations of the final determinations under review, Commerce abandoned RORS and adopted the grant approach or grant methodology believing it to be "the most appropriate methodology to use in measuring the benefit from equity infusions made or provided on terms inconsistent with commercial considerations." *General Issues Appendix*, 58 Fed.Reg. at 37,239. Under the grant methodology, Commerce "treats equity infusions into unequityworthy companies as grants." *Id.* at 37,-241.[62] In applying the grant methodology, the first step is for Commerce to determine if the company receiving the infusion is equityworthy. If the company is equityworthy, Commerce does not consider the equity infusion countervailable. If the company is unequityworthy, however, Commerce declares the equity infusion a countervailable subsidy. In the second step of the grant methodology, Commerce calculates the benefit using a declining balance method and allocates equal portions of the equity infusion to the unequityworthy companies over a 15–year period. The methodology employs a discount rate to add to the amount the interest accrued in each year on the unallocated balance remaining from the previous year.

Commerce summarized both the rationale and implementation of the grant methodology:

> The key aspect of this approach is the Department's interpretation of its equity-worthiness determination. Using the grant methodology for equity infusions into unequityworthy companies is based on the premise that an unequityworthiness finding by the Department is tantamount to saying that the company could not have attracted investment capital from a reason-

---

61. *See, e.g., Certain Steel Products from Belgium,* 47 Fed.Reg. 39,304, 39,319 (Dep't Comm.1982) (final determ.) (adopting RORS methodology); *Certain Hot Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom,* 58 Fed. Reg. 6237, 6241–42 (Dep't Comm.1993) (final determ.) (*Hot Rolled Lead from U.K.*) (adopting grant methodology).

62. The grant methodology is used only when a company receiving an equity infusion does not have a market benchmark by which to measure

any countervailable benefit. *See General Issues Appendix,* 58 Fed.Reg. at 37,239 (The grant methodology is "intended for use only when the company in question does not have a market benchmark by which to measure any countervailable benefit, i.e., a publicly-traded price or an infusion by a private investor at the time of the government's infusion."); *see also* Pls.' Br. at 9 n. 9 ("This brief will not addresses [sic] the Department's methodology where a market price for the shares is available.").

able investor in the infusion year based on the available information. Thus, neither the benefit nor the equityworthiness determination should be reexamined *post hoc* since such information could not have been known to the investor at the time of the investment. Therefore, the grant methodology, when used for equity infusions into unequityworthy companies and for grants to all companies, should not be adjusted based on subsequent events (e.g., dividends, profits).

*Id.* at 37,239.

### C. *Equity Infusions in Brazil, France, and Korea*

Commerce determined that the government of Brazil (GOB) made equity infusions into USIMINAS, Companhia Siderurgica Paulista (COSIPA), and CSN in the following years: USIMINAS, 1980 through 1988; COSIPA, 1977 through 1989 and 1991; and CSN, 1977 through 1991. *Brazilian Final Determination,* 58 Fed.Reg. at 37,298. Commerce then examined the three companies in the relevant years and determined that "the GOB's equity infusions into USIMINAS between 1980–1988, into CSN between 1977–1991, and into COSIPA from 1977–1989 and in 1991, were made on terms inconsistent with commercial considerations, and thus countervailable." *Id.*

The Government of France's (GOF) equity infusions relevant in this proceeding flow from a 1978 restructuring plan. One facet of the plan allowed bonds previously issued on behalf of the steel companies to be converted into prêts à caractéristiques spéciales (PACS) or "loans with special characteristics." *French Preliminary Determination,* 57 Fed.Reg. at 57,788; *French Final Determination,* 58 Fed.Reg. 37,306–07. The conversion process enabled the companies to trade in their former obligations on loans and bonds for new obligations based on the PACS. *French Final Determination,* 58 Fed.Reg. at 37,306–07.

Between 1978 and 1991, Usinor Sacilor and its predecessors used PACS to refinance debt on several occasions: "In 1978, Usinor and Sacilor converted 21.1 billion French francs (FF) of debt into PACS. From 1980 to 1981, Usinor and Sacilor issued FF8.1 billion of new PACS." *Id.* at 37,307. The companies later converted "PACS in the amount of FF13.8 billion, FF12.6 billion and FF2.8 billion … into common stock in 1981, 1986 and 1991, respectively." *Id.* Commerce determined PACS were debt and not equity when issued, but that Usinor Sacilor received benefits when the PACS were eventually converted to common stock. *Id.*

Commerce's treatment of the PACS conversions turned on Usinor Sacilor's equityworthiness at the time of the conversions. The agency determined Usinor Sacilor to be unequityworthy from 1978 through 1988 and therefore "consider[ed] the conversion of PACS to common stock in 1981 and 1986 to constitute equity infusions on terms inconsistent with commercial considerations." *Id.* Because Usinor Sacilor was equityworthy in 1991, however, Commerce determined "the PACS-to-equity conversion in 1991 … [was] consistent with commercial considerations." *Id.*

The second facet of the GOF's debt restructuring plan relevant here is the "Fonds d'Intervention Siderurgique" or Steel Intervention Fund (FIS) created by the government in 1983. The FIS worked in tandem with the 1981 Corrected Finance Law which authorized Usinor and Sacilor to issue convertible bonds. *French Preliminary Determination,* 57 Fed.Reg. at 57,788. The companies "issued convertible bonds to the FIS, which, in turn, with the GOF's guarantee, floated bonds to the public and to institutional investors." *French Final Determination,* 58 Fed.Reg. at 37,307. "In 1983, 1984, and 1985, Usinor and Sacilor issued convertible bonds to the FIS. These FIS bonds were converted to common stock in 1986 and 1988." *Id.*

Commerce's treatment of Usinor Sacilor's conversions of the FIS instruments paralleled the agency's treatment of the company's PACS conversions. Thus, because Commerce found Usinor Sacilor unequityworthy in 1986 and 1988, Commerce "consider[ed] the conversion of FIS bonds to common stock in 1986 and 1988 to constitute equity infusions on terms inconsistent with commercial considerations." *Id.*

In the *Korean Final Determination,* Commerce determined in 1978 and 1980 the Government of Korea (GOK), through the Ministry of Finance and the Korea Development Bank, provided equity infusions to POSCO on terms inconsistent with commercial considerations. *Korean Final Determination,* 58 Fed.Reg. at 37,339. In a 1984 determination, Commerce determined POSCO was unequityworthy during 1978 and 1980. *Id.* (citing *Cold–Rolled Carbon Steel Flat Products from Korea,* 49 Fed.Reg. 47,284, 47,286 (Dep't Comm.1984) (final determ.)). Commerce stated in the *Korean Final Determination* that neither POSCO nor the GOK contested Commerce's previous unequityworthiness determination and that Commerce found "no new information to repudiate this determination." *Id.* Thus, because the 1978 and 1980 equity infusions from the GOK were made to POSCO when POSCO was unequityworthy, Commerce determined the infusions bestowed countervailable benefits on POSCO. *Id.*

### ISSUES PRESENTED

Whether Commerce's decision to abandon the rate of return shortfall methodology and whether its decision to adopt a grant methodology and its implementation of that grant methodology to measure the value of benefits of equity infusions into companies deemed to be unequityworthy is supported by substantial evidence on the record and is otherwise in accordance with law.

It is critical to be clear what is not being challenged here. The parties apparently agree the equityworthiness test is *not* under review in this proceeding.[63] That is, the question of whether Commerce properly determined that a company was unequityworthy during the period of investigation when equity infusions were made is not challenged here and consequently will not be reviewed.

### CONTENTIONS OF THE PARTIES

#### A. *Plaintiffs*

Plaintiffs contend there are several infirmities in Commerce's adoption of the grant methodology to value the benefits of equity infusions into unequityworthy companies and the agency's concomitant decision to abandon the RORS methodology. Plaintiffs assert the grant methodology employed by Commerce "fails to measure the actual benefits associated with a government investments [sic] during the period of investigation" and "relies on a series of unstated assumptions that are unreasonable and otherwise unsupported by substantial evidence in the record." (*Id.* at 3–4; *see also id.* at 25–33, 43–46). In addition, plaintiffs claim Commerce's "decision to abandon [RORS] was based on perceived problems with the RORS methodology that do not withstand scrutiny. Specifically, none of the six concerns identified by [Commerce] warrants a rejection of the RORS methodology." (*Id.* at 7 (footnote omitted); *see also id.* at 47–54; Pls.' Reply Br. at 41–55).

Plaintiffs contend Commerce failed in its grant methodology to "properly identify the

---

63. In their papers, plaintiffs challenge Commerce's equityworthiness determination as it is employed in the new grant methodology, (Pls.' Br. at 35–42), and the interpretation of the equityworthiness determination in the context of the grant methodology, (Pls.' Br. at 42–46). Plaintiffs do not, however, "challenge the reasonableness of the Department's equityworthiness determinations *per se,*" nor do plaintiffs address "any issues related to the Department's actual calculations in applying the grant methodology." (Pls.' Br. at 3 n. 3). Commerce and defendant-intervenors apparently concur. (Def.'s Br. at 16; Def.–Intervenors' Br. at 3). Presumably, such issues may be raised in subsequent country-specific proceedings. *See* Pls.' Br. at 3 n. 3.

In addition, at oral argument counsel for plaintiffs, Commerce, and defendant-intervenors described the issue under review solely as the grant methodology. Counsel for plaintiffs stated at oral argument: "I do not quarrel with an equityworthiness determination that's based on an analysis of whether a reasonable investor would have invested in a company. That's not the issue here today." (Tr. at 444). Commerce's counsel informed the Court: "Plaintiffs have not challenged ... the un-equityworthy [sic] finding of the Commerce Department. Consequently, there's no contest that the subsidy was provided. This is solely a challenge to the valuation of that subsidy." (*Id.* at 414). Counsel for defendant-intervenors explained, "the issue is the reasonableness of the Department's grant methodology ... as applied to countervailable equity infusions. That is the only issue before the Court." (*Id.* at 422). Therefore, it is the Court's understanding that Commerce's equityworthiness test is not under review.

nature of the benefit that an equity infusion may or may not bestow." (Pls.' Br. at 25). It is critical to identify the nature of the benefit, plaintiffs argue, because only then can Commerce "properly estimate[ ] the value of the particular subsidy" as required by law. (*Id.* at 24; *see also id.* at 21 n. 38 (citing 19 U.S.C. §§ 1671(a), 1671d(a); 19 C.F.R. § 355.20)). By equating an equity infusion into an unequityworthy company with a grant, plaintiffs maintain, Commerce ignores the simple fact that, unlike receiving a grant, there is a cost to the firm issuing equity. As explained by plaintiffs:

> [F]rom the standpoint of the company, one of the costs of selling equity to an investor is the obligation to operate its firm in such a way to generate a short- or long-term return ... on the equity investment....
>
> In addition, in exchange for equity, the company conveys a claim on its assets to the investor. In connection with this claim, the company has a continuing obligation to preserve and or enhance the value of the investor's claim on the assets.

(*Id.* at 27). Thus, plaintiffs argue the financial benefit of an equity infusion can be calculated only by determining whether the recipient enjoys any relief from the financial costs or obligations flowing from receipt of an equity infusion, that is, the obligation to generate a return on the investor's equity infusion and the obligation to enhance the value of the investor's claim on the assets. By failing to examine whether the recipient is relieved of these obligations, plaintiffs argue, the grant methodology "necessarily overstates the benefits of an infusion except in the rare instance in which the investor does not receive any return on its investment, and in fact loses the full value of the investment." (*Id.* at 5).

Plaintiffs construe Commerce's grant methodology as erecting an "irrebuttable presumption that an equity investment into an unequityworthy company never has a cost." (*Id.* at 30 (emphasis omitted)). This presumption prevents Commerce "from detecting and measuring the actual costs [of an equity purchase] during the POI" thereby rendering Commerce's grant methodology "an unreasonable technique of valuing the

benefit from an alleged subsidy." (*Id.* at 33). In addition, plaintiffs assert the grant methodology is flawed because it precludes an examination of post-infusion events thereby presuming "there is no conceivable manner in which the government and company could cure or diminish the value of the benefit bestowed by the original subsidy event." (*Id.* at 34 (footnote omitted)).

Coupled with its argument that the grant methodology employed by Commerce is unreasonable, plaintiffs assert the RORS methodology should be reinstated because it is a "reasonable methodology that has enabled [Commerce] to correctly value the benefits of equity infusions since 1982." (*Id.* at 46). Plaintiffs advance their support of RORS stating,

> [T]he RORS methodology permits [Commerce] to distinguish between the benefits associated with a grant, and the continuing obligations that attach to an equity investment. Specifically, RORS enables [Commerce] to quantify the cost of that obligation during the POI, and compare that cost to a national average, to determine if the company benefitted in any way during the POI.

(*Id.* at 47).

Furthermore, plaintiffs challenge Commerce's criticism of the RORS methodology as unjustified and not supported by the record. (*Id.* at 47–54; Pls.' Reply at 41–55). In effect, plaintiffs argue Commerce has failed to provide an adequate explanation of its departure from RORS and therefore the agency has abrogated its responsibility to "'either conform itself to its prior decisions, or explain the reasons for its departure.'" (Pls.' Br. at 47–48 (quoting *Hussey Copper, Ltd. v. United States,* 17 CIT ——, ——, 834 F.Supp. 413, 418–19 (1993) (internal citation omitted))). Plaintiffs contend each of Commerce's criticisms of RORS are unexplained, unnecessary, or unclear. (*Id.* at 48–53). Because Commerce did not adequately explain its reason for abandoning RORS, plaintiff argues Commerce acted contrary to law.

Plaintiffs conclude by asserting that even if Commerce's grant methodology is sustained, it must be revised to account for the offsetting costs of certain post-infusion events in-

cluding "the return of capital to the government through a privatization, the issuance of dividends, and the retention of retained earnings." (*Id.* at 54). As construed by plaintiffs, one effect of privatization is that it "eliminate[s] any financial benefit to the company associated with the government's claim on that equity." (*Id.* at 55). The grant methodology must therefore be revised to "accommodate this elimination of the alleged benefit through privatization." (*Id.*). Similarly, because plaintiffs argue dividend payments "reduce or eliminate the benefit from the government's equity infusions," the grant methodology should be adjusted to count these "dividend payments as payments against the remaining countervailable balance from the equity infusions." (*Id.* at 55, 62). Finally, plaintiffs contend retained earnings should be treated similarly and "be netted against any gross benefit calculated using [Commerce's] grant methodology." (*Id.* at 64).

## B. *Defendant*

Commerce argues it has statutory authority to levy countervailing duties against merchandise exported to the United States from a country whose government has bestowed a subsidy in the form of the " 'provision of capital ... on terms inconsistent with commercial considerations." (Def.'s Br. at 6–7 (quoting 19 U.S.C. § 1677(5)(A)(ii)(I) (1988))). Commerce asserts an equity infusion into an unequityworthy company provides capital on terms inconsistent with commercial considerations and therefore such an infusion is countervailable. Because the statute is silent on the manner in which Commerce is to calculate the benefit from equity infusions, Commerce contends it properly exercised its discretion by adopting a grant measurement of equity infusions into unequityworthy companies.

In the determinations under review, Commerce rejected the RORS methodology because it found the methodology deficient and unable to accurately measure the benefit of equity investments in unequityworthy firms. (*Id.* at 9–11). The crux of Commerce's rationale for rejecting the RORS methodology is that an equity investment in an unequityworthy company is tantamount to a grant and should be valued as a grant. (*Id.* at 18). As explained by the agency,

> [A]n unequityworthiness finding by Commerce means that the firm could not have attracted capital from a reasonable investor at that time, based on the information then available. "If a company cannot attract capital, then equity for all purposes is a grant." The most appropriate method to measure the benefit to the recipient firm which it derives from the equity infusion is the grant approach, because it corresponds with the meaning of unequityworthiness— *i.e.*, a reasonable private investor could not expect a reasonable rate of return at the time of the government's equity infusion.

(*Id.* (quoting Memorandum from The Equity Issues Team to Joseph A. Spetrini, Acting Assistant Secretary for Import Administration and Barbara R. Stafford, Deputy Assistant Secretary for Investigations, *Options for Calculating the Benefit from Equity Infusions into Unequityworthy Companies* 8 (stamped May 18, 1993) (*ITA Equity Infusions Memo* ), *reprinted in* Def.'s App. Tab 2 and citing *General Issues Appendix,* 58 Fed. Reg. at 37,241)).

Commerce shifted from RORS to the grant methodology because it identified at least six flaws in RORS. *General Issues Appendix,* at 37,240–41. Commerce found these were not "minor flaws," but rather were fundamental to the RORS methodology and could not be "rectified without abandoning the RORS methodology outright." *Id.* at 37,241. The identification of these flaws in the RORS method as well as other factors [64] led Com-

---

**64.** Commerce cites several sources to demonstrate Commerce "thoroughly considered and explained on the record" its rejection of RORS. (Def.'s Br. at 33; *see id.* at 35–36 (citing *ITA Equity Infusions Memo, reprinted in* Def's Br. App. Tab 2; Memorandum from Joseph A. Spetrini, Acting Assistant Secretary for Import Administration to ITA Staff, *Equity Infusions Sec-*

*tion of the General Issues Appendix* (stamped June 21, 1993), *reprinted in* Def.'s App. Tab 1; Alan F. Holmer, Susan A. Haggerty, and William D. Hunter, *Identifying and Measuring Subsidies under the Countervailing Duty Law: An Attempt at Synthesis, in The Commerce Department Speaks* 310, 443–45, 558 n. 165 (1984))).

merce to adopt the grant methodology in these determinations. (Def.'s Br. at 33–42).

Finally, Commerce rejects plaintiffs' arguments that the grant methodology, if sustained by the Court, should be revised to account for post-infusion events. (*Id.* at 42–47). As stated by Commerce, the focus should not be on events subsequent to the original equity infusion, but rather "Commerce must focus upon the benefit to the recipient at the time the subsidy is conferred." (*Id.* at 43).

## C. Defendant–Intervenors

Defendant–Intervenors assert plaintiffs have failed to carry their burden of showing Commerce's grant methodology to be unsupported by substantial evidence or otherwise not in accordance with law. (Def.–Intervenors' Br. at 10). Defendant–Intervenors contend plaintiffs raise "irrelevant matters" including a defense of the RORS methodology as preferable to the grant methodology. (*Id.*). The question of which method is "more reasonable" is not before the Court, defendant-intervenors argue, and furthermore is not dispositive as to the validity of the grant methodology. (*Id.* at 11 (citing *Wheatland Tube Corp. v. United States,* 17 CIT ——, ——, 841 F.Supp. 1222, 1234 (1993); *Matsushita Elec. Indus. Co. v. United States,* 3 Fed.Cir. (T) 44, 54–55, 750 F.2d 927, 936 (1984); and *Vitro Flex, S.A. v. United States,* 13 CIT 430, 447, 714 F.Supp. 1229, 1242–43 (1989); *see also id.* at 24–25). To sustain Commerce's grant methodology, defendant-intervenors contend, the Court need only find the methodology "reflects a 'permissible' interpretation of the statutory phrases, 'inconsistent with commercial considerations' and 'net subsidy.'" (*Id.* at 11–12 (citing 19 U.S.C. §§ 1677(5)(A)(ii)(I), 1671, 1677(6) (1988))).

Defendant–Intervenors argue the proper measurement of a subsidy benefit is the benefit to the recipient; if there is no difference between a grant and an equity infusion into an unequityworthy company, "it is reasonable to use the same measurement methodology for both." (*Id.* at 14 (footnote omitted)). Defendant–Intervenors suggest there is no material difference, from the perspective of an unequityworthy company, between receiving an equity infusion or a grant. (*Id.* at 14, 32–40). In both instances, the company receives infusions from the government that otherwise would be unavailable from private investors. (*Id.* at 14–15).[65] Furthermore, according to defendant-intervenors, "the company incurs no new obligations as a result of that [equity] infusion, but rather continues to owe all of its (enhanced) earnings to its owners ... exactly as it would in the case of a grant of equal magnitude." (*Id.* at 15; *see id.* at 15–18, 33–37).

Defendant–Intervenors contend Commerce has "adequately explained its methodological choice" and therefore the grant methodology is "due all of the deference of any agency adopted methodology." (*Id.* at 19). Defendant–Intervenors claim the grant approach was fully litigated when Commerce first adopted the grant methodology and abandoned RORS in a previous final determination. (*Id.* at 22 (quoting *Certain Hot Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom,* 58 Fed.Reg. 6237, 6241 (Dep't Comm.1993) (final determ.) (*Hot Rolled Lead from U.K.*))). Notwithstanding *Hot Rolled Lead from U.K.,* defendant-intervenors argue the lengthy procedural steps taken by Commerce in applying the grant methodology to the determinations under review coupled with Commerce's comprehensive discussion and analysis in the *General Issues Appendix,* "more than satisfies the 'reasonable clarity' standard of *SCM Corp.*

**65.** In its analysis, defendant-intervenors appear to equate the determination under the equityworthiness test that a "reasonable investor" would not invest in the firm to a finding that the firm could attract no capital. (Def.–Intervenors' Br. at 14–15). At oral argument and in their briefs, plaintiffs challenge this aspect of the determination and allege Commerce impermissibly changed its equityworthiness test by moving from an examination of whether a *reasonable* investor would invest in the company to an examination of whether *any* investor would invest. (Tr. at 402–08; Pls.' Br. at 36–37; Pls.' Reply at 23–26, 33). Plaintiffs argue Commerce "changed [its] equityworthiness test here and they haven't admitted to it." (Tr. at 407). As discussed above, however, plaintiffs inform this Court that they do not challenge the equityworthiness test per se as a general issue in this joint proceeding. *See supra* note 63.

and the 'reasoned justification' standard of *Rust.*" (*Id.* at 24 (quoting *SCM Corp. v. United States,* 84 Cust.Ct. 227, 232, 487 F.Supp. 96, 100 (1980) (internal quotations omitted); *Rust v. Sullivan,* 500 U.S. 173, 187, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991))).

Defendant–Intervenors further reject plaintiffs' arguments that equity investments impose certain costs on the recipient that should be netted from the subsidy benefit. Plaintiffs' contention that dividends and retained earnings should be treated as subsidy offsets, defendant-intervenors argue, is prohibited by 19 U.S.C. § 1677(6) (1988), which contains an exclusive list of permitted subsidy offsets. Defendant–Intervenors maintain Commerce correctly determined the benefit from an equity subsidy is the "full amount of the equity provided, and that 'no earnings of the company in subsequent years should be used to offset the benefit.'" (*Id.* at 30–31 (quoting *Certain Steel Products from Austria,* 57 Fed.Reg. 57,781, 57,783 (Dep't Comm.1992) (prelim. determ. and alignment of final determs.) and citing *General Issues Appendix,* 58 Fed.Reg. at 37,239)). To hold otherwise, defendant-intervenors suggest, would "run afoul of the prohibition on *post hoc* analysis" of a subsidy's effects as established by statute, legislative history, agency practice, and decisional law. (*Id.* at 31 (citing S.Rep. No. 189, 103d Cong., 1st Sess., 42–43 (1993); *Saarstahl, A.G. v. United States,* 18 CIT ——, ——, 858 F.Supp. 187, 193 (1994); *British Steel Corp. v. United States,* 9 CIT 85, 95–96, 605 F.Supp. 286, 294–95 (1985))).

Finally, defendant-intervenors agree with Commerce that the RORS methodology is hopelessly flawed and reject plaintiffs' arguments for an alternative methodology as legally irrelevant. (*Id.* at 43–49; *see also id.* at 10–12).

## Discussion

The Court's review of Commerce's grant methodology can be separated into two interconnected inquiries. First, did Commerce err in its abandonment of the RORS methodology. *See Hussey Copper, Ltd. v. United States,* 17 CIT ——, ——, 834 F.Supp. 413, 418 (1993) ("It is 'a general rule that an agency must either conform itself to its prior decisions or explain ... its departure.'") (quoting *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988)). Second, is the application and implementation of the new grant methodology to countervail equity infusions made into unequityworthy companies based upon substantial evidence on the record and otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B) (1988). The Court holds Commerce adequately examined and explained its departure from the RORS methodology and the Court holds further the application by Commerce of its grant methodology to countervail equity infusions made into unequityworthy companies is sustained as based upon substantial evidence on the record and as otherwise in accordance with law.

### A. Commerce's Abandonment of the RORS Methodology

The posture of a court reviewing a change in agency practice is aptly summarized in *Mantex, Inc. v. United States,* 17 CIT ——, 841 F.Supp. 1290 (1993), where the Court stated,

> The mere fact that an agency reverses a policy, or a statutory or regulatory interpretation does not indicate the agency's decision is unreasonable, arbitrary, or capricious. It is well-settled that such reversals are entitled to deference from the courts.

*Mantex,* 17 CIT at ——, 841 F.Supp. at 1302–03 (citing *Rust v. Sullivan,* 500 U.S. 173, 186, 111 S.Ct. 1759, 1768–69, 114 L.Ed.2d 233 (1991) (citation omitted)). As explained by the United States Supreme Court in *Rust,*

> [A] revised interpretation deserves deference because an initial agency interpretation is not instantly carved in stone and the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.... An agency is not required to establish rules of conduct to last forever ... but rather must be given ample latitude to adapt its rules and poli-

cies to the demands of changing circumstances.

*Rust,* 500 U.S. at 186–87, 111 S.Ct. at 1769 (citations and internal quotations omitted). The agency's ability to deviate from prior practice is tempered, however, by the requirement that " 'the ground[s] for the departure from prior norms ... must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.' " *Hussey Copper,* 17 CIT at ——, 834 F.Supp. at 419 (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973)). As directed by the Supreme Court, an agency must adequately explain its departure from prior norms and sufficiently spell out the legal basis for its decision. *Secretary of Agric. v. United States,* 347 U.S. 645, 653–54, 74 S.Ct. 826, 832, 98 L.Ed. 1015 (1954) (stating agency must explain its decision "with the simplicity and clearness through which a halting impression ripens into reasonable certitude") (citations omitted). The Court finds Commerce sufficiently explained on the record its abandonment of the RORS methodology to value the benefits of equity infusions made into unequityworthy companies.

In the *General Issues Appendix* and in its papers before the Court, Commerce explained the factors it considered in reaching the conclusion that the RORS methodology does not effectively measure the value of subsidy benefits. *See General Issues Appendix,* 58 Fed.Reg. at 37,240–41; Def.'s Br. at 33–42. Commerce summarized the shortcomings of the RORS methodology:

First, when measuring the rate of return in the period of investigation (POI), [Commerce] does not account for the effect of current subsidies on the company's return. These subsidies could affect the rate of return, thereby distorting the RORS analysis.... Second, the RORS method only measures the rate of return in the POI, thereby allowing poorly-performing com-

panies which by chance experience a profitable year in the POI to escape countervailability.... Third, RORS does not measure the rate of return on each of the government's equity infusions but rather the rate of return in the POI on the firm's total equity. If the equity is near zero, a very small profit will result in a negative countervailability finding.

Fourth, [RORS] does not adequately account for the expectation held by a potential investor (at the time of the infusion) of the company's rate of return on equity. Fifth, RORS is biased because it is only applied when [Commerce] finds a company unequityworthy. Finally, and perhaps most importantly, RORS implies a "cost to government" standard rather than a "benefit to recipient" standard.

*General Issues Appendix,* 58 Fed.Reg. at 37,240–41. It is not for the Court to fault Commerce's decision if the agency's rationale may not be the most reasonable. Commerce provided a detailed explanation of its decision to abandon the RORS methodology and to adopt the grant methodology in internal memoranda made part of the record. *See id.* at 37,239.[66] In light of the deference granted to agency changes in practice, the Court holds Commerce has provided a reasoned analysis explaining its departure from RORS. *See Rust,* 500 U.S. at 187, 111 S.Ct. at 1769; *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966).

### B. *Commerce's Adoption of the Grant Methodology*

The scope of judicial review of agency methods and practices was outlined by the Court in *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 636 F.Supp. 961 (1986), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987), where the Court held:

The deference granted or extended to the agency's interpretation of its statutory mandate also applies to the methodology that the agency employs in fulfilling its lawfully delegated mission.... In order for [Commerce] effectively to administer

---

**66.** "We considered several methodologies offered by interested parties and generated internally (For a complete discussion of those options, see

*[ITA Equity Infusions Memo* at 8, *reprinted in* Def.'s App. Tab 2])." *General Issues Appendix,* 58 Fed.Reg. at 37,239.

the countervailing duty laws, it is necessary to permit some methodological flexibility. As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.

*Ceramica Regiomontana*, 10 CIT at 404–05, 636 F.Supp. at 966 (citations omitted); *see also GMN Georg Muller Nurnberg AG v. United States*, 17 CIT ——, ——, Slip Op. 93–54 at 5, 1993 WL 129804 at *2 (Apr. 20, 1993) ("It is well-established that Commerce is granted flexibility in selecting the appropriate methodology.") (citing *ICC Indus., Inc. v. United States*, 5 Fed.Cir. (T) 78, 84–85, 812 F.2d 694, 699 (1987) and *Consumer Prods. Div., SCM Corp. v. Silver Reed America, Inc.*, 3 Fed.Cir. (T) 83, 90, 753 F.2d 1033, 1039 (1985)). It is not the role nor function of the reviewing court to determine which agency practice is most reasonable or most accurate. *See Wheatland Tube Corp. v. United States*, 17 CIT ——, ——, 841 F.Supp. 1222, 1234 (1993) ("Commerce has broad discretion to choose a methodology to satisfy the statutory mandate."); *Hercules, Inc. v. United States*, 11 CIT 710, 726, 673 F.Supp. 454, 469 (1987) ("[T]his Court may not substitute its judgment for that of Commerce when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*") (quoting *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 22–23 (1st Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983) (further citation omitted)) (internal quotations omitted). Rather, the role of this Court is to examine the agency determination to determine if it is based on substantial evidence on the record and is otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B) (1988).

To determine if the "agency's methodology and procedures are reasonable means of effectuating the statutory purpose," the starting point is an examination of the countervailing duty statute. *See Ceramica Regiomontana, S.A.*, 10 CIT at 404–05, 636

F.Supp. at 966. The reasonableness of the grant methodology turns on the definition of the term subsidy and whether an equity infusion into an unequityworthy company can be countervailed in the same manner as an outright grant to the company. The countervailing duty statute includes a definitional section, which provides in relevant part:

**(5) Subsidy**

 **(A) In general**

 · · · ·

 (ii)

 · · · ·

 (I) The provision of capital, loans, or loan guarantees *on terms inconsistent with commercial considerations.*

19 U.S.C. § 1677(5)(A)(ii)(I) (1988) (emphasis added). The thrust of Commerce's grant methodology is to treat equity infusions into unequityworthy companies as "inconsistent with commercial considerations" because no reasonable investor expecting a reasonable rate of return would have invested in an unequityworthy company. *See General Issues Appendix*, 58 Fed.Reg. at 37,239; Def.'s Br. at 18. Such equity infusions are therefore countervailable under Commerce's grant methodology. As explained by Commerce,

> The key aspect of [the grant methodology] is the Department's interpretation of its equityworthiness determination. Using the grant methodology for equity infusions into unequityworthy companies is based on the premise that an unequityworthiness finding by the Department is tantamount to saying that the company could not have attracted investment capital from a reasonable investor in the infusion year based on the available information.

*General Issues Appendix*, 58 Fed.Reg. at 37,239.

In applying the grant methodology to equity infusions made into unequityworthy companies, Commerce properly focuses on the *benefit to the recipient* of the equity infusions and not on the cost to the donor making the equity infusion. *See British Steel Corp. v. United States*, 9 CIT 85, 97, 605 F.Supp. 286, 295 (1985) ("Fundamentally, the value of a subsidy must be measured in accordance

with its benefit to the recipient...."); S.Rep. No. 249, 96th Cong., 1st Sess. 85–86 (1979), *reprinted in* 1979 U.S.S.C.A.N. 381, 381, 471–72 (requiring, in the context of non-recurring subsidy grants, "a reasonable period" over which to allocate the value of subsidies "based on commercial and competitive benefit *to the recipient*") (emphasis added). When the benefit to the recipient is the focus, it is clear from the perspective of the unequityworthy company, there is little difference between receiving an equity infusion and receiving a grant.

Plaintiffs stridently argue there is a difference between equity infusions and grants to an unequityworthy company and that Commerce has failed to properly distinguish between the two in its grant methodology. The Court is unpersuaded by plaintiffs' arguments. In particular, the Court is unconvinced by the argument that equity infusions impose costs on recipient firms, costs that differentiate equity infusions into unequityworthy companies from grants. For purposes of valuing the benefit to the recipient, Commerce's methodology of equating the benefit received by an unequityworthy company from an equity infusion with the benefit conferred by receipt of an outright grant is a "permissible construction of the statute." *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (standing for the principle that in the absence of statutory language to the contrary, a reasonable agency interpretation will be upheld). Commerce's methodology provides a reasonable method of allocating the value of subsidy benefits from the bestowal of equity infusions into unequityworthy companies. For all of the foregoing reasons, the Court concludes Commerce's application and implementation of its grant methodology to countervail benefits arising from the infusion of equity into unequityworthy companies is supported by substantial evidence on the record and is otherwise in accordance with law.

Furthermore, the Court rejects plaintiffs' argument that Commerce's grant methodology must be revised to account for the offsetting costs of certain post-infusion events including privatization, the payment of dividends, and the retention of retained earnings. In valuing the benefits of subsidies, Commerce's determination that its grant methodology need not consider events subsequent to the original equity infusion is reasonable. Moreover, the statute provides an exclusive list of offsets that may be deducted from the amount of a gross subsidy to yield the net subsidy and an offset for the payments of dividends is not included in the statute. *See* 19 U.S.C. § 1677(6) (1988). The Court therefore rejects plaintiffs' arguments to revise the grant methodology. The Court sustains the methodology as applied and implemented by Commerce in the determinations under review.

## CONCLUSION

The Court holds Commerce's abandonment of the rate of return shortfall (RORS) methodology as set forth in the *General Issues Appendix* appended to *Certain Steel Products from Austria*, 58 Fed.Reg. 37,225, 37,-239–44 (Dep't Comm.1993) (final determ.) and applied in the final countervailing duty determinations in *Certain Steel Products from Korea*, 58 Fed.Reg. 37,338 (Dep't Comm.1993) (final determ.), *Certain Steel Products from Brazil*, 58 Fed.Reg. 37,295 (Dep't Comm.1993) (final determ.), and *Certain Steel Products from France*, 58 Fed. Reg. 37,304 (Dep't Comm.1993) (final determ.) was reasonable and is sustained as based upon substantial evidence on the record and as otherwise in accordance with law.

The Court holds the grant methodology employed by Commerce to countervail equity infusions into unequityworthy companies as set forth in the *General Issues Appendix* appended to *Certain Steel Products from Austria*, 58 Fed.Reg. 37,225, 37,239–44 (Dep't Comm.1993) (final determ.) and applied in the final countervailing duty determinations in *Certain Steel Products from Korea*, 58 Fed.Reg. 37,338 (Dep't Comm.1993) (final determ.), *Certain Steel Products from Brazil*, 58 Fed.Reg. 37,295 (Dep't Comm. 1993) (final determ.), and *Certain Steel Products from France*, 58 Fed.Reg. 37,304 (Dep't Comm.1993) (final determ.) is reasonable and is sustained as based upon substantial evi-

dence on the record and as otherwise in accordance with law.

### SECTION FOUR: SALES DENOMINATOR

Usinor Sacilor, Sollac, GTS, and British Steel plc (collectively "plaintiffs") jointly move for partial judgment on the agency record pursuant to U.S. CIT R. 56.2 and for an order declaring that aspect of the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed.Reg. 37,225, 37,231–36 (Dep't Comm.1993) (final determ.) (*General Issues Appendix*)[67] pertaining to the appropriate sales denominator employed by the Department of Commerce (Commerce) as set forth in the *General Issues Appendix* and applied in the final countervailing duty determinations in *Certain Steel Products from France,* 58 Fed.Reg. 37,304 (Dep't Comm.1993) (final determ.) (*French Final Determination*)[68] and *Certain Steel Products from the United Kingdom,* 58 Fed. Reg. 37,393 (Dep't Comm.1993) (final determ.) (*British Final Determination*)[69] to be unsupported by substantial evidence on the record and not otherwise in accordance with law. Defendant opposes plaintiffs' motion asserting Commerce's determinations are based upon substantial evidence on the administrative record and are otherwise in accordance with law.

AK Steel Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a unit of USX Corporation, and WCI Steel, Incorporated (collectively "defendant-intervenors") oppose plaintiffs' motion arguing Commerce's determinations are fully supported by substantial evidence and are not contrary to law. Defendant–Intervenors move for an order to strike an affidavit con-

tained in the appendix to plaintiffs' reply brief along with certain other documents in the reply brief making reference to or discussing non-record evidence. In addition, defendant-intervenors move for an order to strike plaintiffs' supplemental memorandum and allege the memorandum violates the Court's scheduling order, or in the alternative, defendant-intervenors move for leave to file an expanded supplemental memorandum.

### BACKGROUND

In general terms, the computation of a net subsidy requires Commerce to divide the benefits attributable to subsidies received by a company by the sales of the company's products. *See* 54 Fed.Reg. 23,366, 23,383–84 (Dep't Comm.1989) (to be codified at 19 C.F.R. § 355.47) (proposed May 31, 1989) (*Proposed Regulations*). After identifying subsidies, Commerce divides the net countervailable benefit allocable to the period of investigation (POI)—the numerator—by the company's sales of benefitting merchandise during the POI—the denominator. The result is the per-unit subsidy rate expressed as an *ad valorem* rate:

$$\frac{\textit{Total Subsidy Allocable to POI} - \textit{Offsets}}{\textit{Firm's Sales of Benefiting Merchandise During POI}} = \begin{array}{c} \textit{Ad Valorem Rate of} \\ \textit{Countervailable Benefit} \\ \textit{During POI} \end{array}$$

The factual determination of the appropriate denominator to be used in the equation is at the heart of the sales denominator issue. If the subsidy at issue is deemed tied to domestic production, Commerce allocates the benefit of the subsidy fully to the sales of domestically produced merchandise and uses domestic sales as the denominator. *General Issues Appendix,* 58 Fed.Reg. at 37,231. If the subsidy is deemed untied, however, Commerce allocates the benefit of the subsidy to total worldwide sales and uses worldwide sales as the denominator. *Id.*

---

**67.** See *supra* note 10 and accompanying text describing the nature of the *General Issues Appendix.*

**68.** Commerce amended the *French Final Determination* on August 17, 1993. *See Certain Steel Products from France,* 58 Fed.Reg. 43,759 (Dep't Comm.1993) (order and am. final determ.).

**69.** Commerce amended the *British Final Determination* on August 17, 1993. *See Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 43,748 (Dep't Comm.1993) (order and am. final determ.).

In making the factual determination of whether a particular subsidy at issue is tied to domestic production, Commerce begins with the approach it employed in *Certain Hot Rolled Lead and Bismuth Carbon Steel Products from France,* 58 Fed.Reg. 6221 (Dep't Comm.1993) (final determ.) (*France Bismuth*). Under this approach, the "focus is on resolving the factual question of whether the subsidies at issue are tied to the recipient firm's production of merchandise domestically in the country under investigation or, alternatively, untied." (Def.'s Br. at 4). *France Bismuth* marked the first time Commerce decided the appropriate sales denominator when a respondent's total sales included not only sales of domestically produced merchandise, but also sales of merchandise produced in one or more other countries. *General Issues Appendix,* 58 Fed.Reg. at 37,231. In the *French Final Determination* and the *British Final Determination,* Commerce modified the sales denominator analysis it employed in *France Bismuth* by erecting a rebuttable presumption to be employed when deciding the factual question of tying. As explained by Commerce,

> [U]nder [Commerce's] refined "tied" analysis, [Commerce] will begin by presuming that a subsidy provided by the government of the country under investigation is tied to domestic production. However, this presumption is not irrebuttable. A party may rebut this presumption by presenting evidence tending to show that the subsidy was not tied to domestic production.

*Id.*

To rebut the presumption that subsidies are tied to domestic production, Commerce declared,

> Relevant evidence may include the nature of the program at issue, whether the subsidy was bestowed specifically to provide other than a domestic benefit, communications between the government and the respondent relating to the subsidy provided pursuant to the program at issue, the government's ownership interest, if any, in the respondent, and any other evidence addressing the likely beneficiaries of the subsidy.... [T]he above list of evidentiary

criteria is not exhaustive, nor can any one or several of these factors necessarily give decisive guidance in all cases.

*Id.* Commerce makes its tied determination "based upon record evidence showing the *likely* effects of the subsidies, *i.e.,* the likely uses or beneficiaries determined as of the time the subsidies were bestowed by the subsidizing government." (Def.'s Br. at 4). Commerce does not consider evidence of subsequent events demonstrating the actual effects of the subsidies. *France Bismuth,* 58 Fed.Reg. at 6230–31.

### Issue Presented

Whether Commerce's determination of the appropriate sales denominator to be used in subsidy calculations when a respondent's total sales include not only sales of domestically produced merchandise, but also sales of merchandise produced in one or more foreign countries is supported by substantial evidence on the record and is otherwise in accordance with law.

### Contentions of the Parties

#### A. *Plaintiffs*

Plaintiffs argue Commerce's new presumption-based methodology to calculate the sales denominator is unsupported by substantial evidence and is contrary to law and therefore should be reversed. Specifically, plaintiffs contend Commerce departed from its practice of treating equity and other capital infusions as untied benefits and allocating them over total sales. (Pls.' Br. at 4, 19–24). The foundation for this practice is the inherent fungibility of money, which plaintiffs argue is reflected in Commerce's *Proposed Regulations.* Plaintiffs maintain Commerce erred by departing from its established fungibility principle and creating a new exception for multinational companies. (*Id.* at 4–5, 29–31).

Plaintiffs further argue Commerce's adoption of its refined tying analysis constitutes a departure from longstanding agency practice and requires a reasoned analysis that Commerce failed to provide. (*Id.* at 24–26). Plaintiffs contend "[t]here is no rational basis for distinguishing between foreign and domestic production when allocating otherwise

untied subsidies," and even if one exists, plaintiffs believe Commerce has failed to set it forth on the record. (*Id.* at 28).

In challenging the new tying presumption, plaintiffs assert the presumption is not supported by substantial evidence and is contrary to law because it has no foundation in logic, fact, or economic reality. Alleging the presumption relies on the presumed intent of a foreign government and produces results contrary to the remedial purpose of the countervailing duty law, plaintiffs maintain the sole basis for the presumption is Commerce's generalized and undefined "administrative experience." (*Id.* at 5–6; *see id.* at 32–41).

Plaintiffs also contest Commerce's claim that the presumption is rebuttable and argue the presumption is virtually irrebuttable, (*id.* at 43–51), because the types of rebuttal evidence cited by Commerce that could refute the presumption exclude "the most probative evidence that a subsidy is not tied—*i.e.,* evidence that the capital subsidies, by nature, are financial benefits to the entire company," (*id.* at 7). Plaintiffs maintain Commerce "may not decide a critical legal and factual issue by resorting to an irrebuttable presumption as a substitute for engaging in reasoned decisionmaking and basing its findings on evidence in the record." (*Id.* at 44–45 (citing *NLRB v. St. Francis Hosp.,* 601 F.2d 404, 416 (9th Cir.1979); Charles I. Koch, Jr., *Administrative Law and Practice* § 6.43 (Supp.1992); and Jacob A. Stein, *et al., Administrative Law* § 24.04 (1994))). In addition, plaintiffs contend, the presumption impermissibly shifts the burden of proof onto respondents. (*Id.* at 48 n. 49, 51–52).

Plaintiffs claim Commerce first announced its presumption-based tying methodology in the final determinations under review and in the *General Issues Appendix* "thereby depriving the parties of the opportunity to submit evidence to rebut the presumption." (*Id.* at 7; *see id.* at 52–55). From plaintiffs' viewpoint, the agency "committed legal error and violated considerations of fundamental fairness by its untimely adoption of its new presumption and its failure to afford respondents either prior notice of its new rule or the opportunity to develop the facts on the record necessary to prove the presumption invalid." (*Id.* at 54 (footnote omitted)). If Commerce had considered such evidence, plaintiffs suggest, that evidence of record could have successfully rebutted the presumption. (*Id.* at 64–66).

Finally, plaintiffs raise the objection that Commerce's "decision to establish and find 'unrebutted' the new tying presumption was contrary to the substantial evidence of record established in the French investigation." (*Id.* at 8). Plaintiffs argue Commerce failed to construe evidence on the record showing the subsidies bestowed on Usinor Sacilor benefitted Usinor Sacilor's worldwide production and that such subsidies were not tied to domestic production.

## B. *Defendant*

Commerce responds that it "did not deviate from past practice because it had not previously addressed how to treat equity infusions in the multinational production setting, except in *France Bismuth,* where it found them capable of being tied." (Def's Br. at 25). Contrary to plaintiffs' assertion, Commerce insists it has not developed a per se rule that equity infusions are untied, only that equity infusions are capable of being tied. (*Id.*)

Commerce rejects plaintiffs' argument that equity infusions should, as a matter of law, be treated as untied. (*Id.* at 36). Plaintiff has missed the point, Commerce claims, by ignoring that other forms of subsidies, such as grants and loans, are equally fungible, yet Commerce has found them to be tied in certain cases.[70] Thus, the fungibility of equity infusions does not preclude Commerce from tying equity infusions to domestic production just as other forms of subsidies are found to be tied. (*Id.* at 37). In addition, Commerce argues, the "basic underlying principle of Commerce's traditional tying analysis is that it is appropriate to make

---

**70.** Commerce cites to several final determinations including *Carbon Steel Buttweld Pipe Fittings from Thailand,* 55 Fed.Reg. 1695, 1697 (Dep't Comm.1990) (final determ.) and *New Steel* *Rail, Except Light Rail, from Canada,* 54 Fed. Reg. 31,991, 31,994 (Dep't Comm.1989) (final determ.). (Def.'s Br. at 37 n. 25 (other citations omitted)).

exceptions to the fungibility of money principle in certain circumstances." (*Id.*) As explained previously by Commerce,

> If Congress had intended that we universally apply the fungibility concept, we would have to countervail export subsidies on sales to countries other than the United States, allocate export subsidies on U.S. sales over total sales instead of over only export sales, and dilute benefits tied to a product under investigation by allocating them over total sales.

(*Id.* at 38 (quoting *Industrial Nitrocellulose from France,* 51 Fed.Reg. 5386, 5387 (Dep't Comm.1986) (prelim. admin. review))). Commerce maintains the agency is now creating a third exception to the fungibility of money approach,[71] one "which would recognize the possibility that a subsidy could be tied to domestic production." (*Id.* at 39).

Commerce rejects plaintiffs' argument that the agency has not articulated the basis for its new tying approach and has failed to reconcile the new approach with the "established rule" that equity infusions are inherently fungible. (*Id.* at 41). Commerce argues it clearly spelled out in *France Bismuth* why it treated firms with multinational production different from firms with only domestic production. In *France Bismuth,* Commerce stated it was " 'not prepared to conclude automatically ... that otherwise untied domestic subsidies to a holding company with both domestic and foreign subsidiaries ... benefits [sic] not only domestic production, but also foreign production.' " *France Bismuth,* 58 Fed.Reg. at 6230.

Commerce contends the rationale for raising the tying presumption is founded upon the agency's belief that "a government normally would provide subsidies to a firm with multinational production only for decidedly domestic purposes." (*Id.*). The agency's adoption of the rebuttable presumption on the factual question of tying is reasonable, Commerce contends, considering the agency's "extensive administrative experience

with foreign subsidies." (*Id.* at 8 (citing *General Issues Appendix,* 58 Fed.Reg. at 37,231)). As summarized by Commerce, "[o]n the basis of our past administrative experience, we believe that it is reasonable to presume that the government of a country normally provides subsidies for the general purpose of promoting the economic and social health of that country and its people." (*Id.* (quoting *General Issues Appendix,* 58 Fed. Reg. at 37,231)).

Commerce defends the adoption of a rebuttable presumption and argues it is both consistent with the intent of the relevant statute and based on "some rational connection between the facts proved and the facts then presumed." (*Id.* at 49 (citing *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 804–05, 65 S.Ct. 982, 988–89, 89 L.Ed. 1372 (1945); *Luria v. United States,* 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101 (1913); *Rhone Poulenc, Inc. v. United States,* 8 Fed.Cir. (T) 61, 67–68, 899 F.2d 1185, 1191 (1990); *United Scenic Artists v. NLRB,* 762 F.2d 1027, 1034 (D.C.Cir.1985); and *NTN Bearing Corp. v. United States,* 15 CIT 75, 78, 757 F.Supp. 1425, 1428 (1991), *aff'd,* 10 Fed.Cir. (T) ——, 972 F.2d 1355 (1992))). Commerce contends the tying presumption is consistent with one of the basic purposes of the countervailing duty statute because the presumption attempts to measure the subsidies benefitting the merchandise under investigation. (*Id.* (citing *Certain Steel Products from Belgium,* 47 Fed.Reg. 39,304, 39,320 (Dep't Comm. 1982) (final determ.); *Industrial Nitrocellulose from France,* 52 Fed.Reg. 833, 835 (Dep't Comm.1987) (final admin. review))). In addition, Commerce claims "there is a rational connection between the facts proved, *i.e.,* that the government ... has provided a subsidy to a firm with multinational production, and the facts presumed, *i.e.,* that the subsidy is tied to the firm's domestic production." (*Id.* at 50).

Commerce rejects plaintiffs' claim of procedural unfairness in the agency's adoption of the rebuttable presumption. First, Com-

---

**71.** Prior to *France Bismuth,* Commerce made two exceptions to the general principle of the fungibility of money: (1) where a domestic subsidy is tied to a particular product or products; and (2) where an export subsidy is tied to a

particular market. *General Issues Appendix,* 58 Fed.Reg. at 37,234 (citing *Proposed Regulations,* 54 Fed.Reg. at 23,383–84 (to be codified at 19 C.F.R. § 355.47(a), (b))).

merce argues it sought all information relevant to the tying question in the questionnaires sent to the French and U.K. respondents. (*Id.* at 73–74). Although the questionnaires did not use the term "tied," Commerce claims the questions still "would elicit all information relevant to Commerce's determination of whether a particular subsidy program is tied to ... domestic production." (*Id.* at 73). Second, Commerce contends after the agency issued the preliminary determinations in these cases plaintiffs "were aware that tying was one of two possible theories upon which Commerce would rely in its final determination" yet plaintiffs did not attempt to supplement their questionnaire responses. (*Id.* at 77). When Commerce issued the *France Bismuth* final determination in January 1993, Commerce maintains it "identified specifically which of the two rationales it was relying upon to limit the denominator to sales of domestically produced merchandise." (*Id.*). Commerce states the parties received copies of *France Bismuth* one day before the regulatory deadline for the parties to submit factual information in the present cases. Even if plaintiffs did not know in advance about the tying presumption or about their evidentiary burden, Commerce insists plaintiffs were not prejudiced because: (1) the record already contained all relevant evidence on the question of tying; and (2) plaintiffs were aware that Commerce would be determining, as a factual matter, whether the subsidies at issue were tied to domestic production. (*Id.* at 78–79).

## C. *Defendant–Intervenors*

Defendant–Intervenors support Commerce's position by arguing the agency reasonably presumed domestic subsidies may be tied to domestic production and furthermore, Commerce "determined—with or without a presumption—the subsidies here were *in fact* tied to domestic production." (Def.–Intervenors' Br. at 12 (footnote omitted)). Defendant–Intervenors maintain Commerce did not depart from its past practice arguing the agency had never considered this particular tying question before *France Bismuth* and "therefore 'had no prior practice' to depart from." (*Id.* at 22 (citing *General Issues Appendix,* 58 Fed.Reg. at 37,235)).

Defendant–Intervenors contend Commerce's adoption of a rebuttable presumption was reasonable and "solidly based on record evidence and administrative experience." (*Id.* at 15; *see id.* at 14–21). First, defendant-intervenors assert the presumption is based on the common understanding that governments are not generally motivated to assist foreigners at a cost to their own taxpayers. Second, Commerce's exhaustive analysis of the domestic subsidies at issue here "informs and supports the Department's decision concerning how to fashion this rebuttable presumption." (*Id.* at 16). Finally, defendant-intervenors contend Article 11 of the GATT Subsidies Code endorses Commerce's presumption that domestic subsidies are "purely national in scope." (*Id.* (footnote omitted) (citing *Agreement on Interpretation and Application of Articles VI, XVI, and XXIII on the General Agreement on Tariffs and Trade,* Art. 11 (1979))).

Defendant–Intervenors reject plaintiffs' criticism that factual presumptions are disfavored and viewed with great skepticism by courts and claim that agencies have "broad discretion to apply a factual presumption so long as it is, both in principle and in application, rebuttable." (*Id.* at 19; *see id.* at 17–21). In addition, defendant-intervenors contend Commerce's use of an initial presumption is "fully consistent with the agency's investigatory mandate" and is not an unalterable rule, but one allowing for "decisions 'on a case-by-case basis.'" (*Id.* at 19, 20 (footnote omitted)).

Defendant–Intervenors disagree with plaintiffs' argument that the late adoption of the tying presumption abridged plaintiffs' due process rights. Defendant–Intervenors contend that although "the presumption analysis was a new development in the determinations presently before the Court, the allocation of subsidies to domestic production was not." (*Id.* at 36). The tying presumption raised here, defendant-intervenors insist, is "merely a complementary means of reaching the same allocation result reached in [*France Bismuth* ]" and thus, plaintiffs had sufficient opportunity for notice and comment. (*Id.*) Indeed, in the preliminary

French determination, defendant-intervenors declare Commerce found the subsidies to be tied domestically, and "within a month, all parties knew exactly why." (*Id.* at 38 (citing *Certain Steel Products From France,* 57 Fed.Reg. 57,785, 57,788 (Dep't Comm.1992) (prelim. determ.))). That is, one of the grounds Commerce relied upon, according to defendant-intervenors, was "an explicit reaffirmance of [*France Bismuth* ]'s factual tying finding." (*Id.* (citing *General Issues Appendix,* 58 Fed.Reg. at 37,236)). Finally, defendant-intervenors suggest that insofar as Commerce's "explanation—as opposed to the result—in the Final Determinations varied from that set out [in the preliminary determination], the Department has the discretion to modify its findings or methodology in a final determination." (*Id.* at 39 (citing *Cementos Anahuac del Golfo, S.A. v. United States,* 12 CIT 525, 557, 689 F.Supp. 1191, 1216 (1988), *aff'd sub nom. Cementos Guadalajara, S.A. v. United States,* 7 Fed.Cir. (T) 113, 879 F.2d 847 (1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990))).

## DISCUSSION

### A. *Agency Explanation of the Tying Presumption*

Ordinarily, an agency may revise its interpretation of the statutory requirements it enforces and enjoy deference from the courts. *Rust v. Sullivan,* 500 U.S. 173, 186, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991). Such deference, however, is predicated on a finding that the agency revised its interpretation with "a reasoned analysis." *See Rust,* 500 U.S. at 187, 111 S.Ct. at 1769 (deferring to the agency's revised statutory interpretation because "the Secretary amply justified his change of interpretation with a 'reasoned analysis' ") (citing *Motor Vehicles Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)).

Commerce's traditional practice with respect to domestic subsidies, as set forth in the *Proposed Regulations,* is to treat them as untied benefits. 54 Fed.Reg. 23,366, 23,384 (Dep't Comm.1989) (to be codified at 19 C.F.R. § 355.47(c)(2)) (proposed May 31, 1989) (*Proposed Regulations* ); *see also Car-*

*bon Steel Structural Shapes, Hot–Rolled Carbon Steel Plate, and Hot–Rolled Carbon Steel Bar from the United Kingdom,* 47 Fed. Reg. 39,384, 39,391 (Dep't Comm.1982) (final determ.) ("[W]hen a government buys equity in a company, it is providing funds for the corporation as a whole, not for particular divisions or projects."). The reasoning supporting this practice is well settled: equity investments benefit a company's overall operations. *See British Steel Corp. v. United States,* 9 CIT 85, 96, 605 F.Supp. 286, 294–95 (1985) (finding it "unnecessary to trace the use of such funds or to find that they directly related to enhanced product competitiveness" because equity investments in the company under investigation benefitted "all of its remaining manufacturing and exporting operations"); *see also Stainless Steel Plate from the United Kingdom,* 51 Fed.Reg. 44,656, 44,658 (Dep't Comm.1986) (final admin. review) (reasoning that "[r]egardless of the particular uses" to which the equity infusions at issue were put, "it is clear that these funds provide[d] long-term benefits, bolstering all phases and aspects" of the receiving company's production).

In *France Bismuth,* Commerce addressed, apparently for the first time, the "issue of the appropriate sales denominator to be used in subsidy calculations when a respondent's total sales include not only sales of domestically produced merchandise, but also sales of merchandise produced in one or more foreign countries." *General Issues Appendix,* 58 Fed.Reg. at 37,231. Commerce determined the subsidies at issue in *France Bismuth* were tied to domestic production. Commerce found:

> In making this determination, consistent with our existing methodology, we examined whether the subsidies were bestowed specifically to benefit domestic production.... On the record before us, after reviewing the programs from which the subsidies at issue arose ... we concluded that the [Government of France] was seeking to promote domestic social policy and domestic economic activities and therefore to encourage domestic production.

*France Bismuth,* 58 Fed.Reg. at 6231 (citation omitted).

When it faced the issue of the appropriate sales denominator for respondents with foreign sales six months later in the determinations under review, Commerce explained:

> We have decided to continue using a "tied" analysis to resolve this issue, although we have refined the analysis that we used in France Bismuth. . . .
>
> [U]nder the Department's refined "tied" analysis, the Department will begin by presuming that a subsidy provided by the government of the country under investigation is tied to domestic production. However, this presumption is not irrebuttable. A party may rebut this presumption by presenting evidence tending to show that the subsidy was not tied to domestic production.

*General Issues Appendix*, 58 Fed.Reg. at 37,231. Commerce justified this modification of its tied analysis and its adoption of the rebuttable presumption by reasoning the changes reflect what the agency has observed over the years:

> On the basis of our past administrative experience, we believe that it is reasonable to presume that the government of a country normally provides subsidies for the general purpose of promoting the economic and social health of that country and its people, and for the specific purposes of supporting, assisting or encouraging domestic manufacturing or production and related activities (including, for example, social policy activities such as the employment of its people). Conversely, that same government would not normally be motivated to promote, at what would be considerable cost to its own taxpayers, manufacturing or production or higher employment in foreign countries.

*Id.*

In describing its apparent departure from the *Proposed Regulations*, which provide that "the Secretary will treat equity infusions as untied benefits," *Proposed Regulations*, 54 Fed.Reg. at 23,384 (to be codified at 19 C.F.R. § 355.47(c)(2)), Commerce observed the *Proposed Regulations* do not "contemplate[] the possibility that the subsidy would be bestowed upon a respondent with multinational production," *General Issues Appendix*,

58 Fed.Reg. at 37,234. Commerce stated it "concluded in *France Bismuth* that § 355.47(c)(1) simply did not contemplate a respondent with multinational production. We reaffirm that conclusion here." *Id.*

There is little doubt Commerce has reviewed, analyzed, and decided numerous cases involving the identification and allocation of equity infusions, grants, and other subsidies in countervailing duty investigations. The Court finds no fault with Commerce's claim that it has "past administrative experience" in these matters. Additionally, Commerce's explanation that its tying presumption is consistent with the intent of the relevant statute because the presumption aids Commerce in determining the appropriate denominator appears reasonable on its face. On the basis of the record evidence produced thus far in this action, it appears Commerce has sufficiently explained its adoption of the tying presumption. As explained below, however, it is premature for the Court to decide whether Commerce has provided a reasoned analysis for adopting the tying presumption because interested parties had neither notice of the new presumption nor the opportunity to present evidence to rebut the presumption.

### B. *Adoption of the Tying Presumption*

In adopting the rebuttable presumption, Commerce insists it has not changed its practice, but rather has "refined" the methodology it first set forth in *France Bismuth*. Because *France Bismuth* was the first time Commerce confronted the determination of the appropriate sales denominator for a multinational company receiving subsidies, Commerce declares it had no prior practice and therefore its refinement as explained in the *General Issues Appendix* was not a departure from an established agency practice.

■ There is no question Commerce first raised the tying presumption in the final determinations under review here. Commerce concedes this point. Irrespective of whether Commerce adopted the tying presumption by a change in agency practice, through informal rulemaking, or by some other means, fundamental fairness dictates

Commerce should have given plaintiffs due notice of the agency's decision to adopt the tying presumption as well as afforded plaintiffs the opportunity to submit evidence to rebut the tying presumption. Commerce is not required to afford interested parties an unlimited opportunity to comment on each modification of the agency's practice or procedure. To provide otherwise would be to unnecessarily burden the agency with an unending cycle of notices, comments, and responses. Fundamental fairness demands, however, that in certain circumstances, an interested party be given at least the opportunity to be heard on agency actions that may adversely impact upon the party's interests.

In the countervailing duty final determination challenged in *Sigma Corp. v. United States*, 17 CIT ——, 841 F.Supp. 1255 (1993), Commerce shifted from applying a company-specific margin in its preliminary determination to a country-wide margin in the final determination. The plaintiff in *Sigma* claimed Commerce failed to afford the plaintiff notice or opportunity to comment on the agency's change. The Court responded:

> [I]t goes against all fairness for Commerce to say one thing in the preliminary results and then to have plaintiffs rely on this fact and not argue its case any further. Then, when plaintiffs cannot argue any further, Commerce changes its position and issues a final determination saying the complete opposite.

*Sigma*, 17 CIT at ——, 841 F.Supp. at 1267. Plaintiffs in these final determinations face a similar predicament. In the preliminary determinations, Commerce did not discuss or analyze the use of a rebuttable presumption that subsidies are tied to domestic production in certain instances. *See Certain Steel Products From France*, 57 Fed.Reg. 57,785 (Dep't Comm.1992) (preliminary determ.); *Certain Hot Rolled Lead and Bismuth Carbon Steel Products from the United Kingdom*, 57 Fed. Reg. 42,974 (Dep't Comm.1992) (preliminary determ.). Thus, plaintiffs had neither notice that Commerce intended to erect a tying presumption nor the opportunity to submit evidence to rebut that presumption.

The Court is unconvinced by Commerce's claim that plaintiffs had sufficient notice of Commerce's tying methodology merely by the questions posed by the agency in the verification forms. It is certainly true that plaintiffs had notice that Commerce sought some evidence relevant to a factual determination of whether subsidies provided were tied to domestic production. There is a large leap, however, from having notice of the agency's need for evidence relevant to tying to having notice of the need to submit evidence to rebut a newly raised presumption that domestic subsidies are tied to domestic production. The Court finds Commerce failed to give plaintiffs the opportunity to submit evidence specifically to rebut the presumption erected by Commerce. Furthermore, the Court finds Commerce failed to afford plaintiffs notice and the opportunity to comment on the agency's adoption of the presumption that subsidies are tied to domestic production.

### C. *Motion to Strike Portions of Plaintiffs' Reply Brief*

Defendant–Intervenors, with consent of Commerce, move pursuant to U.S. CIT R. 12(f) for an order striking portions of plaintiffs' reply brief and allege certain portions were "not part of the administrative record below." (Def.–Intervenors' Mot. to Strike Portions of Foreign Producers' Reply Br. on the General Issue of Denominator at 2). In particular, defendant-intervenors object to the affidavit of Richard Hewitt, Manager in Management Accounting at British Steel plc, included in the appendix to plaintiffs' reply brief arguing: (1) there was no basis for allowing non-record evidence designed to show what plaintiffs would have submitted to Commerce below if plaintiffs had been aware of its relevance at that time; (2) the affidavit contains no information bearing on an issue currently before this Court; (3) the grant subsidy discussed in the affidavit is apparently not one of the subsidies disclosed to and countervailed by Commerce; and (4) plaintiffs had ample opportunity to submit the newly proffered information below even after formal closure of the administrative record. (*Id.* at 3–7).

Defendant–Intervenors also object to plaintiffs' reference to three materials that were not part of the record below, namely: (1) D. Salvatore, *International Economics* (3d ed. 1990) (cited in Pls.' Reply Br. at 21 nn. 32–33); (2) R. Caves, J. Frankel, & R. Jones, *World Trade and Payments* (5th ed. 1990) (cited in Pls.' Reply Br. at 21 n. 33); and (3) U.S. Department of Commerce, *North American Free Trade Agreement: Generating Jobs for Americans* (1991) (cited in Pls.' Reply Br. at 21, 22 n. 34 and accompanying text). Defendant–Intervenors allege these three secondary sources were not made part of the record below and furthermore "they have nothing to do with the issues currently before this Court." (*Id.* at 8).

Plaintiffs oppose defendant-intervenors' motion to strike portions of plaintiffs' reply brief arguing plaintiffs

> do not claim with respect to either category of documents that they have factual evidence in the administrative record, or that they should be added to the administrative record, or that the ITA relied on them. Nor do Plaintiffs contend that the Court should rely on the extra-record evidence to substitute its judgment for that of the agency on factual issues. Rather, Plaintiffs have cited these documents simply for the purposes described, and ask that the Court take judicial notice of them for those purposes.

(Pls.' Resp. to Def.–Intervenors' Mot. to Strike Portions of Pls.' Reply Br. at 5).

■■■■■ Plaintiffs concede the challenged documents are not part of the administrative record and plaintiffs do not seek to make them a part of that record. Rather, plaintiffs request that the Court take judicial notice of these documents for a limited purpose—to show plaintiffs have evidence that could have been used to rebut Commerce's tying presumption if plaintiffs had known about the presumption before the final determinations.

The Court declines to take judicial notice of the challenged documents because to do so would be inconsistent with the general principles of judicial notice.[72] The Court will allow, however, the challenged documents to remain as part of plaintiffs' papers for the sole and limited purpose of establishing plaintiffs' offer to produce evidence that may or may not rebut the tying presumption raised by Commerce. Defendant–Intervenors' motion to strike the challenged documents and certain references in plaintiffs' reply papers is granted in all other respects.

### D. *Motion to Strike Plaintiffs' Supplemental Memorandum*

■■■■■ Defendant–Intervenors, with consent of Commerce, move pursuant to U.S. CIT R. 12(f) for an order striking plaintiffs' supplemental memorandum, which was filed in response to questions from the Court following oral argument. Defendant–Intervenors assert that the scheduling order governing this joint proceeding adopts Fed.Cir.R. 32(a), which requires all briefs to be double-spaced. The plaintiffs, however, submitted a supplemental memorandum "which is almost completely single-spaced." (Def.–Intervenors' Mot. to Strike Foreign Producers' Supplemental Mem. at 2 (footnote omitted)). Furthermore, if plaintiffs' memorandum had been double-spaced, defendant-intervenors contend, it would be "approximately 18 pages in length" and therefore would contravene the Court's instructions that responses to the Court's questions be no more than ten pages in length. (*Id.*). Defendant–Intervenors claim "[h]aving adhered to the Court's instructions in preparing their own supplemental memoranda, [defendant-intervenors] have been unfairly prejudiced by Foreign Producers' decision to ignore those instructions." (*Id.* at 3). If the motion to strike is denied, defendant-intervenors request in the alternative "leave to expand their own supplemental

---

72. Judicial notice permits a court to admit certain facts into evidence without the usual requirements of proof when those facts are "not subject to reasonable dispute" either because such facts are generally known (e.g., the sun rises in the east) or because they are readily verifiable by reliable sources (e.g., at sea level water boils at 212° F). *See generally* Christopher

B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 51 at 266 (2nd ed. 1994) (discussing Fed.R.Evid. 201(b)(2)). The Hewitt affidavit, two textbooks, and the agency document challenged here are not proper subjects for judicial notice because they contain assertions of fact that are neither generally known nor readily verifiable.

denominator submission by eight pages." (*Id.*)

The Court notes, first, plaintiffs' response is nine pages in length and therefore is within the ten-page limit set by the Court. Second, given that plaintiffs' supplemental memorandum, when reformatted into the traditional text-and-footnote format, is still within the Court's ten-page limit, defendant-intervenors' claim of unfair prejudice is unavailing. Third, the Court notes that the granting of a motion to strike "constitutes an extraordinary remedy, and should granted only in cases where there has been a flagrant disregard of the Rules of this Court." *Fujitsu General, Ltd. v. United States,* 15 CIT 432, 433, 1991 WL 164482 (1991) (citing *Jimlar Corp. v. United States,* 10 CIT 671, 673, 647 F.Supp. 932, 934 (1986)). For all of the foregoing reasons, the Court holds plaintiffs did not flagrantly disregard the rules of this Court and no prejudice was suffered by defendant-intervenors or Commerce. Therefore, defendant-intervenors' motion to strike plaintiffs' supplemental memorandum is denied.

## CONCLUSION

The Court holds Commerce did not permit plaintiffs a reasonable opportunity to be heard on the issue of Commerce's adoption of the presumption that subsidies are tied to domestic production for companies with multinational production in Commerce's determination of the appropriate sales denominator. Notwithstanding the deficiencies, if any, in Commerce's determination of the appropriate sales denominator, the Court holds further that Commerce did not provide plaintiffs an adequate opportunity to submit evidence to rebut the presumption erected by Commerce in its determination of the appropriate sales denominator.

The Court remands the general issue of the sales denominator. Insofar as *Certain Steel Products from France,* 58 Fed.Reg. 37,304 (Dep't Comm.1993) (final determ.) is concerned, Commerce is directed to give interested parties notice and the opportunity to comment on the agency's adoption of the tying presumption. If, after consideration of such comments Commerce determines the

tying presumption is an appropriate means to calculate the sales denominator, the agency is ordered to give interested parties notice and the opportunity to submit evidence on the record for the purpose of rebutting the tying presumption. Commerce shall then examine the submitted evidence to determine whether it is sufficient to rebut the tying presumption. If Commerce finds the evidence submitted is sufficient to rebut the tying presumption, the agency is directed to make all necessary and appropriate findings and calculations consistent with this opinion.

Insofar as *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm.1993) (final determ.) (*British Final Determination*) is concerned, if Commerce should find in its remand determination on the general issue of privatization that any party is liable for countervailing duties, Commerce is directed to give interested parties against whom countervailing duties have been assessed notice and the opportunity to comment on the agency's adoption of the tying presumption. If, after consideration of such comments Commerce determines the tying presumption is an appropriate means to calculate the sales denominator, the agency is ordered to give interested parties notice and the opportunity to submit evidence on the record for the purpose of rebutting the tying presumption. Commerce shall then examine the submitted evidence to determine whether it is sufficient to rebut the tying presumption. If Commerce finds the evidence submitted is sufficient to rebut the tying presumption, the agency is directed to make all necessary and appropriate findings and calculations consistent with this opinion. Should Commerce find in its remand determination of the *British Final Determination* on the general issue of privatization that no parties are liable for countervailing duties, then the agency need not revisit the general issue of the sales denominator.

The Court holds defendant-intervenors' motion to strike certain documents in plaintiffs' reply brief is granted except that the challenged documents shall remain as part of plaintiffs' papers for the sole and limited purpose of establishing plaintiffs' offer to produce evidence that may or may not rebut

the tying presumption raised by Commerce. The Court denies defendant-intervenors' motion to strike plaintiffs' supplemental memorandum.

### SECTION FIVE: DISPROPORTIONALITY

On the general issue of disproportionality, Plaintiffs Dongbu Steel Company, Ltd., Pohang Iron & Steel Company, Ltd. (POSCO), Pohang Coated Steel Company, Ltd., Pohang Steel Industries Company, Ltd., and Union Steel Industries Company, Ltd. (collectively "Korean Respondents") have filed a joint motion for partial judgment on the agency record and supporting memoranda challenging the general issue of Commerce's treatment of disproportionality for the purpose of evaluating the specificity of a potentially countervailable program in *Certain Steel Products from Korea,* 58 Fed.Reg. 37,338 (Dep't Comm.1993) (final determ.) (*Korean Final Determination* ).[73] Defendant the Department of Commerce (Commerce) and defendant-intervenors AK Steel Corporation, Bethlehem Steel Corporation, Geneva Steel, Gulf States Steel Incorporated of Alabama, Inland Steel Industries, Incorporated, Laclede Steel Company, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a unit of USX Corporation, and WCI Steel, Incorporated (collectively "Domestic Producers") have responded in support of Commerce's determination.

### BACKGROUND

Commerce's period of investigation in the *Korean Final Determination* is calendar year 1991. *Korean Final Determination,* 58 Fed.Reg. at 37,339. The products covered by Commerce's investigation are certain hot-rolled carbon steel flat products, certain cold-rolled carbon steel flat products, certain corrosion-resistant carbon steel flat products, and certain cut-to-length carbon steel plate. *Id.*

In the *Korean Final Determination,* Commerce confirmed its preliminary determination that the Government of Korea (GOK)

"effectively controls long-term lending practices in Korea." *Id.* at 37,340; *see Certain Steel Products from Korea,* 57 Fed.Reg. 57,-761, 57,764–65 (Dep't Comm.1992) (prelim. determ.). Commerce also found evidence on the record to support a finding of GOK control over the Korean financial system through the following means: "(1) Control of lending practices pursuant to authority granted to the GOK under the General Bank Act; (2) The appointment of banking officials; (3) Informal intervention in the allocation of loans; and (4) The strict regulation of interest rates." *Korean Final Determination,* 58 Fed.Reg. at 37,340. Commerce concluded that a finding of GOK control of long-term lending institutions in Korea was "sufficient to establish a government program" under Commerce's own regulations, and constituted "government action" under § 771(5)(A)(ii) of the Tariff Act of 1930, as amended. *See* 54 Fed.Reg. 23,366, 23,379 (1989) (to be codified at 19 C.F.R. § 355.2(r)) (proposed May 31, 1989) (*Proposed Regulations* ) (defining "program" to mean "any act or practice of a government"); Tariff Act of 1930, § 771(5)(A)(ii), 19 U.S.C. § 1677(5)(A)(ii) (1988) (defining "subsidy" to include certain domestic subsidies "if provided or required by government action").

Having determined that GOK control of long-term lending in Korea constitutes government action, Commerce had to address the question of whether the Korean Respondents received industry specific benefits from that action under 19 U.S.C. § 1677(5)(B). *Korean Final Determination,* 58 Fed.Reg. at 37,342; *see* 19 U.S.C. § 1677(5)(B) (1988) ("[T]he administering authority, in each investigation, shall determine whether the bounty, grant, or subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or industries."). To do so, Commerce reasoned that it was obligated to determine "whether, despite the removal of certain *de jure* preferences provided to the steel industry, there has been a *de facto* change in the patterns of lending to this industry from the time ... which GOK officials acknowledged was a period during

---

**73.** Commerce amended the *Korean Final Determination* on August 17, 1993. *See Certain Steel*

*Products from Korea,* 58 Fed.Reg. 43,752 (Dep't Comm.1993) (orders and am. final determ.).

which the GOK actively favored the steel industry ... through the provision of subsidized long-term financing." *Korean Final Determination*, 58 Fed.Reg. at 37,342 (quoting 19 U.S.C. § 1677(5)(B) (1988)).

To determine whether the government action provided *de facto* selective benefits, Commerce turned to § 355.43(b)(2) of its proposed regulations which instructs Commerce to consider:

> (i) The extent to which a government acts to limit availability of a program;
>
> (ii) The number of enterprises, industries, or groups thereof that actually use a program;
>
> (iii) Whether there are dominant users of a program, or whether certain enterprises, industries, or groups thereof receive disproportionately large benefits under a program; and
>
> (iv) The extent to which a government exercises discretion in conferring benefits under a program.

*Proposed Regulations*, 54 Fed.Reg. at 23,379 (1989) (to be codified at 19 C.F.R. § 355.43(b)(2)); *Korean Final Determination*, 58 Fed.Reg. at 37,342–43. Commerce explained the analysis it had to perform:

> The facts in this case do not show that the program has been selectively limited to a small number of users; likewise, there is no dominant user of the program. However, if the lending patterns to the steel industry have not changed since the HCI drive, *i.e.*, if the GOK continued to target the steel industry for government-controlled long-term loans during the [period of investigation (POI)], a finding of *de facto* specificity may be made, if the steel industry receives a disproportionate share of the benefits.

*Korean Final Determination*, 58 Fed.Reg. at 37,343. Commerce then explained how a comparison based on gross domestic product (GDP) was appropriate for its disproportionality analysis:

> An appropriate test for measuring whether the Korean steel industry has continued to receive a disproportionate share

of the benefits from government controlled long-term loans is to compare the share of long-term loans held by the steel industry over the relevant time period (1977–1991) with the share of gross domestic product ... accounted for by this industry....

> In this case, comparing the steel industry's share of long-term loans with its share of GDP is an appropriate measure of disproportionality. The program under investigation, government controlled long-term lending in Korea, is a "nationwide program," *i.e.*, a program in which virtually every segment of the economy in the market naturally participates to some extent. Accordingly, given the broad, nationwide nature of this program, share of GDP is an appropriate point of comparison because it is a reasonable and objective nationwide measure of the expected share of restricted credit, all else being equal.

*Id.*

Applying this analysis to the facts, Commerce determined that:

> [W]hile the basic metals industry's share of GDP has remained relatively constant ... since the early to mid–1980s, the industry's share of long-term loans has actually risen slightly since the *de jure* preferences were terminated at this time. This trend is characteristic of both long-term Korean won loans and domestic foreign currency loans....
>
> It is especially true concerning the largest source of long-term lending in the country, the Korea Development Bank [(KDB)]. The basic metals industry's share of long-term (equipment) loans from the KDB more than doubled from the date of the termination of *de jure* key industry targeting ... to the POI. In 1991 alone, this industry received over 20 percent of new KDB loans to the manufacturing sector.

*Id.* Commerce also noted it had been informed during verification that industries specifically named in one provision of the Korea Development Bank Act (KDB Act),[74] including the iron and steel industries, re-

---

**74.** The Korea Development Bank Act created the KDB in 1954 "with capital wholly subscribed by the government." *Korean Final Determination*, 58 Fed.Reg. at 37,340.

ceived preferential access to KDB funds at least until 1985, despite the addition of another provision to the KDB Act nominally permitting all other industries access to those loans. *Id.* Furthermore, as to POSCO, the KDB had provided loans that were "not always in accordance with the KDB's lending guidelines, and ... POSCO had received KDB funds at a lower interest rate than its KDB credit rating would justify." *Id.*

Finally, in addition to finding countervailable the GOK's provision to the Korean steel industry of preferential access to favorable domestic credit markets,[75] Commerce determined the GOK had provided preferential access to foreign credit markets as well. *Id.* at 37,344. Commerce further determined the GOK program of preferential foreign credit market access conferred *de facto* selective benefits upon the respondent steel companies: "The steel industry has received a volume of direct foreign loans that is overwhelmingly higher than that received by any other industry in Korea." *Id.*[76] Commerce concluded: "Based on the sum of this evidence, we determine that the GOK has provided the steel industry with preferential access to medium- and long-term credit from government and commercial banking institutions." *Id.* at 37,345.

### CONTENTIONS OF THE PARTIES

#### A. *The Korean Respondents*

The Korean Respondents criticize Commerce's use of GDP in relation to disproportionality on two principal grounds. First, the Korean Respondents maintain Commerce's GDP analysis is not a reasonable measure of disproportionality because "there is, in fact, no logical or economic relationship between GDP and long-term lending." (Pls./Def–Intervenors' R. 56.2 Br. at 5; *see id.* at 15–36). The Korean Respondents argue that, for a government action to be countervailable, substantial evidence must show selectivity. Here, however, no meaningful relationship has been shown between the government action countervailed and the test used to determine whether selectivity exists. Other than providing a "minimalist" explanation, Commerce failed "to adequately articulate the grounds for adopting a *per se* disproportionality test in this case," (*id.* at 23), the application of which resulted in the substitution of a mechanical, *per se* test for the case by case analysis dictated by Commerce's long-established practice, (*id.* at 27–29). Furthermore, the Korean Respondents argue, the *per se* GDP test does not measure disproportionality "because there is no relation between GDP and expected shares of credit." (*Id.* at 29 (emphasis omitted)). The Korean Respondents maintain the GDP test as a measure of output is inappropriate as a measure of expected use of input and ignores creditworthiness as a factor in lending decisions.

Second, the Korean Respondents maintain that, as demonstrated by substantial evidence on the record, long-term loans were not in fact disproportionately supplied to the Korean steel industry. The Korean Respondents argue Commerce's analysis is not based upon substantial evidence because

---

**75.** Commerce explained:

The benefit we have identified relates to preferential access to specific sources of credit. It is not access to credit *per se,* but the relative access to those long-term credit markets that offer favorable interest rates compared with the rates prevailing in other long-term credit markets. In the case of domestically available loans, the more favorable credit markets are those that offer government-regulated interest rates. The more favorable credit markets for long-term foreign currency loans are those that offer loans from foreign banks at world market rates....

The existence of more favorable and less favorable credit markets is to a large extent the result of actions taken by the GOK. The dichotomy in the interest rates among the vari-

ous credit markets in Korea has created excess demand for loans in the more favorable credit markets. The competition for access to these favorable credit markets means that while some industries may have complete access to the favorable markets, others will be locked out either partially or completely from them. *Korean Final Determination,* 58 Fed.Reg. at 37,-345.

**76.** Commerce explained: "[T]he iron and steel industry has received approximately 60 percent of all direct foreign loans to the manufacturing sector since 1985, and over 40 percent of all direct foreign loans to all industries since this time." *Korean Final Determination,* 58 Fed.Reg. at 37,344.

Commerce has not shown a causal link between GOK financial policies and their alleged effects on the steel industry. Furthermore, the Korean Respondents contend record evidence shows Commerce erred in finding long-term loans to the Korean steel industry were disproportionate. Instead, information on the record indicating the relatively high capital requirements of the steel industry indicates that lending to the steel industry was not in fact disproportionate. In addition, Commerce failed to take into account the level of investment by the Korean industry and the extent to which it was financed internally as significant indicators of the steel industry's expected share of loans.

### B. *The Department of Commerce*

Commerce agrees that, to countervail a government action, Commerce must make a finding of specificity on a case by case basis. *See* Def.'s Mem. in Opp'n at 19–20 ("[T]he specificity test cannot be reduced to a precise mathematical formula. Instead, the Department must exercise judgment and balance various factors in analyzing the facts of a particular case.") (citing *Proposed Regulations*, 54 Fed.Reg. at 23,368 (preamble to provision to be codified at 19 C.F.R. § 355.43(b)(2)) (proposed May 31, 1989)). Commerce contends, however, that based upon the facts of this case, Commerce selected a proper methodology by which to measure *de facto* specificity. In this case, "plaintiffs have admitted subsidization in the past." (*Id.* at 23). Accordingly, Commerce compared the Korean steel industry's percentage share of restricted credit during the time subsidization was admitted to the period during which the *de jure* subsidizations were allegedly terminated. Upon performing this comparison, Commerce argues it found "[t]he steel industry's percentage share of credit did not decrease, it actually *increased* slightly, indicating that even though the laws had changed, the actual lending patterns had not changed." (*Id.* at 22–23 (citing *Korean Final Determination*, 58 Fed.Reg. at 37,343)). Based on this evidence, Commerce maintains it properly concluded "that the GOK must still have been *de facto* directing a disproportionate share of the available credit to the steel industry." (*Id.* at 23).

Thus, Commerce argues, GDP was not the sole basis for Commerce's finding of disproportionality. Instead, "Commerce's method for determining that the Korean steel industry received a disproportionate share of the restricted amount of available credit is primarily based upon an analysis of the patterns of long-term lending to the iron and steel industry over an extended period of time." (*Id.* at 21 (citation omitted)). In addition to performing this analysis, "Commerce further compared the ratio of the steel industry's share of GDP with its percentage share of loans over time ... as a general check to see if there might be other reasons for the absence of a change in the lending patterns." (*Id.* at 23). Commerce argues the Korean Respondents have taken quotations pertaining to the GDP analysis out of context to support the Korean Respondents' argument that the GDP comparison was the sole basis for Commerce's finding of disproportionality. Commerce counters by pointing to other passages in the *Korean Final Determination* indicating "Commerce performed a much more intricate analysis." (*Id.* at 29 (citing *Korean Final Determination*, 58 Fed.Reg. at 37,343)). Furthermore, Commerce defends its use of GDP as relevant to its disproportionality analysis because

> GDP may be used as a litmus test of the relative position of the steel industry within the economy as a whole. There does not need to be a relationship between shares of loans and GDP for Commerce to use GDP as an indicator of changes in the relative economic size of the industry.

(*Id.* at 28).

Finally, Commerce contends it properly considered and rejected the Korean Respondents' proposed factors for testing disproportionality. As to capital-intensiveness, Commerce claims "the relative capital-intensiveness of an industry in Korea does not provide any guidance in determining the amount of loans an industry should be expected to receive." (*Id.* at 25). Similarly, as to internal financing, "the fact that an industry maintains substantial internal financing has no bearing upon the share of external funds which it receives." (*Id.* at 26).

## C. *The Domestic Producers*

The Domestic Producers urge this Court to uphold Commerce's determination as reasonable and defend Commerce's *de facto* specificity analysis. The Domestic Producers contend "evidence that a government directs credit to an industry *or* evidence that a program allocates benefits in a disproportionate fashion is sufficient for a finding of specificity." (Def.–Intervenors' Br. in Opp'n at 12). In this case, because Commerce "found *de facto* specificity on the basis of government direction of credit to the steel industry," Commerce did not have to find *de facto* specificity on any other basis. (*Id.* at 13). Commerce did, however, analyze disproportionate use, and that analysis was "[c]onsistent with long-standing practice." (*Id.* at 14). Furthermore, the Domestic Producers contend Commerce's disproportionality test was not arbitrary. Instead, "[c]ombined with the extensive record evidence of governmental direction of loan program benefits to the steel sector, the results of the Department's GDP analysis easily support the Department's conclusion that the GOK provided *de facto* selective benefits" to the Korean Respondents. (*Id.*).

The Domestic Producers also dispute the Korean Respondents' criticisms of Commerce's disproportionality analysis. The Domestic Producers contend the Korean Respondents confuse the purpose of the disproportionality test when arguing that it was inappropriate for Commerce to use GDP to measure whether long-term loans were provided to the steel industry: "[T]he disproportionality test measures whether the pattern of *benefits*—not any pattern of *loans*—reveals distribution of government largess on a selective basis." (*Id.* at 18). The Domestic Producers also reject what they characterize as the Korean Respondents' assertion "that the steel industry has received a disproportionate share of loans only because loan programs are particularly well suited to the needs of the steel industry," and argue "[t]hat a government program may be well suited to a particular group of industries is irrelevant when assessing specificity." (*Id.* at 21 (footnotes omitted)). The Domestic Producers also dispute the Korean Respon-

dents' contentions concerning creditworthiness and levels of internally-sourced funds. Finally, the Domestic Producers argue Commerce was not required as a matter of law to find that the GOK program had the effect of directing a disproportionate amount of loans to the steel industry, and contend that "the Department repeatedly has held that there is no need to demonstrate 'purposeful government action' or 'targeting'—*i.e.* direction of credit—to demonstrate *de facto* specificity." (*Id.* at 24 (footnote omitted)).

## DISCUSSION

Under 19 U.S.C. § 1677(5)(B), Commerce, to countervail a bounty or grant, must determine

whether the bounty, grant, or subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or industries. Nominal general availability, under the terms of the law, regulation, program, or rule establishing a bounty, grant, or subsidy, of the benefits thereunder is not a basis for determining that the bounty, grant, or subsidy is not, or has not been, in fact provided to a specific enterprise or industry, or group thereof.

19 U.S.C. § 1677(5)(B) (1988). A finding of *de facto* specificity "requires a 'case by case' analysis to determine whether 'there has been a bestowal upon a specific class.'" *PPG Indus., Inc. v. United States,* 9 Fed.Cir. (T) 71, 80, 928 F.2d 1568, 1577 (1991) (quoting and discussing *Cabot Corp. v. United States,* 9 CIT 489, 620 F.Supp. 722 (1985), *dismissed as unappealable,* 4 Fed.Cir. (T) 80, 788 F.2d 1539 (1986)); *see Roses Inc. v. United States,* 15 CIT 465, 467, 774 F.Supp. 1376, 1379 (1991) ("The court continued to adhere to the principle that the statute requires a case by case analysis to determine whether there has been a bestowal of benefits upon a specific class, *i.e.,* it remains paramount that a discrete class of beneficiaries exist.") (footnote omitted).

As discussed above, Commerce determined in the *Korean Final Determination* that the GOK "controls the long-term lending institutions in Korea." *Korean Final Determination,* 58 Fed.Reg. at 37,342; *see also id.* at 37,340 (stating that "the GOK directly con-

trols a majority of long-term lending in Korea," and "[i]nformation on the record indicates that the GOK also controls the Korean financial system through several other means"). Commerce also determined that "the GOK has intervened in the market to direct credit available in favorable markets to the steel industry" and that the Korean steel industry thus received a countervailable benefit in the form of "relative access to those long-term credit markets that offer favorable interest rates compared with the rates prevailing in other long-term credit markets." *Id.* at 37,345. In the case of access to favorable domestic credit markets, Commerce appears to have based its determination regarding direction of credit on the finding, among other findings, that the basic metal industry's "share of long-term loans has . . . risen slightly since the *de jure* preferences were terminated," while "the basic metal industry's share of GDP has remained relatively constant at approximately 2–2.5 percent since the early to mid–1980s." *Id.* at 37,343; *see also id.* at 37,345 ("[W]e have based this determination on the disproportionate share of government-regulated loans obtained by the steel industry in relation to that industry's share of GDP."). In the case of access to favorable foreign credit markets, Commerce appears to have based its conclusion regarding direction of credit "on the disproportionate share of foreign loans obtained by the steel industry in relation to all other industries." *Id.* at 37,345.

■ The Korean Respondents maintain the "GDP test" cannot measure disproportionality because there is no demonstrated relationship between shares of GDP and lending. Commerce argues that GDP was not the sole basis for finding disproportionality in the case of access to favorable domestic credit markets. Instead, Commerce maintains it determined that the Korean steel industry received a disproportionate share of the restricted amount of available credit,

based upon an analysis of the patterns of long-term lending to the iron and steel industry over a long period of time. The GDP analysis, Commerce argues, was a further, "general check to see if there might be other reasons for the absence of a change in the lending patterns." (Def.'s Mem. in Opp'n at 23). In short, Commerce appears to be using GDP as a sort of measuring stick. While this Court might prefer that Commerce use a different methodology, the Court will, nevertheless, defer to Commerce and its expertise in designing and implementing a methodology that is reasonable. *See Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404, 636 F.Supp. 961, 966 (1986) ("The deference granted or extended to the agency's interpretation of its statutory mandate also applies to the methodology that the agency employs in fulfilling its lawfully delegated mission.") (citations omitted), *aff'd* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987).

■ However, even if the Court were to accept all of the findings set forth in the *Korean Final Determination,* the Court sees no nexus between these findings, singularly or together, that would permit this Court to hold that Commerce could reasonably conclude the Korean steel industry was or was not receiving benefits from subsidies. Commerce does not sufficiently explain in the *Korean Final Determination* the connection between the government *de facto* program and the steel companies' alleged preferential access to specific sources of credit. Assuming the steel companies at issue did have significant access to domestic credit markets offering favorable interest rates, Commerce has not presented enough evidence nor has it sufficiently explained the evidence presented to enable this Court to hold that the agency could reasonably conclude the control of the GOK over long-term lending institutions in Korea caused the respondent steel companies to receive preferential access to favorable domestic credit markets.[77]

---

77. The Court notes Commerce appears to have acknowledged the need for a link in the *Korean Final Determination.* In its specificity analysis, Commerce reasoned:

 [I]f the lending patterns to the steel industry have not changed since the HCI drive, *i.e.,* if the GOK continued *to target the steel industry*

for government-controlled long-term loans during the POI, a finding of *de facto* specificity may be made, if the steel industry receives a disproportionate share of the benefits.

*Korean Final Determination,* 58 Fed.Reg. at 37,-343 (emphasis added). While Commerce did analyze "if the steel industry receiv[ed] a dispro-

Commerce urges that the share of loans and the access to loans is disproportionate compared to that received by other commercial endeavors in the Korean economy. Commerce, however, does not seem to address reasons that may explain why respondent steel companies have such a large share. For example, the steel industry may have been expanding during the period of investigation, or there may have been a special need for increased capital investment in the steel industry necessitating loans at that time, as distinguished from other heavy industries. Perhaps there were other reasons based on commercial considerations. Commerce does briefly discuss and dismiss the Korean Respondents' arguments concerning capital intensity and internally-sourced funding. *See Korean Final Determination,* 58 Fed.Reg. at 37,343–44. Commerce does not, however, invite the Court's attention to any evidence that draws one to reasonably conclude there is a nexus between a Korean program and the significant access to credit the respondent steel companies appear to enjoy. There is no question that whether a *de jure* or *de facto* subsidy is to be countervailed, it must be industry specific. To be industry specific, Commerce must show, at a minimum, the existence of a program and that, because of the program, a specific industry received a subsidy. Commerce has failed to do so in this case.

In the *Korean Final Determination,* Commerce cited its decision in *Certain Softwood Lumber Products from Canada,* 57 Fed.Reg. 22,570, 22,580–81 (Dep't Comm.1992) (final determ.) to argue that "[t]he regulations do not require a finding of a 'purposeful government action' as a prerequisite to conducting a specificity analysis." *Korean Final Determination,* 58 Fed.Reg. at 37,342 (citing parenthetically *Certain Lumber Products from Canada,* 57 Fed.Reg. at 22,580–81: "[N]either 'purposeful government action' nor government 'targeting' is necessary in order to establish a government act or practice.").

Similarly, in papers submitted to this Court, the Domestic Producers argue the Korean Respondents' "assertions that the Department must find that there is a government policy to provide subsidized credit to the steel industry is not correct as a matter of law." (Def.–Intervenors' Br. in Opp'n at 25).

This Court will not require Commerce to find *purposeful* government action in order to countervail. Commerce must show, however, that some causal link, whether purposeful or not, exists between a government program of general control and the alleged subsidy received. Without such a link, it cannot be determined whether the alleged donee has received a subsidy at all or whether a government program of general control has resulted in the provision of benefits to a specific industry. Here, for example, even if the Court accepts Commerce's finding that the steel companies at issue had access to specific sources of credit, access alone does not constitute a subsidy just as mere possession or receipt of any asset or benefit does not necessarily evidence a subsidy. Mere access to credit is not sufficient to indicate the steel companies were in fact receiving *preferential* access to domestic credit markets offering favorable interest rates under a GOK program.

Therefore, while the Court will defer to Commerce's chosen methodology where it is reasonable, this Court holds that even with the evidence presented and its application to that methodology, Commerce's determination that the Korean steel industry received countervailable benefits from subsidies in the form of preferential access to favorable domestic credit markets was unreasonable because Commerce has failed to show a nexus between the government action and the alleged benefits bestowed. The Court holds Commerce's determination is not supported by substantial evidence and is not otherwise

---

portionate share" of access to loans, Commerce did not explicate in the *Korean Final Determination* what evidence would support the conclusion that "the GOK continued to target the steel industry for government-controlled long-term loans." Commerce further fails to explain or demonstrate that merely because the respondent steel companies appear to have extensive loan access ability, that fact is attributable to a GOK loan program and not other factors based on commercial considerations such as economic expansion or other reasons not associated with the GOK.

in accordance with law.[78]

■ In regard to preferential access to direct foreign loans, Commerce notes that the Ministry of Finance, as part of the GOK's economic policy, exercises oversight of foreign capital through the Foreign Capital Inducement Act. *Korean Final Determination*, 58 Fed.Reg. at 37,344. The Ministry of Finance at verification explained that to secure foreign loans, a company had to be able to negotiate a direct foreign currency loan with a creditor at or below a set ceiling established by the Ministry of Finance. *Id.* If a company could not negotiate a loan with an interest rate below the ceiling, it was not permitted to borrow on foreign currency markets. *Id.* This program was apparently directed at all commercial enterprises in Korea, and not just the respondent steel companies. *Id.* Commerce also notes the Ministry of Finance at verification acknowledged that in the mid–1980s it intentionally lowered the allowable ceiling so that, in effect, very few companies could qualify to receive direct foreign loans. *Id.* According to the Ministry of Finance, this apparently was done to force most companies to borrow foreign currency domestically in order to recycle the current account surplus that existed at that time, and in order to protect Korea's international credit standing by permitting only the most creditworthy companies to borrow directly on foreign capital markets. *Id.*

It appears from the *Korean Final Determination* that Commerce believes this program provided *de facto* selective benefits to the respondent steel companies during the POI. *Id.* Commerce appears to base this conclusion largely on the steel industry's receipt of "a volume of direct foreign loans that is overwhelmingly higher than that received by any other industry in Korea." *Id.* (stating further that "the iron and steel industry has received approximately 60 percent of all direct foreign loans to the manufacturing sector since 1985, and over 40 percent of all direct foreign loans to all industries since this time"); *see id.* at 37,345 (explaining Commerce based its determination concerning the direction of credit to the steel industry in the case of access to favorable foreign markets "on the disproportionate share of foreign loans obtained by the steel industry in relation to all other industries"). As with its analysis of domestic credit market access, Commerce has failed to direct the Court's attention to other reasons that may explain why respondent steel companies have such a large share of direct foreign loans.[79] Commerce has failed to point out or to invite the Court's attention to evidence on the record to permit the Court to conclude there is substantial evidence in the record to support the conclusion of Commerce that this program bestowed industry-specific benefits on respondent steel companies.[80]

78. Commerce has clearly shown, however, that the GOK controls the Korean financial system. That control is extensive and pervasive. Commerce has shown, furthermore, that the respondent steel companies have a large share of the loans and access to credit when analyzed using GDP as a measuring device. Commerce has further demonstrated that the respondent steel companies have a slightly greater percentage of loans since the *de jure* program was terminated.

79. The Court notes Commerce determined that POSCO was unequityworthy during 1978 and 1980. *See Korean Final Determination*, 58 Fed. Reg. at 37,339. In the present opinion, this Court has sustained Commerce's use of the grant methodology to countervail equity infusions into unequityworthy companies as applied in the *Korean Final Determination*. *See supra* **Section Three: The Grant Methodology.** The Court has not, however, ruled upon the question of whether Commerce properly determined that POSCO was unequityworthy. *See supra* note 63 and accompanying text.

80. The Court notes that the parties have not specifically addressed the issue of specificity with regard to access to direct foreign loans. *See, e.g.,* Tr. at 750 (In response to the Court's question "[D]omestic loans, and that's all I'm dealing with in this case," counsel for the Domestic Producers responded, "Yes. We don't believe that there's really any serious challenge to the foreign loans."); *see generally* Pls./Def–Intervenors' R. 56.2 Br. (challenging Commerce's use of GDP in relation to disproportionality and arguing that substantial evidence on the record demonstrates long-term loans were not in fact disproportionately supplied to the Korean steel industry). However, in their motion for partial judgment on the agency record, the Korean Respondents ask this Court to declare the *Korean Final Determination* unlawful, void, and of no effect, and to remand that determination "with respect to the issue of ... Commerce's treatment of disproportionality for the purpose of evaluating the specificity of a potentially countervailable program." (Mot. of Pls./Def.–Intervenors for Partial J. on the R. at 2). The Court has concluded that just as

Accordingly, this Court remands the *Korean Final Determination* to Commerce with the following instructions. Commerce is to explain, if it is able, what evidence on the record demonstrates that programs existed during the period of investigation to benefit the respondent steel companies by giving them preferential access to both domestic and direct foreign credit markets, and how the respondent steel companies received that access to credit. Commerce is directed to advise the Court whether the GOK's control over long-term lending in Korea and the program concerning alleged preferential access to direct foreign loans administered by the Ministry of Finance were industry specific, and point out what evidence on the record, if any, demonstrates specificity. Commerce is further directed to explain in both cases, if it is able, why the large share of loans and access to loans by the respondent steel companies is attributable to an industry specific program of the GOK, and not to some other reason, such as expanding capital needs or other reasons consistent with commercial considerations. Commerce should also calculate what countervailing duties, if any, should be imposed upon the respondent steel companies consistent with this opinion.[81]

CONCLUSION

After considering all arguments submitted by the parties, the Court holds Commerce's final determination in *Certain Steel Products from Korea*, 58 Fed.Reg. 37,338 (Dep't Comm.1993) (final determ.) is remanded so that Commerce may, consistent with this opinion, point out what evidence, if any, on the record demonstrates that GOK programs existed during the period of investigation to specifically benefit respondent steel companies by giving them preferential access to domestic and foreign credit and explain its rationale. Commerce is further directed to calculate that benefit where applicable.

**ORDER**

These consolidated actions in this joint proceeding having been duly submitted for decision, after due deliberation, it is hereby

**ORDERED** that the Department of Commerce's determination in *Certain Steel Products from Mexico*, 58 Fed.Reg. 37,352 (Dep't Comm.1993) (final determ.), insofar as it pertains to Commerce's application of its privatization methodology, is remanded; and it is further

**ORDERED** that the Department of Commerce's determination in *Certain Steel Products from Brazil*, 58 Fed.Reg. 37,295 (Dep't Comm.1993) (final determ.), insofar as it per-

Commerce has failed to show a nexus in regard to favorable domestic credit markets access, it has similarly failed to show a nexus with regard to foreign credit markets access. Accordingly, this Court has ordered a remand on the issue of specificity with regard to foreign credit market access as well.

**81.** The Court notes that Commerce's proposed regulations pertaining to the determination of whether benefits are specific, *see Proposed Regulations*, 54 Fed.Reg. at 23,379 (1989) (to be codified at 19 C.F.R. § 355.43(b)(2)), have recently been codified in the statutory implementation of the Uruguay Round as follows:

(iii) Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
(II) An enterprise or industry is a predominant user of the subsidy.
(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation. Uruguay Round Agreements Act, Pub.L. No. 103–465, § 251(a), 108 Stat. 4809, 4904 (1994) (to be codified 19 U.S.C. § 1677(5)(A)(D)(iii)). The Court notes that even if these provisions were in force at the time relevant to the present case, this fact would not alter the Court's decision because Commerce has failed to point to evidence on the record to permit the Court to conclude there is substantial evidence in the record taken together with analysis by Commerce to support a conclusion by Commerce that the GOK program bestowed industry-specific benefits on respondent steel companies.

tains to Commerce's application of its privatization methodology, is remanded; and it is further

**ORDERED** that the Department of Commerce's determination in *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm.1993) (final determ.), insofar as it pertains to Commerce's application of its privatization methodology, is remanded; and it is further

**ORDERED** that the Department of Commerce's determination in *Certain Steel Products from Germany,* 58 Fed.Reg. 37,315 (Dep't Comm.1993) (final determ.), insofar as it pertains to Commerce's application of its privatization methodology, is remanded; and it is further

**ORDERED** that in each of the above remands, Commerce will determine and report to this Court the following: (1) whether each transaction was at arm's length, for fair market value, and based upon commercial considerations; (2) whether each transaction involved a privatization or partial privatization; (3) the terms and substance of each transaction and whether each transaction involved a sale of an asset or several assets or consisted entirely of a sale of shares; (4) whether, under the Court's analysis set forth in the attached opinion, if a privatization or partial privatization took place, the privatized entity continues to be, for all intents and purposes, the same entity that received subsidies prior to the privatization or partial privatization transaction; and (5) whether, under the Court's analysis set forth in the attached opinion, Commerce may properly countervail the privatized or partially privatized corporation at issue in each determination; and it is further

**ORDERED** that the Department of Commerce's determination in *Certain Steel Products from France,* 58 Fed.Reg. 37,304 (Dep't Comm.1993) (final determ.) is remanded for a reexamination of the allocation methodology as employed in that determination and as explained in the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed.Reg. 37,225, 37,225–31 (Dep't Comm.1993) (final determ.) for a case by case examination of the relevant commercial and competitive factors of the firms un-

der investigation occasioned by receipt of the nonrecurring subsidies at issue. After having examined such factors, Commerce is directed to determine if those factors, when examined with or without a proxy such as the IRS tax tables, lead to a method of allocating the benefits of nonrecurring subsidies that reasonably reflects the commercial and competitive advantages enjoyed by the firms receiving such subsides; and it is further

**ORDERED** that insofar as the Department of Commerce's determination in *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm.1993) (final determ.) is remanded on the general issue of privatization, if Commerce should find in its remand determination that any party is liable for countervailing duties, Commerce is directed to reexamine the allocation methodology as applied to those parties against whom countervailing duties have been assessed for a case by case examination of the relevant commercial and competitive factors of the firms under investigation occasioned by receipt of the nonrecurring subsidies at issue. After having examined such factors, Commerce is directed to determine if those factors, when examined with or without a proxy such as the IRS tax tables, lead to a method of allocating the benefits of nonrecurring subsidies that reasonably reflects the commercial and competitive advantages enjoyed by the firms receiving such subsides. Should Commerce find in its remand determination of *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm.1993) (final determ.) on the general issue of privatization that no parties are liable for countervailing duties, then the agency need not revisit the general issue of the allocation methodology; and it is further

**ORDERED** that Commerce's abandonment of the rate of return shortfall (RORS) methodology as set forth in the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed.Reg. 37,225, 37,239–44 (Dep't Comm.1993) (final determ.) and applied in the final countervailing duty determinations in *Certain Steel Products from Korea,* 58 Fed.Reg. 37,338 (Dep't Comm.1993) (final determ.), *Certain Steel Products from Brazil,* 58 Fed.Reg. 37,295

(Dep't Comm.1993) (final determ.), and *Certain Steel Products from France,* 58 Fed. Reg. 37,304 (Dep't Comm.1993) (final determ.) is sustained as based upon substantial evidence on the record and as otherwise in accordance with law; and it is further

**ORDERED** the grant methodology employed by Commerce to countervail equity infusions into unequityworthy companies as set forth in the *General Issues Appendix* appended to *Certain Steel Products from Austria,* 58 Fed.Reg. 37,225, 37,239–44 (Dep't Comm.1993) (final determ.) and applied in the final countervailing duty determinations in *Certain Steel Products from Korea,* 58 Fed.Reg. 37,338 (Dep't Comm.1993) (final determ.), *Certain Steel Products from Brazil,* 58 Fed.Reg. 37,295 (Dep't Comm. 1993) (final determ.), and *Certain Steel Products from France,* 58 Fed.Reg. 37,304 (Dep't Comm.1993) (final determ.) is sustained as based upon substantial evidence on the record and as otherwise in accordance with law; and it is further

**ORDERED** that insofar as the Department of Commerce's determination in *Certain Steel Products from France,* 58 Fed. Reg. 37,304 (Dep't Comm.1993) (final determ.) is remanded on the general issue of allocation, Commerce is further directed in its remand determination to give interested parties notice and the opportunity to comment on the agency's adoption of the tying presumption. If, after consideration of such comments Commerce determines the tying presumption is an appropriate means to calculate the sales denominator, the agency is ordered to give interested parties notice and the opportunity to submit evidence on the record for the purpose of rebutting the tying presumption. Commerce shall then examine the submitted evidence to determine whether it is sufficient to rebut the tying presumption. If Commerce finds the evidence submitted is sufficient to rebut the tying presumption, the agency is directed to make all necessary and appropriate findings and calculations consistent with this opinion; and it is further

**ORDERED** that insofar as the Department of Commerce's determination in *Certain Steel Products from the United King-*

*dom,* 58 Fed.Reg. 37,393 (Dep't Comm.1993) (final determ.) is remanded on the general issue of privatization, if Commerce should find in its remand determination that any party is liable for countervailing duties, Commerce is directed to give interested parties against whom countervailing duties have been assessed notice and the opportunity to comment on the agency's adoption of the tying presumption. If, after consideration of such comments Commerce determines the tying presumption is an appropriate means to calculate the sales denominator, the agency is ordered to give interested parties notice and the opportunity to submit evidence on the record for the purpose of rebutting the tying presumption. Commerce shall then examine the submitted evidence to determine whether it is sufficient to rebut the tying presumption. If Commerce finds the evidence submitted is sufficient to rebut the tying presumption, the agency is directed to make all necessary and appropriate findings and calculations consistent with this opinion. Should Commerce find in its remand determination of *Certain Steel Products from the United Kingdom,* 58 Fed.Reg. 37,393 (Dep't Comm.1993) (final determ.) on the general issue of privatization that no parties are liable for countervailing duties, then the agency need not revisit the general issue of the sales denominator; and it is further

**ORDERED** that after examination and implementation of the remand instructions, and after reexamination of all applicable methodologies remanded: (1) Commerce will calculate and report any countervailing duties due, if any, by any transferor and transferee subsequent to privatization; (2) if, under the Court's analysis set forth in the attached opinion, Commerce determines that any privatized or partially privatized entity continues to be, for all intents and purposes, the same entity that received subsidies prior to a privatization or partial privatization transaction, Commerce will calculate any and all countervailing duties due on the surviving entity; and (3) Commerce will calculate any and all countervailing duties due on account of any other type of privatization transaction arising in the individual determinations remanded; and it is further

**ORDERED** that on the issue of disproportionality, Commerce's final determination in *Certain Steel Products from Korea,* 58 Fed. Reg. 37,338 (Dep't Comm.1993) (final determ.) is remanded with the following instructions. Commerce is to explain, if it is able, what evidence on the record demonstrates that programs existed during the period of investigation to benefit the respondent steel companies by giving them preferential access to both domestic and direct foreign credit markets, and how the respondent steel companies received that access to credit. Commerce is directed to advise the Court whether the Government of Korea's (GOK) control over long-term lending in Korea and the program concerning alleged preferential access to direct foreign loans administered by the Ministry of Finance were industry specific, and point out what evidence on the record, if any, demonstrates specificity. Commerce is further directed to explain in both cases, if it is able, why the large share of loans and access to loans by the respondent steel companies is attributable to an industry specific program of the GOK, and not to some other reason, such as expanding capital needs or other reasons consistent with commercial considerations. Commerce should also calculate what countervailing duties, if any, should be imposed upon the respondent steel companies consistent with this opinion; and it is further

**ORDERED** that Defendant–Intervenor AG der Dillinger Hüttenwerke's motion for summary judgment in *LTV Steel Co., Inc.* et al. *v. United States,* Consol. Court No. 93–09–00568–CVD, is denied in all respects; and it is further

**ORDERED** that defendant-intervenors' motion to strike certain documents in plaintiffs' reply brief on the general issue of sales denominator is granted except that the challenged documents shall remain as part of plaintiffs' papers for the sole and limited purpose of establishing plaintiffs' offer to produce evidence that may or may not rebut the tying presumption raised by Commerce; and it is further

**ORDERED** that defendant-intervenors' motion to strike plaintiffs' supplemental memorandum on the general issue of sales denominator is denied; and it is further

**ORDERED** that Commerce shall report its remand determinations within 70 days from the entry of this Order by the Clerk of the Court of International Trade; comments or responses by the parties to the remand results are due within 30 days thereafter; any rebuttal comments are due within 15 days of the date responses or comments are due. All comments or responses, and all rebuttal comments are limited to 40 pages.